IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES CONFERENCE       )
OF MAYORS, ET AL.,             )
                               )   CA No. 16-660
        Plaintiffs,            )
                               )   Washington, D.C.
        vs.                    )   January 9, 2018
                               )   9:30 a.m.
GREAT-WEST LIFE & ANNUITY      )
INSURANCE CO.,                 )   Morning Session
                               )
        Defendant.             )
_____)


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE THOMAS F. HOGAN
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:        Margaret H. Warner
                           Michael S. Nadel
                           Jennifer B. Routh
                           Erika N. Pont
                           MCDERMOTT WILL & EMERY LLP
                           McDermott Building
                           500 North Capitol Street, NW
                           Washington, D.C. 20001
                           (202) 756-8000
                           mnadel@mwe.com
                           mwarner@mwe.com

APPEARANCES CONTINUED

For the Defendant:            Michael L. O'Donnell
                              Edward C. Stewart
                              Shawn K. Neal
                              WHEELER TRIGG O'DONNELL LLP
                              370 17th Street
                              Suite 4500
                              Denver, CO 80202
                              (303) 244-1800
                              odonnell@wtotrial.com

                              Mary Patrice Brown
                              O'MELVENY & MYERS LLP
                              1625 Eye Street, NW
                              Washington, D.C. 20006
                              (202) 383-5376
                              mpbrown@omm.com

Court Reporter:               William P. Zaremba
                              Registered Merit Reporter
                              Certified Realtime Reporter
                              Official Court Reporter
                              U.S. Courthouse
                              333 Constitution Avenue, NW
                              Room 6511
                              Washington, D.C. 20001
                              (202) 354-3249

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

PROCEEDINGS

1

2        DEPUTY CLERK:  All rise.  This Honorable Court is

3   now in session, the Honorable Thomas F. Hogan presiding.

4   Please be seated and come to order.

5        THE COURT:  All right.

6        Harold, will you call the case.  You don't have to

7   introduce all the lawyers again.

8        DEPUTY CLERK:  Your Honor, this morning this is in

9   re: the United States Conference of Mayors, et al., versus

10  Great-West Life & Annuity Insurance Company.

11       This is Civil Action Number 16-660.

12       I'll ask the parties to step forward, identify

13  yourselves for the record, please.

14       THE COURT:  No.  That's all right.

15       MS. WARNER:  Good morning, Your Honor.  Peg Warner

16  for the plaintiffs, and with me today are Mr. Nadel,

17  Ms. Pont, and Ms. Routh.

18       THE COURT:  All right.  Thank you.

19       MR. O'DONNELL:  Good morning, Your Honor.

20  Mike O'Donnell on behalf of Great-West.  And with me today

21  are Ms. Brown, Mr. Stewart and Mr. Bresler.

22       THE COURT:  Thank you very much.

23       MR. O'DONNELL:  Thank you.

24       THE COURT:  All right.  We're here this morning to

25  begin the actual trial.  The jury came and they're on time.

1   The last jury just found its way at the end of the corridor.

2   And I'm going to bring the jury in and have the jury sworn.

3   I will then give them the opening and preliminary

4   instructions, with a brief statement of the case, and turn

5   it over to you all for the opening statements to be

6   delivered by the parties.

7            I did receive this morning, a response from the

8   plaintiff as to the hearsay objection on the conversation

9   that the plaintiffs' principal witness alleges she had with

10  someone from Nationwide, we'll need to look at that, but not

11  right now, and designations of depositions which I've not

12  had a chance to review yet, but I will.

13           Anything else to start off the day?

14           MS. WARNER:  Yes, Your Honor.  Your Honor, I just

15  want to make sure that it's acceptable to the Court for

16  purposes of delivering opening statement, if I may use a

17  little music stand as my lectern right here.

18           THE COURT:  All right.  That's fine.  I have no

19  problem with that.

20           MS. WARNER:  And then, Your Honor, we just want to

21  make sure we understand what your procedure will be for the

22  admission of exhibits, whether you want us to -- when we get

23  to a witness, whether you want us to wait until the end of

24  the witness' testimony, and we can do all of that outside

25  the presence of the jury, to keep things moving.  Is that a

1   practice that you would prefer?

2          THE COURT:  I can use that.  The only issue is,

3   unless you're going to need the witness because of some

4   objection that's coming, and I'll have to ask the witness

5   questions or something, if there's any that are particularly

6   sensitive, you probably should have the witness discuss it.

7   But I don't mind if you have a whole series of exhibits that

8   are going to be coming in to have that identified at the

9   close of the testimony.  All right.

10         MS. WARNER:  Thank you.

11         THE COURT:  Ms. Brown.

12         MS. BROWN:  Good morning, Your Honor.  Just a

13  followup to that and then one other matter.

14         I'm not sure I understand what counsel is saying,

15  but it strikes me that we can't publish any exhibit to the

16  jury until it's been offered and admitted into evidence.

17  So...

18         THE COURT:  The only problem I have, though, was

19  the idea if they're going to be objected to or not.

20  I assume --

21         MS. BROWN:  I assume so too.

22         THE COURT:  We could probably have the exhibit

23  reviewed before the witness testifies, perhaps, and make

24  sure that there's no objection to them.  If there are, I

25  agree that the jury couldn't then have them displayed unless

1  you're going to agree they can be admitted.

2         MS. BROWN:  Your Honor, the second thing I would

3  like to do on behalf of Great-West is to invoke the rule on

4  witnesses.  It appears in the courtroom today is the

5  plaintiffs' first witness, Mayor Benjamin.  I have no

6  difficulty with Ms. Weyland staying in the courtroom, she's

7  their corporate representative, and Mr. Bresler is here on

8  our behalf.  I would note that the plaintiffs served him

9  with a trial subpoena today, but I would invoke the rule on

10  any other witnesses present.  Thank you.

11         MS. WARNER:  Your Honor, absolutely we agree that

12  the rule on witnesses is appropriate; however, the rule on

13  witnesses, 615, says at a party's request, the Court must

14  order witnesses excluded so that they cannot hear other

15  witnesses' testimony.  And all we're suggesting is that it's

16  completely appropriate and proper and has been done in civil

17  cases in my experience for witnesses to be able to listen to

18  opening statements and then, of course, they would be

19  sequestered, so that's what our suggestion is.

20         THE COURT:  All right.

21         I'm going to disagree with that suggestion and

22  order all witnesses to be released.  I think it's unfair to

23  have any witness on either side have any preview beyond what

24  the lawyers already reviewed with them of what's going to go

25  on in the case.  So I'll excuse all witnesses at this time

1  on either side to the case and they'll be excluded from the

2  trial until such time as they're called as a witness.  Once

3  their testimony it completed and they're not going to be

4  called in rebuttal, they can stay.

5          All right.  If we're ready, we'll bring the jury

6  in, please.  Thank you, Harold.

7          (Pause).

8          DEPUTY CLERK:  All rise.

9          (Jury entered the courtroom.)

10          THE COURT:  All right.  Thank you very much.

11          Thank you, ladies and gentlemen, you may be

12  seated.

13          Ladies and gentlemen, good morning, thank you for

14  coming in.

15          THE JURORS:  Good morning.

16          THE COURT:  We're ready to begin the case.  I was

17  worried, with woke up early this morning with ice, but it

18  turned out not to be too bad so we could all make it in a

19  timely fashion.

20          You found your way to the jury room, and that's

21  where you'll be, your new home, when you are here for the

22  next few days.

23          What we're going to do this morning as I discussed

24  a little bit generally yesterday with you, I'm going to give

25  you some preliminary instructions and talk about the trial,

1    how it goes forward and what happens in a trial.  I'm going

2    to give you a brief statement about, very brief, about the

3    case itself.  What I say is not evidence, it's not to be

4    taken as evidence, it's not to be taken of any views I have

5    of the case.  It's strictly a neutral statement about a very

6    basic bones of the case.

7            And when I finish the preliminary instructions and

8    the statement of the case to you, then what we'll do is have

9    the opening statements by counsel.  And as I mentioned last

10   night, the opening statements by counsel are not evidence

11   unless it's a stipulation.

12           But they're meant to give you a roadmap, in

13   essence, of what each side expects their evidence will show

14   in the case.  And at the end of the case, when they finish,

15   they'll have a chance to give summation or closing argument,

16   which is then a chance to show you what they believe the

17   evidence shows and what they wish you to conclude from the

18   evidence.

19           But it's going to be up to you to find the facts

20   of the case.

21           So let me explain now the legal rules that

22   I'm going to use at trial.  There will be some final

23   instructions, which will be the detailed ones I'll give you

24   at the end of the trial before you start your deliberations.

25   But these preliminary ones are meant to give you some sense,

1   as I said, with what the trial is about and what's going on

2   in the courtroom, and also your responsibilities as jurors.

3   First, you should see, you should have notebooks there.  If

4   you notice that, all right, and a pencil or pen waiting

5   there.  That's because you may take notes, if you wish,

6   during trial.  Whether you take notes is entirely up to you.

7   You don't have to take notes.  Many people find taking notes

8   helps them remember testimony and evidence, others find it

9   distracts them from listening to the witnesses.  Witnesses

10   are going to be right here, close to you so you can observe

11   the witnesses.

12          But you're permitted to take your notebooks back

13   with you to the jury room only during your deliberations.

14   Otherwise, notebooks remain locked here in the courtroom

15   during recess and overnight.  You cannot take the notebooks

16   with you when you come and go and you're not permitted to

17   take them home with you.

18          At the end of the trial, your notebooks will be

19   collected and the pages will be torn out and destroyed, and

20   no one, including myself, will look at your notes you've

21   taken.  So you're free to write whatever notes you wish.  So

22   if you're doodling, we won't know that, instead of paying

23   attention.  But you may take notes if it helps you, that's

24   the whole answer.  If it doesn't help you, don't worry about

25   it.

1          Your notes, however, are your own memory aid.

2     They're not evidence.  They can't replace your recollection

3     of the evidence, and jurors do who do not take notes should

4     rely upon their own memory of the evidence, shouldn't be

5     influenced by another juror's notes.  The juror could write

6     down something wrong.  So you can't rely on other's notes

7     necessarily.

8          Now, at the beginning of the case when we're

9     selecting the jury, I introduced to you, through names only,

10    witnesses.  Now, if at any time during the trial you realize

11    that you recognize or you think you know a witness or you've

12    come, you see someone else come in the courtroom as helping

13    the lawyers, et cetera, or someone who's mentioned in the

14    testimony or evidence, or you think you know someone

15    connected with this case, you raise your hand immediately

16    and you ask to speak with me, in case it turns out you know

17    someone in the case.

18         Now, let me talk to you about our duties and what

19    we're going to be doing and a little bit about the law as to

20    burden of proof in the case.  First as to our -- first, as

21    to our duty, my function is to conduct the trial in an

22    orderly, fair and efficient manner, and I'll decide the

23    question of law and the procedures that arise during the

24    trial.  And it's your duty to decide the facts, that's your

25    duty, based upon the evidence in the case.  And that's your

1   job, that's yours alone.  You alone determine the weight and

2   the effect and the value of the evidence and the

3   believability of the witnesses; in other words, credibility

4   of the witnesses.

5           You should decide the facts only from a fair

6   evaluation of all of the evidence without any prejudice,

7   sympathy, fear or favor.

8           Now, before you're going to retire to deliberate

9   on the end of the trial, I'll instruct you about the rules

10  of law you will follow and apply to render your verdict.

11  You'll then have to apply the law to the facts you find.

12          You must follow the law that I give you even if

13  you disagree with it or don't understand the reason for the

14  law.  But you're bound to follow the Court's instructions.

15          Now, anything I say or do during the course of the

16  trial is not intended to indicate any opinion on my part

17  about the facts or what your verdict should be.  So, for

18  instance, I may make a ruling on some objection.  That has

19  no bearing for you as to what I think the verdict should be

20  in the case.  It's up to you to decide the verdict.

21          Now, I mentioned before, but you'll hear the terms

22  "plaintiff" and "defendant."  Simply, the plaintiff is a

23  person or the company here, the organization, who starts the

24  lawsuit; and the person or the corporation sued is the

25  defendant who's sued by the plaintiff.  Here, the Mayors and

1    their organization are plaintiffs, Great-West is the

2    defendant.  Additionally, Great-West had brought a

3    counterclaim so they're a plaintiff in their counterclaim

4    against the Mayors.

5            Now, as to burden of proof.  I had mentioned this

6    briefly in the voir dire, but this is a civil case.  As the

7    plaintiffs, the Mayors, have the burden of proof, proving

8    their case by what's called a preponderance of the evidence.

9    Great-West has brought claims against the Mayors as well,

10   call it a counterclaim.  On those claims, Great-West has the

11   same burden of proof as the Mayors do for their claims.

12           Now, what's a preponderance of the evidence?  To

13   establish a fact by a preponderance of the evidence is to

14   prove that it's more likely so than not so; in other words,

15   preponderance of the evidence means the evidence produced is

16   in your mind the belief that the thing or the issue in

17   question is more likely true than not true.

18           So after you consider all of the evidence, you

19   find the evidence favorably -- favorable to the plaintiff

20   side of an issue is more convincing to you, so you believe

21   that the probability of truth favors the plaintiff, then

22   they've succeeded in carrying the burden of proof on that

23   issue.

24           The term preponderance of the evidence does not

25   mean the proof must produce an absolute mathematical

1   certainty.  So, for example, you've heard evidence of proof

2   beyond a reasonable doubt.  That's a strict standard of

3   proof that applies only in criminal cases.  It does not

4   apply in a civil case like this one.

5           When I instruct you that a party has a burden of

6   proof on any proposition or use the expression, if you

7   defined or if you decide, I mean that you must be persuaded

8   considering all of the evidence in a case that the

9   proposition is more likely true than not.

10          So whether the preponderance of the evidence

11  depends upon the quality and not the quantity of the

12  evidence.  In other words, merely having a greater number of

13  witnesses or documents does not necessarily show a

14  preponderance of the evidence.

15          If you believe the evidence is evenly balanced on

16  an issue that the plaintiff had to prove, then the

17  plaintiffs have not carried their burden of proof and your

18  finding on that issue must be for the defendant.  The same

19  is true for the defendant on its counterclaims.

20          Now, I'm going to give you some examples of

21  evidence and talk to you about the nature and types of

22  testimony you may hear and a couple of concluding remarks on

23  the conduct of the jury and the trial.

24          First, about evidence, because we mentioned the

25  word "evidence."  You hear that word all the time.

1        The evidence from which you'll find the facts in

2   this case will consist of sworn testimony of witnesses who

3   will be called during the trial, regardless of who might

4   have called them.

5        Also from exhibits that were received in evidence.

6   That's like documents received in evidence, regardless of

7   who may produce them.  And any facts the attorneys agree to,

8   that is called stipulations, or that I could instruct you to

9   find.

10       Now, certain things are not evidence and you must

11  not consider them as evidence.  I'm going to list them for

12  you.  One, statements, arguments, and questions by the

13  lawyers are not evidence.  And that last sometimes is a

14  little confusing.  If a lawyer asks a witness, was the light

15  green and the witness says, no, it was red, there's no

16  evidence the light was green just because he asked the

17  question and the lawyer can't argue that the light must have

18  been green.  So questions themselves are not evidence, it's

19  the answer that's the evidence.

20       Objections to questions are not evidence.  The

21  lawyers are obligated to make objections when they believe

22  the evidence being offered is improper under our Rules of

23  Evidence.  You should not be influenced by any objection or

24  by the Court's ruling on it.  If the objection is sustained,

25  if I say sustained, that means that the witness can't answer

1   the question, you have to ignore the question.  If I say

2   overruled, then the answer is treated like any other.  If

3   you're instructed that some item of evidence is received

4   only for a limited purpose or very restricted purpose, then

5   you must follow that instruction.

6           If there's any testimony that I exclude or I tell

7   you to disregard, that's not evidence and you can't consider

8   it later on.  Anything you see or hear outside this

9   courtroom is not evidence and must be disregarded.  In

10  fairness to the party, you have to decide this case based

11  solely on the evidence presented here in the courtroom.

12          Now, there's a lot of talk about different kinds

13  of evidence.  I wouldn't worry about that.  Traditionally,

14  there's called two kinds of evidence, direct and

15  circumstantial.  It all has the same weight.

16          Direct evidence is direct proof of facts.  It's

17  the testimony of an eyewitness of what he or she saw.  I saw

18  the light was red.  That's direct testimony.

19          Circumstantial is proof of facts that you may

20  infer or conclude other facts exist.  A simple example is it

21  snows, you didn't see it snow, you wake up the next day, you

22  look out, and you see footprints in the snow, you realize

23  somebody has walked in the snow.  You didn't actually see

24  someone walk in the snow.  That's circumstantial evidence.

25          I'll give you some further instructions on these

1   and other matters about evidence at the end of the case, but

2   you consider any of the evidence we allow in is fair to

3   consider.

4          Now, there's -- about the testimony and

5   credibility of witnesses, as I said, another word is

6   believability.

7          Now, in evaluating and deciding what facts are

8   that you're going to do, you must consider and weigh the

9   testimony of all of the witnesses who appear before you.

10  You are the sole judges of the credibility of the witnesses;

11  in other words, you alone determine whether to believe any

12  witness or to what extent any witness' testimony should be

13  believed.  If there's conflict in the testimony between

14  witnesses' testimony and other evidence, you have to resolve

15  the conflict and determine where the truth lies.

16         In deciding the credibility of any witness, you

17  can consider any matter that may have a bearing on the

18  subject.  You may consider the appearance and the behavior

19  of the witness here on the witness stand.  Whether a witness

20  impresses you as a truthful individual; whether the witness

21  impresses you as having an accurate memory and recollection;

22  whether the witness had a full opportunity to observe the

23  matters about which he or she is testifying; whether the

24  witness had any interest in the outcome of the case; or

25  whether witnesses has any friendships or animosity towards

1    other persons concerned in this case.  You consider the

2    unreasonableness or the reasonableness of the -- or the

3    probability or improbability of the testimony of the witness

4    in determining whether to accept it as true and accurate.

5    You may consider whether a witness has been contradicted or

6    has been corroborated by other credibility evidence; if you

7    believe that any witness has shown himself or herself to be

8    biased or prejudiced to be either for or against either side

9    in this trial, you may consider and decide whether that bias

10   or prejudice has colored that testimony of the witness so it

11   would affect the witness' desire and capability to tell the

12   truth.

13           The bottom line is, you should give the testimony

14   of each witness as much weight as in your judgment it's

15   fairly entitled to receive.

16           There may be inconsistencies and discrepancies in

17   the testimony.  Two or more persons seeing an event may see

18   or hear it differently.  In weighing the effect of any

19   discrepancy, always consider whether it pertains to a matter

20   of importance or unimportant detail or whether the

21   discrepancy might result from some innocent errors or an

22   intentional falsehood.  It's up to you to decide which

23   witness to believe, which witnesses not to believe and how

24   much of any witness' testimony to accept or reject.

25           Now, one of the ways you're going to hear

1    testimony in this case is through a deposition instead of

2    the live witnesses.  The witnesses may be living elsewhere

3    in the country, so the lawyers took what we call a

4    deposition; that is, questioning of the witness under oath,

5    outside the courtroom here, with the lawyers.

6           And a deposition is sworn testimony of a witness

7    that's taken before a trial.  The witness is placed under

8    oath and swears to tell the truth, the lawyers for each

9    party may ask questions.  A court reporter's present and

10   records the questions and the answers.

11          Some depositions of witnesses may be presented to

12   you by video, some without video.

13          Now, deposition testimony is entitled to the same

14   considerations and is to be judged as much as possible in

15   the same way as if the witnesses were here to present the

16   testimony in live form.

17          During the trial, I occasionally may ask a

18   question of a witness to obtain information or bring out the

19   facts that I may not understand.  You should not take my

20   questions to witnesses as any indication of my opinions how

21   you determine the facts.

22          I try not to ask a lot of questions and interrupt

23   the lawyers, but that could happen.

24          Now, as I said before, the lawyers can make

25   objections and there may be times during the trial where a

1    lawyer will make an objection to a question asked by another

2    lawyer or to the answer given by the witness.  It's the duty

3    of the lawyer to make objections if the lawyer believes

4    something improper is being offered.

5           Again, if I sustain it, the witness is not allowed

6    to answer it and you can't attempt to guess what the answer

7    might have been.  If I tell you to disregard and order an

8    answer stricken, you put that out of the your mind and

9    cannot refer to it during your deliberations.

10          Now, it's natural to feel somewhat impatient if

11   there are delays caused by objections or other matters in

12   these proceedings.  Don't let your feelings affect in any

13   way your deliberations, how you consider the evidence.

14          Finally, I'm going to allow a procedure for you,

15   which is not allowed, at least in my court, in the criminal

16   cases, but I allow it in civil cases, so this is something

17   you should think about carefully.  I will allow you to

18   propose written questions to witnesses after the lawyers

19   have completed their questions of each witness.  You may

20   propose questions in order to clarify the testimony, but you

21   cannot express any opinion about the testimony or argue with

22   the witness in your question.

23          If you propose any question, remember your role is

24   that of a neutral fact-finder, not an advocate.  Before I

25   excuse each witness, I will offer you the opportunity to

 1   write out a question.  Do not sign the question.  I'll

 2   review it with the attorneys to determine if it is legally

 3   proper.

 4          There are some proposed questions I will not

 5   permit, I will not ask in the wording that's been submitted

 6   by the juror.  That might happen due to Rules of Evidence or

 7   other legal reasons or because the question is expected to

 8   be answered later in the case.

 9          If I do not ask a proposed question or if I

10   rephrase it, don't speculate as to the reasons.

11          Finally, don't give undue weight to any question

12   that you or another juror propose.  You should evaluate the

13   answer to those quotations in the same manner as you

14   evaluate all the other evidence.

15          But this is an opportunity we don't give to a lot

16   of jurors.  We're going to in this case.  I'm not suggesting

17   you do so or are required to do so.  But it's often the

18   case, a lawyer may not ask a question because it's legally

19   objectionable so they didn't bring out something on purpose

20   or because a later witness may be discussing that subject

21   and it's not necessary to ask this witness.

22          So remember, our system of justice requires you to

23   decide the case, the facts of this case in an impartial

24   manner, and again, don't be influenced by any bias,

25   sympathy, prejudice or public opinion.  It would be a

1    violation of your sworn duty to base your verdict on

2    anything other than the evidence presented.

3          Now, just to the trial itself, and we'll be

4    finishing these preliminary instructions, I'll have you

5    sworn and then we'll begin with the trial.

6          First, you should consider and decide this case as

7    a dispute between persons of equal standing in the

8    community, of equal worth, and holding the same or similar

9    stations in life.  A corporation is entitled to the same

10   fair trial as a private individual.  All persons, including

11   corporations and other organizations, stand equal before the

12   law, they're all treated as equals.

13         Now, your conduct as jurors is important as we go

14   forward with this trial.  This is a case that the lawyers

15   have spent many months preparing and working very hard on.

16   Their clients have a very serious interest in this case and

17   its outcome so it's important that you watch your conduct.

18         First, you as jurors must decide this case based

19   solely on the evidence presented here in this courtroom.

20   That means, during trial, you must not conduct any

21   independent research about this case, the matters in this

22   case, the individuals or the corporations involved in this

23   case.

24         To be very clear, that is, you don't consult

25   dictionaries or reference materials, you do not search the

1   Internet, Websites, blogs or use any electronic tools to

2   obtain information about this case or help you decide the

3   case.  Please do not try to find out information from any

4   sources outside the confines of this courtroom.

5            Until you retire to deliberate, you may not

6   discuss this case with anyone, even your fellow jurors.

7            After retiring to deliberate, you may begin

8   discussing the case with your fellow jurors but cannot

9   discuss it with anyone else until you have returned a

10  verdict and the case is finished.

11           Now, what that means is that you don't go home at

12  night and tell your significant other, I'm sitting on this

13  very interesting case and here's all about it.  You cannot

14  do that.  You can tell others and your employer you're on a

15  trial that is going to last several days in the Federal

16  Court and that's where you have to leave it.  You don't put

17  on Facebook, for the next week, I'm in this case called the

18  Mayors versus Great-West and it's really interesting, you

19  cannot do that.  You can -- just don't get into that,

20  please, in the social media.

21           Now, you all have cell phones, obviously, and you

22  have other devices and technology available.  Again, you

23  don't talk to people on that media about this case or use

24  the tools to communicate about the case.  Again, that's

25  family and friends, co-workers.  You cannot communicate with

1  anyone about the case on any of the social media, including

2  such things as Twitter or Facebook or Instagram, and it goes

3  on and on:  Snapchat, LinkedIn, YouTube, et cetera.  If I

4  have not mentioned a specific technology, you're still not

5  allowed to use it.  There's an awful lot that keeps coming

6  up.  So do not use any technology, any similar platform or

7  social media to communicate about the case.

8          If you become aware of another juror's violation

9  of these instructions, you will inform me immediately.

10  Failure to follow these instructions and restrictions

11  jeopardize the fairness of these proceedings and a mistrial

12  could result, which would require the entire process to

13  start over, which would be phenomenally expensive to the

14  parties, so we don't want to do that.

15          Finally, don't form any opinions about this

16  case -- that is, who's right or who's wrong -- until all the

17  evidence is in.  You keep an open mind until you start your

18  deliberations at the end of the case.

19          I think, and I hope, that you'll find the case

20  interesting and noteworthy.  You've got very good counsel on

21  each side who have prepared this case at length.

22          The trial is going to now again.  Again, the first

23  item, each side will make an opening statement.  Again, that

24  opening statement is not evidence or arguments, it's an

25  outline of what the party expects to prove in the case.

1   It's offered to help you understand the evidence.

2           Then the plaintiff begins.  That's the Mayors,

3   presents their witnesses.  The defendant will cross-examine

4   those witnesses.  And when the plaintiff finishes their

5   case, the defendant may present witnesses and will have

6   direct examination, then the plaintiffs will cross-examine

7   the defense witnesses.

8           There may be a short rebuttal by the plaintiffs

9   after the conclusion of all the witnesses on each side,

10  which would conclude the trial.

11          At times, I'll be calling the lawyers up to the

12  bench and I'll discuss with them out of your hearing

13  regarding questions of law or procedure.  If it's going to

14  require a considerable time, the discussion, I'll let you go

15  back to the jury room or have coffee while we talk here.  I

16  try to avoid those as much as possible.  We try to do our

17  work before you, in the mornings or in the evenings after

18  you leave.  But there will be occasions where there will be

19  bench conferences and if they take a long time, I'll allow

20  you to have a break.

21          Once the evidence is finished, then the parties

22  will come back to you and present you with summation or

23  closing arguments.  That'll summarize and interpret the

24  evidence for you from their point of view, and I'll give you

25  the final instructions of law, you'll retire to deliberate

1   and return your verdict, and that'll conclude the case.

2          Now, ladies and gentlemen, one other thing.

3   I'm going to first give you a statement about the case.  And

4   this is really just to give you, as I said, a bare outline

5   of what the case is about.  It's one short paragraph.  And

6   then I'm going to have you sworn to be the jurors in this

7   case.

8          All right.  This case involves a contract dispute

9   between two parties.  The plaintiffs are the Mayors.  That

10  includes the United States Conference of Mayors and the

11  United States Mayors Enterprises, Inc.

12          The defendant has been known as Great-West Life &

13  Annuity Insurance Company.  As may be relevant here, the

14  Mayors have sponsored supplemental retirement programs

15  designed to help public employees save for retirement.  It's

16  governed by the IRS Code Section 457, provides city

17  employees a tax deferred means of saving for retirement.

18  It's like a 401(k) plan for city employees.

19          The program was formerly administered by another

20  insurance company, but in 2012 the Mayors requested

21  Great-West prepare a program proposal.  Following

22  negotiations, the Mayors and Great-West made an agreement,

23  in October 2012, to sell the retirement program to cities.

24  As a result, they had two valid enforceable contracts

25  between them.  One is called a Joint Marketing and Training

1    Agreement and the second is called a licensing agreement.

2    Through these agreements, the parties agreed to sell the

3    retirement plan to the Mayors member cities and their

4    municipal employees using the Mayors brand and logo.

5            On or about December 22nd, 2015, so that was about

6    two years, two and a half, three years later, the Mayors

7    notified Great-West of their intention to terminate the

8    contract for cause.

9            The Mayors claimed Great-West breached the

10   contracts through poor performance.  They're suing

11   Great-West for breach of contract and for breach of implied

12   covenant of good faith and fair dealing.

13           Great-West has denied any breach and has brought a

14   counterclaim against the Mayors for breaching both the

15   contract and implied covenant in good faith and fair

16   dealing, arguing the Mayors are the ones that failed to hold

17   up their end of the bargain, and the Mayors have denied

18   those allegations.

19           So, ladies and gentlemen, that is a very short

20   summary of what you -- the case, the fundamental aspects of

21   the case are.  You'll hear that is not evidence, not to be

22   taken as evidence, what I just said.  That's just my own

23   summary.

24           You'll hear a detailed report now in the opening

25   statements by counsel for each side as to what they believe

 1   the evidence will show in the case, of what the issues are

 2   as to these claims and counterclaims.

 3          So I'm going to have you sworn to be the jurors in

 4   this case by Harold Smith.  Thank you.

 5          DEPUTY CLERK:  Ladies and gentlemen, would you

 6   please stand and raise your right hand.

 7          (Jurors placed under oath.)

 8          THE COURT:  All right.  Ladies and gentlemen,

 9   we'll begin, the plaintiff goes first, because in their

10   case-in-chief, they have the burden, and then the defendant

11   will get a chance to give their opening statements.

12          Depending on the length, they may or may not take

13   a break between opening statements, we'll just see as we go

14   forward.  So I'm going to recognize the plaintiffs' counsel

15   in this matter who will be giving her opening statement, as

16   the attorney Margaret Warner.  Ms. Warner.

17          Excuse me, I'm sorry to interrupt you, Ms. Warner.

18          You have screens in front of you and they should

19   be on if there's going to be exhibits used, not at this

20   time, but maybe while the evidence is coming on, but don't

21   worry about them right now.

22          (Pause.)

23          MS. WARNER:  May it please the Court.

24          This lawsuit is about failure.  Not some benign

25   failure, we tried hard but it just didn't work.  Total

1   failure.

2          Great-West's failure to live up to its

3   obligations.  Its failure to use its best efforts, its

4   failure to perform consistent with professional standards.

5   And ultimately, failure to do business in good faith.

6          These failures were committed by Great-West's

7   senior executives, responsible for the contracts.  To prove

8   that failure, we'll present to you evidence about three

9   things.  First, we'll show you the evidence about the

10  contracts, what actually was entered between the Mayors and

11  Great-West.  Second, we'll show you evidence about

12  Great-West's breach of that contract and its breach of the

13  duty of good faith and fair dealing.  And third, we'll show

14  you the evidence of the harm that was done to the Mayors

15  because of what did and did not happen.

16         Great-West will try to make this case about other

17  things, but, really, it's just about those three things.

18         You'll see the evidence in black and white,

19  documents, candid emails.  We'll show you Great-West's own

20  word written at the time these contracts were in existence.

21         The gentleman who negotiated, the architect of

22  this contract, and who consulted on it for Great-West for

23  many years, will tell you in his own words about the

24  failings of Great-West.

25         He also will talk to you about the senior

1  executive that Great-West put in charge and the fact that it

2  was that executive's goal, "to tank the deal," to jettison

3  the program.

4          Again, these aren't my words.  These are

5  Great-West's words that you will hear.

6          Meanwhile, that senior executive, instead of doing

7  his job to perform under the contracts, was using the

8  opportunity to meet with the Mayors, to commit business

9  expense improprieties.  He submitted fraudulent business

10 expenses.

11         He would claim to be meeting with the Mayors and

12 performing his job selling the program when he was not at

13 the meetings.  He wasn't at the meetings at all.

14         His fraudulent expenses ultimately got him fired.

15 But not until he and Great-West had destroyed the value of

16 this program to city employees and to the Mayors.

17         Now, Great-West promised that it would give the

18 Mayors a competitive product that city employees would want

19 to participate in.  Their lead competitor was offering a

20 fixed rate fund, you'll hear all about it, at 3.5 percent.

21 Great-West never got a product over 2 percent.

22         The contracts contained examples in which the

23 Mayors were told, by Great-West, that if there was

24 performance under the contract, hundreds of thousands of

25 city employees would join.  But you'll find that in the end,

1  when this contract was terminated, just over 3,000 city

2  employees joined.

3       The evidence will show that Great-West breached

4  these contracts on a massive scale, and not because they

5  weren't capable of performing, but because they just didn't

6  want to.

7       Good morning.  I'm Peg Warner.  I represent

8  proudly the United States Conference of Mayors and United

9  States Mayor Enterprises.  The U.S. Conference of Mayors is

10  an organization that serves cities, their mayors, and people

11  like us who live in cities.

12       The U.S. Conference of Mayors has been in

13  existence for 84 years, and you will learn in this case that

14  this is the first time it has ever sued anyone.

15       Sometimes, the Conference will be referred to as

16  USCM.  Sometimes U.S. Mayor Enterprises will be referred to

17  as USME, and sometimes we'll just call them the Mayors.

18       USCM, the Mayors, represent big cities like

19  Philly, New York, L.A., and, yes, the District.

20  Medium-sized cities like Columbia, South Carolina, and

21  Sacramento, California, and smaller cities, like Rochester

22  Hills, Michigan; Alexandria, Virginia; Rockville, Maryland.

23       The Conference of Mayors is nonpartisan.  It's an

24  organization of Democrats, of Republicans, independents, who

25  have a united goal, the betterment of cities and service to

1    the citizens of cities.

2              And that's why we're here for this trial, because

3    the contracts that Judge Hogan told you about are absolutely

4    fundamental to the mission of the United States Conference

5    of Mayors.

6              The Mayors Conference is funded through dues paid

7    by cities, by taxpayers, and by endorsement contracts, and

8    specifically by an endorsement contract related to a

9    retirement program for city employees.

10             The Mayors put their stamp of approval on this

11   program.

12             You may save for your retirement, through work,

13   using one of these kinds of plans.  If you work for a

14   company, it's a 401(k).  If you work for a non-profit, it's

15   a 403(b).  If you work for a city or local government, it's

16   a 457 plan.

17             Here's the way it works.  An employee takes money

18   out of each paycheck, you take it out before taxes, that's

19   where the numbers come in, 401(k), 457, those are sections

20   of the tax code.

21             Your employer picks the financial institution

22   that's going to hold the money for you, and then you, as the

23   employee, direct the money into stocks or mutual funds,

24   money market accounts, whatever you choose.

25             The idea is, it will be there when you need it to

1    retire.

2              In the 1970s, the Mayors drafted legislation and

3    got that legislation passed so that this retirement vehicle,

4    this tax deferred retirement vehicle, could be available to

5    city employees across the country.

6              So, ladies and gentlemen, this retirement program

7    is very important.  It's about providing security to the

8    people who serve us and protect us, first responders, water

9    and sewer employees, sanitation workers.

10             For more than 30 years, this program was

11   administered through Nationwide.  You've heard of them,

12   they're an insurance company.  But they have a very large

13   retirement business as well.

14             The Mayors partnered with Nationwide in an

15   endorsement engagement, an arrangement, a licensing

16   contract.

17             Nationwide paid the Mayors to endorse the

18   retirement program.

19             You'll hear that at times Nationwide paid the

20   Mayors as much as $6 million per year to endorse the

21   retirement program.

22             In 2010, '11, and for most of '12, Nationwide paid

23   the Mayors $3 million per year to endorse the retirement

24   program.

25             Think of it like Michael Jordan endorsing Nike

1    sneakers.  Nike pays Michael Jordan money so that it can put

2    Air Jordan on sneakers and that helps because it helps Nike

3    sell lots of shoes.

4          It's the same thing with the Mayors.  Mayors and

5    city managers trust the United States Conference of Mayors

6    to evaluate retirement programs and to pick ones that best

7    serve city employees.

8          So cities would sign up because the Mayors gave

9    the program their stamp of approval.

10         You'll hear that this retirement program was the

11   Mayors' most important program.  When Nationwide ran it,

12   over 330,000 city employees across the country put $6

13   billion of their money into this retirement plan.  This

14   retirement plan was the largest source of funding for the

15   United States Conference of Mayors to do their programs.

16         And you'll hear that what they use this money for

17   was very important to the Conference, for programs and

18   advocacy about mass transportation and infrastructure in our

19   cities, job training, minimum wage, hunger and homelessness.

20   Every year, the Conference has a hunger and homelessness

21   survey so that Americans keep in front of their minds this

22   problem in our cities.

23         And special task forces on things like climate

24   change, women's rights, rights of the disabled, and the

25   arts.  That's what this money is used for.

1          Now, when the great recession hit in 2008 and

2    2009, you know lot of people saw their retirement money go

3    out the window.  The Mayors watched this happen, and they

4    were concerned about two problems.  City employees did not

5    have enough access to education about how to save for

6    retirement, how to plan.  And city employees were being

7    charged too many fees for just having their money managed by

8    somebody else.

9          So the Mayors decided to do something about it.

10   The Mayors' Chief Operating Officer is Kathryn

11   Kretschmer-Weyland.  Sometimes you're going to see in the

12   exhibits in this case that she's called KKW.  She's right

13   here.  And she's going to be with us this entire trial,

14   because she's been with this retirement program for 40

15   years.

16          Sometimes I'm just going to call her Ms. Weyland,

17   because her name is really long.

18          She saw an opportunity for a revolution in

19   retirement for city employees.  She's even called it the

20   revolution.

21          In 2010 and 2011, she asked Nationwide, will you

22   help me to start this revolution so that municipal employees

23   across the country have the same options as the people who

24   participate in 401(k)s.

25          Nationwide, at that time, said, no, they didn't

1   want to provide more education, and they didn't want to

2   reduce their fees.

3          And another thing happened.  And you'll hear a lot

4   about this.  Nationwide also wanted to reduce the amount of

5   endorsement money it was paying to the Mayors.

6          Basically, Nationwide thought they were the only

7   games in town.

8          The Mayors said, well, if you won't revolutionize

9   retirement programs for city employees, we're going to go

10  find somebody that will work with us to do this.  And that's

11  what happened.  The Mayors went out, it researched everyone

12  that did this, the companies that were involved, and it

13  decided to start a new partnership.

14         And that's where Great-West comes in, because they

15  found that Great-West's retirement business goes by the name

16  of Empower.

17         Let's look at what Great-West said about its

18  retirement business for government workers.  They were the

19  leader in the industry.  They were No. 1 in 457 planned

20  assets, that's the amount of money managed.  No. 1 in 457

21  participants, the number of government workers.  They had

22  $85.8 billion of government worker money under their

23  management.  They were a leader.

24         And the Mayors thought, they would help the Mayors

25  revolutionize this area for city employees.

1          In 2011, a man named Gregg Seller ran the

2    government markets business segment for Great-West.

3    Ms. Weyland and Mr. Seller had known each other for over 20

4    years.  They had worked together on various projects with

5    regard to the Mayors, and they had come to know each other

6    because of both of their work with city retirement programs.

7          Ladies and gentlemen, we're going to talk a lot

8    about Gregg Seller in this case, a lot.

9          Beginning in the summer of '11, the Mayors and

10   Mr. Seller negotiated.  Mr. Seller called the project,

11   Project Villa, or Villa.  He named it after the mayor of

12   Los Angeles at that time, Mayor Villaraigosa.

13         Mayor Villaraigosa was the President of the

14   United States Conference of Mayors at that time.  So you'll

15   see reference to Project Villa.

16         On October 1st, 2012, Great-West and the Mayors

17   executed a contract.  We're going to keep coming back to

18   these contracts.  As the Judge said, this is a contract

19   case.  The contracts are Exhibits 1 and 2 of the plaintiffs

20   in this case.

21         The most important thing about those contracts,

22   they were ten-year contracts.  Great-West would provide

23   education to city employees.  They would charge

24   significantly lower fees than Nationwide, and they would pay

25   the Mayors for the use of the seal of approval that the

1  Mayors could provide and its good will in the cities.

2          Now, it's important to understand that the

3  payments that would be made to the Mayors would not come

4  from the city employees' savings.  Those payments were made

5  by Great-West to the Mayors.

6          Importantly, the expectation was that Great-West

7  would sign up not only many of the cities that had

8  participated in the Nationwide program, but also thousands

9  of new participants, because of the lower fees, the more

10  education that was provided.

11          Both Great-West and the Mayors knew that under the

12  law, only Great-West could sell these programs, because

13  they're licensed brokers.

14          The Mayors' job, under the contracts, was to

15  promote the program, to promote the program with the Mayors,

16  the cities, help with educational seminars, and generally

17  promote it on their Website, at their meetings, and in their

18  newsletters.

19          Let's look at the contracts.  They're ten-year

20  contracts.  They started on October 1, 2012.  They were to

21  go to 2022.

22          Here's what the contracts required Great-West to

23  do.  Section 2.1, develop and deliver retirement products to

24  cities and their employees.  Provide necessary support and

25  promote the program, and see right in the contract there,

1   and continuous followup.

2           Sections 2.4.  You're going to hear a lot in this

3   trial about the best efforts.

4           These contracts required three parts to the best

5   efforts of the parties.  Each party would first agree to use

6   its best efforts to cooperate with the other party to

7   further the goals of the program.

8           The second part of the best efforts:  Neither

9   party will knowingly act in a manner contrary to the

10  achievement of goals of the program.

11          And the third best effort:  Neither party will act

12  in a manner that competes with the program, except as

13  provided by the contract.

14          Ladies and gentlemen, the evidence will show that

15  Great-West breached all three of these best efforts

16  requirements.

17          The evidence will not permit Great-West to run

18  from the language of these contracts.

19          Here's what Great-West represented and warranted

20  that it would do in Section 5.2.7 of those contracts.

21          Great-West warranted that it and its employees

22  performance would represent its best efforts.  Great-West

23  warranted that its services would be done by qualified

24  personnel consistent with all professional standards, all

25  professional standards.  You will hear a lot of evidence in

1    this case about this point.

2         Great-West warranted that it would use its best

3    efforts not to have its other businesses, like its business

4    with states, compete with the Mayors' program.  That's right

5    in the contract, Exhibit 1, Section 5.2.8.

6         That's what Great-West was required to do.

7         Now, let's talk about what the Mayors were

8    required to do.

9         The Mayors were required to use their best efforts

10   to sponsor and oversee the program, to promote the program,

11   maintain the Website information, assist Great-West in

12   distribution of program materials, develop educational

13   seminars in collaboration with Great-West.

14        And then in the business plan that was part of the

15   contracts, you can see right there that the Mayors were

16   required to do some other things, including enter into

17   administrative agreements with cities, and right at the

18   bottom, continue to survey and evaluate the field to make

19   sure that the product was competitive.

20        You will see that the evidence will prove in this

21   trial that the Mayors fulfilled every one of the

22   requirements that they had under these contracts.  And they

23   did more.

24        You'll hear from Steve Benjamin.  He's the Mayor

25   of Columbia, South Carolina.  He is the incoming President

1   of the United States Conference of Mayors.  You'll hear

2   today from him about all the hard work that he did to make

3   this program a success.

4           You'll hear from Ms. Weyland.  She'll tell you

5   about all of the things she did for years to try to make

6   this program work.

7           You'll hear from Jeanie Fanning, who's from

8   Cleveland, about her hard work.

9           They and others will tell you about what the

10  Mayors did to fulfill their obligations.

11          Now, let's talk about Great-West.

12          We will show you in this trial Great-West's own

13  emails, their own documents that demonstrate that they

14  breached the contracts, but that they breached something

15  even more important.

16          As Judge Hogan instructed you, every contract has

17  an implied covenant of good faith and fair dealing, every

18  contract.  That's our law.

19          We will prove to you that Great-West breached good

20  faith and fair dealing in what it did with the Mayors.

21          Great-West's breach will be proved by the words,

22  by the actions of its senior executives.  So let's meet

23  them.

24          There's three on the screen.  Let's look at the

25  gentleman in the middle, Gregg Seller.  He was the Senior

1    Vice President of Government Markets of Great-West in 2011.

2    He's the architect of the program.  He announced his

3    retirement three weeks before this program went into

4    existence, after he had been negotiating it with the Mayors

5    for over a year.

6           You will hear testimony that Kathryn was shocked

7    when she found out about this.  But you will also hear

8    testimony that Mr. Sellers' boss, Charlie Nelson, who was

9    the President of Retirement Services at Great-West, assured

10   Ms. Weyland that Mr. Seller would stay involved, that he

11   would continue to be a consultant, and he was, he was a

12   consultant on this program for Great-West, between January

13   2013, all the way through September of 2015.

14          And then Mr. Nelson assured Ms. Weyland, as you

15   will hear, that Mr. Neese, who would become Gregg Seller's

16   replacement, would take his job, that Mr. Neese was fully

17   committed to the program and that this program would go

18   forward.

19          You are going to hear a lot of testimony and see a

20   lot of evidence in this case about Brent Neese, the senior

21   Great-West executive who was in charge of this program from

22   the day it was rolled out until the day we terminated it.

23          You will see many emails about him.  You will hear

24   much testimony about how he viewed the Mayors' program, and

25   how he treated Ms. Weyland and others, how he acted as

1   Great-West's senior executive.

2          Now, these contracts, let's go back to them.

3   You'll see that both contracts, Exhibits 1 and 2 of the

4   plaintiffs', contain the same attachment.  In the Joint

5   Marketing Agreement, it's attachment C1.  You can see right

6   on the screen here that this part of the contract contains

7   an example, in black and white, of what Great-West expected

8   of the program.  You'll hear that all of the data in this

9   attachment to the contract was provided by Great-West.  You

10  will hear evidence that Mr. Nelson required that this

11  attachment be put into the contract.  And you will hear that

12  the expectations were not met.

13         In fact, you'll see that in this part of the

14  contract, in this example, it's said that by the end of --

15  during 2013, there would be 125,000 city employees who would

16  participate.  You will hear, the evidence will prove, that

17  at the end of 2013, 1,311 people signed up.

18         You will see the example in this contract that at

19  the end of 2016, 375,000 participants were expected.

20  Great-West actually signed up, as the evidence will show,

21  3,020.

22         Utter failure.  Utter failure.

23         Now, the examples in those contracts are important

24  because you're going to hear from Great-West about the 2 and

25  a half million dollars advance that Great-West paid to the

1  Mayors.  They're going to tell you a lot about that.

2          These examples in this contract that Mr. Nelson

3  required, they came from Great-West to show how that 2 and a

4  half million dollars advance was going to be repaid.

5          Ladies and gentlemen, you're going to hear they

6  don't like these examples anymore, and they're going to try

7  to undermine them.

8          But remember when they do, that was Great-West's

9  data.

10          You're going to see and you're going to hear that

11  from the get-go in October 2012, the issues about

12  Great-West's performance, Great-West's commitment,

13  Great-West's staffing started to crop up.  Let's look at

14  what happened.

15          Right away, the first week of the program, the

16  Mayors and Great-West go to promote the program in

17  Bridgeport, Connecticut, and what do we find out?  We find

18  out that the person that Great-West sent on this trip was a

19  newbie.  He was saying things like, I like this job because

20  I don't have to worry about my mortgage.  And the Great-West

21  managers said, sounds like a bad match.  Out of the gate,

22  sending the newbie on a sales call.  And then Bridgeport is

23  unhappy with our services already.

24          First week of the program.

25          And Mr. Bresler is sitting over here as the

1  corporate representative of Great-West, and his response,

2  one week into the program, was, we have nobody else, just

3  the newbie.

4         Next, you'll see Brent Neese's email to Mr. Nelson

5  in March 2013.  This is five months, ladies and gentlemen,

6  into a 120-month contract.  Mr. Neese says to his boss,

7  Mr. Nelson, we were already at a disadvantage with our

8  product, the fixed rate.  Without a substantial change in

9  the product and distribution of this -- in this program,

10  this program is destined to fail.  This is the guy in charge

11  of it five months in.

12         January 3rd, 2014, this is after one year and two

13  months of the program, Great-West, in its own, own emails,

14  is grading its performance of its salespeople in 2013.  And

15  what grades does Great-West give itself?  Fail.  Fail.

16  Fail.  Fail.  Fail.  Fail.  That's just after the first year

17  and two months.

18         And then next, in April of 2014, Mr. Seller writes

19  to Mr. Nelson -- remember, they had lot of candor between

20  them, because they had known each other for 30 years, they

21  were like brothers, that's the evidence.

22         Mr. Seller says to Mr. Nelson, "I spoke with

23  Brent.  He really doesn't need the USCM program to work to

24  make his numbers."

25         Later, May 2014, Mr. Seller writes again to

1    Mr. Nelson, and this evidence that you will see, you will

2    hear, this evidence, Mr. Seller says to Mr. Nelson, the

3    President of Great-West Retirement Business, "He has made it

4    pretty clear that he wants to tank the USCM deal.  Brent is

5    looking for ways internally to kill the deal."

6             Ladies and gentlemen, this is just 18 months into

7    a ten-year contract.

8             But let's go further in 2014 to Halloween, where

9    Mr. Seller writes again to Mr. Nelson.  This situation has

10   grown somewhat common.  USCM staff working on sales, with no

11   Great-West person present or involved.  It's like they have

12   just yanked all of the sales support.  And I can't get a

13   straight answer.

14            November of 2014, Don Jurgens, you'll find out,

15   the evidence will show, he was brought in in the summer of

16   2014, at the Mayors' request, to restart the program.  In

17   November 2014, what does Mr. Jurgens say about the program?

18   "You can see that I feel we will do much better without the

19   USCM relationship."

20            Six days later, November 26th, 2014, Gregg Seller

21   and Charlie Nelson, again -- remember, they wrote candid

22   emails to each other, because they knew each other, they

23   both were involved with this program from the beginning,

24   they both approved these contracts being executed by

25   Great-West.

1          Mr. Seller says to Mr. Nelson, "I'm trying to come

2     up with something to get Brent reengaged in this project."

3          And then Mr. Seller tells Mr. Nelson, "I think

4     Brent's goal is to jettison the program," jettison the

5     program.  This is November of 2014.

6          But then you get into 2015 and Mr. Seller writes an

7     email on October 16, 2015.  Ladies and gentlemen, you are

8     going to hear a lot about this email.

9          Mr. Seller wrote this email to Ms. Weyland.  This

10    was Mr. Seller's confession, the man who was the architect

11    of this program, and he writes her in October of 2015.  And

12    when he writes her, he attaches a memorandum that he had

13    written in July of '13 to Mr. Neese and to Mr. Nelson.

14         And as the evidence will show, as we will prove to

15    you from our witnesses, everything that Mr. Seller said in

16    this email, in October of 2015, was entirely consistent with

17    what he had been saying to Ms. Weyland throughout 2013,

18    2014, and 2015.

19         And here's what he told her.  Great-West was not

20    fulfilling the terms of the contract.  Seven ways.

21    Mr. Seller's confession, that's seven ways, seven ways that

22    Great-West was not fulfilling the terms of the contract.

23         The market strategy was altered without

24    Great-West -- without the Mayors' agreement.

25         Most cities were visited once, if at all.

1          The promised reporting by Great-West, never

2    provided.

3          Great-West failed to deliver, failed to provide

4    agreed reports, they failed to provide sales coordination.

5    They failed to include the United States Conference of

6    Mayors in sales promotion.  They failed to provide

7    accounting fees.  They failed to assign resources.  And when

8    they did, they assigned those resources to other activities

9    besides the Mayors.

10         October 16, 2015, Mr. Sellers' confession, ladies

11   and gentlemen.

12         But there's more to this story.  Great-West

13   warranted in the contract that all of its products would

14   represent its best efforts.  But their products were not

15   their best efforts.  The most important part of the product

16   for city employees, in the minds of city employees, was not

17   competitive.  It was called the fixed account rate.  It was

18   not competitive with Nationwide.  So how were they going to

19   take people and convince them that the revolution of less

20   fees, lower fees, more education was going to be better for

21   them if they weren't even competitive with a product that

22   Great-West knew 75 percent of city employees put their money

23   into.

24         Brent Neese, Brent Neese, the man in charge, knew,

25   in March of 2013, five months into this program, he asked

1  for there to be a competitive analysis, and his staff did

2  that analysis, and they show that Great-West's fixed rate

3  was 1.4 percent.  And Nationwide's, 3.5 percent.  And it's

4  right there, ladies and gentlemen, in black and white.  It's

5  highlighted here.  But it's in black and white in the

6  document that Mr. Neese asked his staff to prepare.

7          Extremely high importance to customer.  Those are

8  the city employees.  70 percent of the participants have

9  money in the fixed, and 50 percent only used the fixed.

10          Great-West promised that its products would be

11  topnotch, competitive.

12          Great-West never tried to make that product

13  competitive.  And you'll see why, because the evidence will

14  show that that would have cost them money.

15          So Great-West, they wouldn't fix the fixed rate.

16  1.4 percent, the end of '12, 1.4 percent; the middle of '13,

17  2 percent, '13, at the end of -- December '14, 1.65 percent.

18  City employees wanted a more competitive product.

19          Now, in addition, Great-West represented and

20  warranted under these contracts that they would use their

21  best efforts to not have their own other business, like with

22  states, compete with the Mayors' program.

23          But the evidence will show, the testimony you will

24  hear, you will see overwhelming evidence that Great-West

25  failed to honor that representation and warranty.  Again,

1   it's their own documents, their own emails, their own senior

2   executives.  Let's look at this.

3           Mr. Neese to Mr. Nelson, February of 2013.  This

4   is three months into -- four months into the contract.

5           "In nine of our states," our states, "we actively

6   market the state plan to cities.  Many of these states have

7   first right of refusal.  All of these planned sponsors, all

8   of these states have been concerned about the Mayors'

9   program."

10          Again, the next slide.

11          Early in November of 2012, 2013, a lady, who was

12  one of the field reps of Great-West, wrote in to

13  Mr. Bresler, who's sitting there, Mr. Bresler was at the

14  headquarters of Great-West in Denver, Colorado, and she

15  wrote in and she said, "I'm sorry to say, I have not had any

16  time to work on my USCM business, and it doesn't look like I

17  will be able to get it -- to it until January."

18          She was working on Newport, California, L.A.  What

19  did Mr. Bresler respond to her in November of 2013?  "Don't

20  worry about USCM right now.  You'll get to it."

21          More evidence, ladies and gentlemen, July of 2013,

22  Ms. Weyland asked, "What are you doing about the problem

23  with the states?"

24          Look at this email, July 2013, from Teresa Myers,

25  who, at that time, was the national director for the program

1    for Great-West.  "USCM wants to discuss the sales approach

2    in the following states.  They continue to be stuck on this

3    issue and want us to clarify our sales strategy in the 11

4    states."

5              The Mayors were darn stuck on it, because in those

6    states, Great-West was selling the state program to local

7    cities, and nobody was selling the Mayors' program.

8              August 2014, but while this was going on, what was

9    happening at Great-West?  The evidence will show that

10   actually, Mr. Neese and his staff, and the government

11   markets segments at Great-West had their best year ever in

12   2014, best year ever.

13             In addition, you can see that in August of 2014,

14   Mr. Jurgens wrote an email.  Mr. Jurgens, the evidence will

15   show, was brought on, as I said, to run this program, to

16   restart it.

17             In this email, they have received inquiries from

18   various plans that have participated before with the Mayors,

19   they were part of the old program with Nationwide.  What did

20   the people at Great-West say?  "It makes more sense to have

21   them consolidate assets and join the state plan."

22             Mr. Jurgens said, "I would call them, let them

23   know that we could offer the USCM plan, but that they are

24   better off in the state plan."  In other words, go with

25   Great-West's state plan, not the Mayors plan, August 2014.

1           2014 was a great year for Great-West, a great

2    year, best year ever for their government markets business.

3    They added five new state plans.  They crossed $4 billion in

4    management of assets of government employees.  They renewed

5    25 plans.  They renewed five state plans.

6           Do you know that the evidence will show you that

7    in 2014, Great-West sold less than a thousand city

8    participants, sold to less than a thousand city participants

9    in the Mayors' plan?  They had a great year but not for us.

10          Let's now talk more about Mr. Neese.  Mr. Neese,

11   as you know, was in charge, and you saw this contract

12   provision before that said everybody had to apply applicable

13   professional standards.

14          Mr. Neese was the boss, but the evidence will show

15   that Mr. Neese was sanctioned by Great-West, as early as

16   2013, and then again in 2014.  For what?  For behavior and

17   inappropriate conduct under the code of business conduct and

18   ethics of Great-West.

19          Mr. Nelson told them, as a Great-West financial

20   executive, it's your responsibility to conduct yourself in

21   the highest of ethical standards.

22          Mr. Neese was sanctioned.  He got his bonus docked

23   and he didn't get a promotion.

24          But you know what?  He still was in charge of the

25   Mayors' account.  That's what the evidence will show.

1          Mr. Neese's performance caught up with him.

2    You're going to hear this evidence in this trial.  He got

3    caught.  Great-West undertook an investigation of

4    allegations of Mr. Neese's improprieties in connection with

5    company-related travel reimbursement and job performance.

6    Improprieties that related to the United States Conference

7    of Mayors' program.

8          And the conclusion of Great-West's own

9    investigation was that, it was true, Mr. Neese had committed

10   these improprieties.  He had submitted expense reports that

11   he said were related to his working on the Mayors' program,

12   but he wasn't working on the Mayors' program.

13         The evidence will show that at key times when

14   Mr. Neese should have been working hard to make the program

15   a success, he was AWOL.  You will hear that in June '15 at a

16   particularly critical time, when the partnership between

17   Great-West and the Mayors was in critical condition, and the

18   Mayors demanded a meeting in San Francisco, Mr. Neese not

19   only did not attend the meetings, Mr. Neese, as Great-West

20   confirmed, submitted expense reports for lunches and dinners

21   in which he said he was meeting with the Mayors, he was

22   meeting with Ms. Weyland, to talk about the program, to try

23   to deal with the critical problems, except there was a

24   problem.  They weren't there.  He wasn't meeting with the

25   Mayors.  You'll find out what he was doing, but he wasn't

1  meeting with the Mayors.

2         Mayor Benjamin will testify, Ms. Weyland will

3  testify, Mr. Bean will testify that they were not with

4  Mr. Neese when Mr. Neese told the people at Great-West he

5  was trying to save the program.

6         Instead of working with the Mayors to rescue the

7  program, he was enjoying food and drink in San Francisco,

8  but not with the Mayors.

9         And he wasn't attending a particularly important

10 meeting with the Mayors, at which over a thousand mayors and

11 city officials were in attendance, where he had the

12 opportunity to talk to people about the program, the

13 retirement program.

14        You will see that on June 19, 2015, Mr. Neese

15 said, and he reported to Great-West, that he was having

16 lunch with Mayor Benjamin and another mayor at a place

17 called the Franciscan Crab Restaurant in San Francisco,

18 which is on Fisherman's Wharf.

19        But the truth, as the evidence will prove, is that

20 Mayor Benjamin wasn't there in a meeting, Mr. Neese wasn't

21 trying to rescue the program at a critical time.  The

22 evidence will prove that Mayor Benjamin was across

23 San Francisco at the Hilton Hotel with President Obama, who

24 was addressing the United States Conference of Mayors.

25        Mr. Neese didn't even go.

1          Now, Great-West had to report to an industry

2   watchdog called the Financial Industry Regulatory Authority

3   about Mr. Neese's improprieties, and they put in that

4   report, which is a public, online document, that Mr. Neese

5   was discharged for violations of their business code and

6   ethics.

7          The expense analysis revealed inaccuracies that

8   occurred with such frequency that they were not isolated or

9   mistaken.  The company concluded that, through Mr. Neese's

10  repeated misrepresentations, he wrongfully deceived the

11  company for his own financial gain.

12         Ladies and gentlemen, Great-West fired Mr. Neese

13  and they fired him because they, Great-West, confirmed that

14  he had submitted fraudulent business expenses specifically

15  related to activities he said he was doing to promote the

16  Mayors' program.

17         Instead of owning up to their failures, as the

18  Great-West executives did in all those documents I just

19  showed you, you're going to hear in this trial excuses from

20  Great-West.  You're going to hear that, first of all, the

21  Seller email is probably a fake.  We'll present hard

22  evidence it's real.  Their second excuse, that the Mayors

23  didn't perform.  Well, the Mayors did perform.  We did what

24  we were supposed to do, but they were No. 1 in the business.

25  We took our government city employee program for retirement

1  to them because they were No. 1, No. 1, No. 1.

2          Their third excuse.  They're going to poke fun,

3  probably, at Ms. Weyland and the way she wrote some emails.

4  They're going to -- she tries to motivate people, maybe

5  sometimes in ways that others might find a little corny.

6  They're going to question her sincerity.  But as the Judge

7  instructed you this morning, you're going to see her, you're

8  going to hear her.  You will determine if she should be

9  castigated for trusting Great-West.

10          Excuse four.  The Mayors actually owe Great-West

11  money.  Remember I told you, they paid an advance of 2 and a

12  half million dollars to the Mayors, and now they want it

13  back.  There's a problem, though.  There's a problem.  Their

14  own documents say that they can't get it back.

15          The fifth excuse.  They're going to tell you that

16  this program wasn't worth much, wasn't worth -- the market

17  changed.

18          And then they're going to tell you that after we

19  terminated them -- we had to find a new way to deal with the

20  fact that we still have all these city employees.

21  Ms. Weyland still is responsible for their retirement.  So

22  we had to go back to Nationwide.  And so on January 1, 2017,

23  we went back to Nationwide.  And when we went back to

24  Nationwide, the revolution actually did happen.  The

25  revolution that Ms. Weyland wanted to have for city

1  employees happened.  Nationwide agreed to lower their fees.

2  Nationwide agreed to give better investment options.

3  Nationwide agreed to give more education.

4        But you'll also learn that Nationwide, after the

5  2013 and 2014 and 2015 and 2016 when Great-West ruined the

6  value of the program, Nationwide would only pay us $1

7  million per year.

8        What will the evidence be about the value of the

9  Mayors' program before Great-West destroyed it?  We will

10  prove that in '10, '11 and '12, Nationwide was paying the

11  Mayors $3 million per year for this program.  We will prove

12  that the evidence is that when the two most senior

13  executives at Great-West made the decision to execute the

14  contracts with the Mayors, effective October 1, 2012, they

15  talked to each other, they talked to each other about the

16  value of this program.

17        They valued the endorsement of the Mayors by

18  determining how Nationwide valued it.

19        Mr. Gray was the President and chief executive

20  officer of the defendant Great-West Life & Annuity on

21  September 22, 2012, and he asked Mr. Nelson, right in order

22  to make the decision to go into these contracts, what was

23  Nationwide paying?  And Mr. Nelson told him, Nationwide had

24  paid much more than 3 million per year historically, but it

25  has fluctuated and Nationwide had threatened to pay less, a

1  year ago, in their contract negotiations.

2          Recall this past week, Nationwide had offered up

3  to $6 million to retain Villa.  And, remember, Villa was

4  Great-West's name for the Mayors.

5          The senior most executives at Great-West valued

6  this program the way Nationwide valued it.  And in September

7  of 2012, Nationwide valued it, according to Mr. Nelson, at

8  $6 million per year.

9          Remember, ladies and gentlemen, these are ten-year

10 contracts.  We will ask you to make the Mayors whole for the

11 ten years of payments that they agreed to make to the

12 Mayors.

13         When all of the evidence is in, we will ask you to

14 value the harm done to the Mayors.  And the value, we will

15 prove to you, was a minimum of $30 million, and probably

16 more.

17         The evidence will permit you to right the wrong,

18 to right the wrong that Brent Neese did to the retirement

19 program, to right the wrong that Great-West did to the

20 330,000 city employees who could have participated in this

21 program if Great-West had done their job.

22         At the end of this trial, we will ask you to right

23 this wrong.  That's your power as a jury in the

24 United States of America.  You, you saw that report card

25 that Great-West gave itself.  Well, at the end of this

1   trial, you will be able to write your own report card on

2   Great-West's failure, Great-West's failure to perform these

3   contracts, and your report card will be your verdict.

4           We very much look forward to presenting the United

5   States Conference of Mayors' case to you.  Thank you.

6           THE COURT:  All right.  Thank you, Ms. Warner.

7           I'm going to have to take a break.  That was a

8   little bit longer than I thought it would be.  So we're

9   going to take a very short break, ladies and gentlemen, at

10  this time.

11          You've not heard any evidence in the case.  What

12  you've heard is the opening statement of plaintiffs.  You

13  need the hear the opening statement of defendants next

14  before we begin the trial.  So ten minutes, if you go out to

15  the jury room, take a ten-minute recess.  Remember the

16  admonition of the Court.  You don't talk about the case

17  among yourselves or anyone else while you're on break.

18  We'll see you back in ten minutes, please.

19          (Jury exited the courtroom.

20          THE COURT:  All right.  We'll be back in ten

21  minutes.  Thank you.

22          (Recess from 11:17 a.m. to 11:30 a.m.)

23          DEPUTY CLERK:  All rise.  This Court is again in

24  session.  Please be seated and come to order.

25          THE COURT:  Mr. O'Donnell, the court reporter

 1   mentioned you don't want to wear the mic.

 2          MR. O'DONNELL:  It had -- I was going down on my

 3   knee, Your Honor.  And I have a.

 4          THE COURT:  It's hard for the reporter to get it

 5   all down, is the concern.

 6          MR. O'DONNELL:  My voice is too loud.

 7          THE COURT:  I'll allow you to go ahead without it,

 8   but if the reporter signals to me it's not coming through

 9   well, I'm going to stop you and put it on in the middle of

10   your argument.  We have to be sure we've got it down on the

11   record.

12          MR. O'DONNELL:  Thank you, Your Honor.

13          (Jury entered the courtroom.)

14          THE COURT:  All right, ladies and gentlemen.

15   Ready to return -- your attention please.  Be seated and

16   we'll come back to order here.

17          Turn your attention, please, back to the case.

18   We're now going to proceed with the opening statement on

19   behalf of Great-West by Mr. Michael O'Donnell.  Thank you.

20          MR. O'DONNELL:  Your Honor, Counsel, Ms. Weyland,

21   and good morning, ladies and gentlemen.

22          Both sides, everybody in this room, wanted this

23   program to work.  They wanted government workers to be

24   benefited.  They wanted to do a revolution.  And we did.

25   Government workers wanted.  We drove down the fees the

1   competitors had to match.  Who lost?  Great-West lost.  And

2   plaintiffs didn't profit in the way they wanted to.

3          Why?  The very first communication with the cities

4   from the Mayors Conference, at the beginning of this

5   contract, said, Nationwide will continue to administer your

6   retirement program.

7          Here is what Mr. Cochran, the CEO of plaintiffs,

8   said.  On October 8th, 2012, the first day we were allowed

9   to try to sell, "To our valued retirement plan sponsors, we

10  wish to inform you that on September 30, 2012, the

11  relationship between Nationwide and the Conference ended by

12  mutual agreement.  Nationwide will continue to administer

13  your retirement program.

14         "Do you need to do anything at this time?  No.

15  Your existing group annuity contract remains with Nationwide

16  and will continue without interruption," signed Tom Cochran.

17  And announcing the program, somebody from Great-West, no.

18  Eric Stevenson, from our competitor, Nationwide.

19         This is the launch.

20         And plaintiffs received money for sending that

21  letter from Nationwide.

22         Plaintiffs told Great-West, we have talked with

23  the cities, we can open doors with the cities, we have

24  influence with the cities.

25         The cities told Great-West, we're happy with

1   Nationwide, we just signed a new contract with them.  We're

2   not associated with plaintiffs.  We're not familiar -- we

3   don't even know the plaintiffs.  Our mayor does not make

4   retirement plan decisions.  It's a city manager or someone

5   else.  We're not interested.

6          Plaintiffs told Great-West, we have influence over

7   about 4,000 plans.  That influence didn't help us much.  54

8   conversions.

9          Plaintiffs told Great-West, we have relationships

10  with about 1300 cities.  We find out later, only 400

11  dues-paying members.  They were supposed to open doors for

12  us.  Those doors were closed.

13         Plaintiffs praised Great-West.  I don't show you

14  this to criticize, show deceit of Ms. Weyland.  I show you

15  because it's the evidence.

16         The evidence, every one of these yellow boxes,

17  praised, from plaintiffs.

18         And if you'll look, just disregard all the praise

19  beforehand, everything was wonderful, everybody thought it

20  would work, everybody was excited.  But you've heard this

21  parade of terribles after.  Let's see what they said.

22  Thank you for all your hard work.  Great feedback on

23  Great-West.  You were all amazing.  This is after the

24  contract started.  We're a finalist for plan sponsor of the

25  year.  Tom and I thank you for believing.  Thank you for

1   your vision.

2           USCM is continued to be impressed and amazed by

3   the dedication, commitment and hard work by the Great-West

4   team.  I am as grateful and pleased with our partnership.

5   Thank you all for all you do.  Your guidance, patience,

6   perseverance.  Again, thank you for being wonderful.

7           You bring not only wisdom and experience, I

8   appreciate your guidance and patience.  Again, thank you for

9   being you.  Thank you for being you.  You are fabulous.

10  Great job on the training program.  Months before they cut

11  the contract short, after three years and two months of a

12  ten-year deal, they terminated, not Great-West.

13          What's the case about?  Money.  It's a breach of

14  contract case.  Both sides claim they lost money because of

15  the other sides' conduct.

16          There's no dispute that both sides entered into

17  the contract believing each would make money.  Not seeing

18  any guarantees in the contract.  You've not seen any

19  minimums.  This wasn't a fixed-fee deal like they had with

20  Nationwide.  Plaintiffs said, Great-West invested millions

21  in this program.  Then failed to use its best efforts to

22  sell the program?

23          The only way Great-West made any money and could

24  get a return on their investment is if they made sales.

25  They were absolutely motivated.

1          Ladies and gentlemen, I'm going to organize my

2   thoughts around five themes.  But first, plaintiffs

3   terminated a 30-year relationship with Nationwide due to

4   excessive participant fees and poor service.  No. 2,

5   plaintiffs wanted Great-West and told Great-West they had

6   clout.

7          No. 3, Great-West worked hard to sell the

8   revolution.

9          No. 4, program failed to achieve sales success for

10  reasons outside Great-West's control.

11         And No. 5, Great-West revolutionized the market,

12  plan participants won.

13         First, they terminated the 30-year relationship

14  with Nationwide due to excessive participant fees and poor

15  service.

16         Let's talk first about how the Nationwide contract

17  worked.  So Nationwide would pay an annual fee to

18  plaintiffs.  It was a fixed fee.  And then Nationwide

19  promoted to the Mayors and tried to make their sales app.

20  That was the Nationwide deal.

21         So why did they want to change to Great-West?  For

22  years, plaintiffs got millions to endorse Nationwide as

23  their preferred retirement plan provider.  And that even

24  though Nationwide was charging city employees excessive

25  fees.

1          In 2009, Nationwide paid plaintiffs 3 million, you

2    heard.  May of 2011, Nationwide told the plaintiffs that

3    number would be cut in half down to 1.5 million by 2016.

4          That's why plaintiffs sought out Great-West,

5    because Nationwide was driving down the fixed fee.  Weren't

6    going to pay them as much.

7          And that's what's called an affinity relationship

8    or a trade organization or an endorsement.  Michael Jordan

9    endorsing Nike.

10          Plaintiffs had been getting too much money from

11   Nationwide, and these affinity relationships were getting

12   noticed by plan participants, lawmakers, and plaintiffs'

13   lawyers.

14          Mr. Cochran wrote, the CEO, to Nationwide in 2011,

15   "As you know, upon receipt of your term sheet, my Board of

16   Mayors asked the conference staff to undertake extensive due

17   diligence and complete a detailed analysis of our current

18   deferred compensation program as it relates to others in the

19   marketplace.  This is not only as a result of Nationwide's

20   proposed term sheet that we received in May, but as a result

21   of a new Dodd-Frank regulations," which were enacted in

22   2010, we'll hear more about them, during President Obama's

23   administration, to keep a check on these kinds of

24   endorsement deals and make sure they were transparent and

25   government employees and the public weren't getting

1   bamboozled.

2          So Ms. Weyland, March of 2011, more than a year

3   before the program, "I am wondering how much in assets we

4   have in Great-West.  Perhaps that and our reputation would

5   interest them along with the 393 cases we have currently

6   with Nationwide.  I believe they are also the current

7   provider for the City of Los Angeles, the city of our

8   incoming president.  I wonder if this might give them an

9   interest in talking to us.  Your thoughts."

10         Great-West provides retirement benefit packages

11  for plaintiffs.

12         These are all people who invest their money.

13         Second theme.  Plaintiffs wanted Great-West and

14  told Great-West they had clout.

15         Why did they want Great-West?  Well, market

16  surveys that they had done, they hired consultants, they

17  spent one to two years researching, who should they endorse,

18  who should they recommend.  Market surveyed indicated and

19  these consultant told them, that verified to USCM that

20  partnering with Great-West would start a revolution, to

21  create a richer, better-educated retirement experience.

22  Zero administrative fees under the standard USCM plan.  A

23  new team solely dedicated to USCM business.  Improved fund

24  selection.  More USCM input for both educational offerings

25  and for the program overall.

1          Over the last year since the new program launched,

2     USCM has continued to be impressed and amazed by the

3     dedication, commitment, and hard work by the Great-West

4     team.

5          So this is the internal analysis they did to

6     present to the finance and audit committee of plaintiffs in

7     October of '11.  And that plaintiffs' internal analysis

8     shows Great-West was a better choice.

9          What do you think the first reason was a better

10    choice?  Nationwide revenue was going down.  It was going

11    down to 1.5 million in 2016.

12         A little later, they get to why it's a better

13    choice for plaintiff participants.

14         The Nationwide plan, standard case, 25 million

15    below, pricing will remain the same, varying from 70 to 95,

16    basis points, BPS, for administration.  That's points.

17    It's like a little less than 1 percent.  So a lot of money

18    and a low interest rate environment.  If you're only getting

19    2 or 3 percent, 1 percent fee is huge.  USCM will be asked

20    to focus on intelligence, access, and relationship building.

21    Large cases will be the priority, but USCM will be called

22    upon for help upon small cases as well, doubling the amount

23    of work required.  Nationwide was going to make them do some

24    work.

25         What did they say about the Great-West plan?  USCM

1    will have more involvement and fund performance analysis.

2    This will help show the value of the relationship brings to

3    participants, which will be required to some extent by new

4    regulations, such as Dodd-Frank.

5              So they'll be involved in helping select and do

6    the strategy.

7              Pricing will drop significantly from the current

8    plan with zero administrative fee for nearly all cases.

9    Investment options will be improved.

10             Plaintiffs said Great-West was, quote, the best in

11   class service provider capable of offering products and

12   services that focus on benefiting city employees.  The No. 1

13   provider of retirement plan recordkeeping for the 457 public

14   market, servicing 25,000 plans representing 4.5 million

15   participant accounts.

16             The retirement readiness revolution, 2013 business

17   plan.

18             This business plan wasn't just done by Great-West,

19   it was done in conjunction.  Remember, it's a joint

20   marketing agreement.

21             Great-West's program was, in fact, a revolution.

22   Better outcome for participants, better outcome for cities.

23             For cities, they got best in class plan sponsor

24   services, low cost, high value service provider,

25   transparency, fee transparency, how much is this going to

1   cost you.  All drives us nuts when we don't know how much

2   people are charging us.  Great-West is transparent about

3   that.

4          Ease of administration.  Fiduciary warranty,

5   retirement readiness report card.  And what did the city

6   employees get?  Lower cost, potentially more money in the

7   account.  Guaranteed local services at the locations,

8   retirement readiness tools at their fingerprints, education

9   stuff.  And better products and services.

10          So this compares -- the new USCM program took the

11  old program, the Nationwide, so administration and education

12  fee, zero for Great-West.

13          What did it cost for Nationwide?  95 basis points

14  to 65 basis points, depending upon how much money the plan

15  has.  Almost 1 percent at the 95.

16          Five-year average returns, 3.74 percent, compared

17  to the 1.1 percent.

18          Ten-year average return, 8 percent, compared to

19  the 5.91 percent -- excuse me, 5.93 percent.

20          Number of failing programs for funds?  Than what

21  we propose?  Zero.  Number of the Nationwide program?  Ten.

22  A failing fund is a bad thing.

23          So let's talk about how the Great-West contract

24  was, how that worked.

25          So the Mayors Conference would give us contact

1    list, influence.  Here are the people you should go talk to.

2    We would then, in joint marketing with the Mayors, go, and

3    sometimes we'd go together, sometimes we'd go separately,

4    and meet, phone call, email, educational seminars, to the

5    city governments.

6              And then hopefully they would convert.  If they

7    did convert, we would pay $10 per person for that.  So for

8    every plan participant, we'd pay $10 to the Mayors.  As

9    opposed to Nationwide, which was doing a fixed figure.

10             This was contingent on everyone's performance.  No

11   guarantees, no minimums.

12             Plaintiffs told Great-West, we have clout, about

13   4,000 plans and over 300,000 participants.  The participants

14   are dissatisfied with Nationwide.  They knew a Great-West

15   program was clearly better for city employees.  That's what

16   plaintiffs says.

17             They represented they had clout.  2011.  It was a

18   long discussion.  This started in 2011 and went through

19   until the deal was struck by October 1, 2012.  This is long

20   before this.

21             Our clout reaches far beyond this list that they

22   use.  We can open doors.  But when we got to those doors,

23   the cities told Great-West, never heard of the plaintiffs,

24   employees loved Nationwide.  We just re-signed them.  You'll

25   find out later who helped them re-sign with Nationwide.

1          Mayors part-time talked to the city manager.  You

2    will never leave, for example, International Association of

3    Firefighters.  81 leadership mayors, mayors with leadership

4    roles in plaintiffs' organization.  How many of their cities

5    did they influence?

6          That's the Mayors' leadership.  Four.

7          The third thing, Great-West worked hard to sell

8    the revolution.  We used our best efforts to promote the

9    program.  Great-West contacted over 98 percent of the top

10   937 target cities within the first seven months of the

11   program from October of 2012.  We reported our sales

12   activities and challenges to plaintiff.  And despite our

13   best efforts, very few cities switched to the new program.

14         Brett Neese, to Gregg Sellers and others,

15   November 2, just a few weeks in, end of week 3, we have 21

16   sales, 855 participants, $17,047,784.  We have contacted 60

17   percent of the plans over 1 million in assets.  Detailed

18   report attached.

19         By May 6th, 2013, is that maybe seven months in,

20   number of plans in tier 1 and tier 2.  Tier 1 is over 5

21   million, tier 2 is 1 to 5 million.

22         Total of 937 plans identified.

23         Contacted 927.  That's 98.93 percent in the first

24   seven months.

25         And here they are.  Those are the contacts we made

1   in the first seven months.

2           So for all sort of reasons, sales weren't good.

3   So what did Great-West do?  They said, let's do version 2.0.

4   Let's try something different.  Whatever is happening, the

5   doors aren't getting opened, we're not closing enough deals,

6   let's change it up.  So we did.

7           And you'll look.  So version 1 in the Nationwide,

8   ICMA is another competitor, and then version 2.

9           Morning Star is a big rater of funds.  Our --

10  higher the better, of course.  3.46 and 3.65, we approved at

11  2.0.  Nationwide was 3.04, ICMA was 3.33.

12          Number of failing funds, zero, in version 1 and 2.

13  Eight to seven for Nationwide and ICMA.

14          Expense, again, that's going to take money from

15  the plan participants.  And this is across all the programs.

16  Average expense on our program is .95 and .97 percent.

17  Nationwide, 1.57 and 1.42, more than a half a percent

18  difference in expense.

19          We did additional training.  And we talked about

20  how do we sell against this Nationwide fixed rate.

21          And this is training for our salespeople to say,

22  hey, if you get in the door, the door is open and you get in

23  and you get a meeting, here's what you need to say to those

24  folks.

25          Average credit quality for Nationwide on the left,

1  BBB.

2          Our funds, A plus to AA minus.

3          Credit quality, better for our funds.

4          Participant liquidity, 20 percent annual

5  restriction of taking their money out of the Nationwide

6  program.  So if interest rates went up and they got to more

7  than 3.5, they didn't, but if they did and no one knew

8  whether they would or not, these people would be stuck for

9  five years, because they could only get their money out 20

10  percent of the time.

11          Our program, it was liquidity, they could get out

12  their money out if there was a better program.

13          Protected from creditors in the company.  No.  The

14  Nationwide's money, their fund was backed by the general

15  accounts of Nationwide.  If Nationwide failed like companies

16  did in 2008 and 2009, these people are out of luck.

17          Protected from creditors of the company, yes, for

18  Great-West.  We'll talk about rate subsidization, some of

19  our witnesses will talk about that.  Their's, Nationwide's,

20  was not more responsive in rising interest rate environment,

21  ours was.  You could get your money out.

22          Through the end of 2015, Great-West had used its

23  best efforts to make sales.  We had 1,157 meetings, 1,173

24  phone calls, 900 emails.  Sold to 2,931.  We did 17

25  Webinars, approximately three or four a year.  We did six

1   mass mailings, a couple of year.  Six fiduciary seminars, a

2   couple a year.

3          And here's a little different story.  Ms. Weyland,

4   November 2, 2012, to Brent Neese, my friendship with you is

5   submitted.  You've earned my faith and trust.  I look

6   forward to building this partnership together.

7          January 21, 2013, thank you for all your hard work

8   and confidence in the conference.  I got great feedback on

9   the Great-West revolutionaries and our form, you were all

10  amazing.  It was USCM and my great fortune to partner with

11  you as well as my personal pleasure and blessing.

12         Ms. Weyland, 2013, to Brent Neese, you are such a

13  special person.  I am so grateful and pleased with our

14  partnership and blessed with our friendship.  It was a

15  pleasure to be part of the Great-West family and honor.  In

16  fact, this soldier's traveling across Kentucky,

17  West Virginia, and Maryland battlefields to rest and march

18  on with our revolution.  God bless with lots of awe and

19  respect.

20         Ms. Weyland, 2014 now, thank you for all you do

21  for me and the program.  Your guidance, patience

22  perseverance, as well as the speed of getting back to us

23  with information.

24         Remember, as Jim reminds me, there's always sun

25  behind the clouds.  Forward to revolution.

1          Again, thank you for being wonderful, steady,

2    supportive.

3          Compliments John Borne, January 6th, 2014, "John,

4    I want to reach out today.  Just beginning the new year,

5    every year I try to remember, you, my dear friend and

6    colleague, are one of them.  As we travel the journey with

7    public employees to a bright financial future and continue

8    the revolution, I want you to know how lucky I remember that

9    USCM is lucky to have you on your team.  You bring not only

10   wisdom and experience, your positivity always reminds me, as

11   Jim is fond of saying, there is always sun behind the

12   clouds.  I know there have some bumps for all of us but we

13   are joined by a worthy goal and travel on with friendship

14   and determination.  I know I'm an acquired taste, sometimes

15   too spicy, sometimes too soggy, but I always know I am

16   totally committed to the revolution, and so grateful you

17   took the leap and joined us as we change lives one at a

18   time.  I appreciate your guidance and patience with me and

19   can assure you my team and I will redouble our efforts this

20   new year.  Again, thank you for being you."

21          Ms. Weyland's team and her will redouble their

22   efforts.

23          2014, to Mr. Neese, Mr. Borne and others, "Dear

24   family, thank you for being you, for being such a super

25   partner and for all you do for our everyday heroes.  You are

1    fabulous.  We are so fortunate to know you and to have

2    joined forces in the journey to a bright financial future.

3    Rest up, get or stay well, and most sincerely, thank you."

4            Plaintiffs did not claim Great-West was the reason

5    for slow sales.  This is their document.  These are the

6    challenges.  They identified them, to selling their program.

7    Nothing about Great-West in there.

8            Theme No. 4.  Programs failed to achieve sales

9    success for reasons outside Great-West's control.

10           So why did the plan switch?  Well, remember the

11   launch letter, Mr. Cochran's letter, told them to do

12   nothing, October of 2012.  Nationwide, mentioned four times;

13   Great-West not in the document.  Do you need to do anything

14   at this time?  No.  Not the kind of launch we expect or

15   expected.

16           And by the way, contractual, they needed to run by

17   communications by us.  No one at Great-West saw this before

18   it came out and they were very angry, and you'll even hear

19   from Ms. Weyland, she tried to make changes to it before it

20   went out, unsuccessfully.

21           Plaintiffs' name and logo, unfortunately, lacked

22   the clout they thought it did.  And that's an example of

23   why.

24           Also, Nationwide implemented a retention strategy.

25   They got cities to sign new contracts during the 12-month

1    notice period.  They gave -- the plaintiffs gave Nationwide

2    a one-year head start.  They gave them notice that they

3    weren't going to use them, they were going to go with

4    Great-West.  So you think Great-West -- what did Nationwide

5    do?  Well, they're competitors.  They have a year to get out

6    in the marketplace.  They lowered fees to keep participants

7    because they knew Great-West was going to come in there with

8    lower fees.  They told participants they'd be taxed if they

9    switched to Great-West.

10          And Jeanie Fanning of the plaintiffs calls this --

11   subject line, Nationwide tricks, April 23, 2013, Nationwide

12   sent a letter to employees that talks about how rollovers

13   can be taxed.  This obviously isn't a rollover, it's a full

14   transition.  But the presence of a letter is confusing

15   participants into thinking they can be hit with a tax

16   liability, which I'm sure is what Nationwide wants.

17   Nationwide tricks.

18          Other reasons for slow sales.  I'm going to go

19   into this in great detail.  Great-West explained the reasons

20   for slow sales.  We had executives get on a plane in Denver,

21   fly to Washington, D.C., met with the Mayors representatives

22   in December of 2014.  We went through the product

23   challenges.  We went through why sales were low.  What was

24   the response?  They asked us to leave.  Didn't want a part

25   of us, didn't want to try to talk about it.

1          Plaintiffs blame Great-West.  We should have

2     offered a 3.5 percent fixed product.  Both sides knew of the

3     rate challenge going in.  The fact that Nationwide was doing

4     its 3.5 percent rate, but we had to sell against it because

5     of all the problems with the 3.5 percent rate.  The credit

6     rating suffered.  The high expense associated with it.  Both

7     sides knew, this was a joint program.

8          There were 55 other options besides the 3.5

9     percent in the Nationwide program.  And we had dozens in

10    ours to choose from.  There's no doubt, government employees

11    tend to, as a rule, like a stable value in funds, fixed

12    rates, no doubt about that.  Not trying to diminish, this is

13    just one of 56, but there were 55 other options.

14         Great-West's overall investment returns were

15    higher.  Again, all of our programs, you go with our

16    program, our overall package was higher if you diversify.

17         We talked about the different ratings that ours

18    was better.

19         We talked about it was less liquid.  You couldn't

20    get out of the program at Nationwide like you could ours.

21         Higher fees, we talked about that.

22         And the market simply would not support, and we'll

23    talk a lot about that.  There's nobody out there that was

24    going to go match them.

25         Plaintiffs blame Great-West for the state plans.

1   They presented a conflict, because we were out state plans.

2   Great-West fully disclosed our state business.  It was no

3   secret, we used separate teams to market the plaintiffs'

4   program.

5           September 20, 2011, almost 13 minutes [sic] before

6   the program started, disclosure item, Great-West discloses

7   that it has some existing relationships with state

8   government deferred compensation plans that require the

9   company to market the state program to eligible political

10  subdivisions in the state.  In some of these states,

11  approximately four, but we're still reviewing, we are

12  prohibited from offering alternatives to the state program

13  in the political subdivision market.

14          We agree to make a best efforts initiative to

15  request approval of such state entities to offer the program

16  in their states.  We cannot, however, guarantee that our

17  efforts will be successful.  We do not believe that this

18  issue would prevent us from assuming services for existing

19  entities that participate in the USCM program.

20          We told them 13 months before that we had the

21  state program.  We said we'd make best efforts to try to be

22  able to sell and compete against the state programs with

23  their city program, and it's exactly what we did, because we

24  went to those states and with all of those, we talked them

25  into it, in letting us serve the cities too and not just the

1   states.

2          They'll say the national rollout diluted sales

3   effort.  We should have concentrated on a few states.  Both

4   parties agreed to the strategy.  Great-West contacted all

5   targets.

6          They signed off on it.  This is August 10th, 2012,

7   several months before the contract.  We're at their offices

8   in D.C., attendees, representatives from -- three

9   representatives from the plaintiffs and three

10  representatives from Great-West.

11         All plans over 1 million in assets will be

12  contacted after the initial mailing by a tier 1 or two

13  contact.  Tier 1 is the top 270 plans, tier 2 is the next

14  603 or so plans.  Tier 3 are the plans under 1 million in

15  assets.  This was joint.

16         They say retirement counsels were not salespeople.

17  Our people were well-trained plan specialists who were

18  motivated to make the program a success.  You don't become

19  No. 1 in any industry without having some clue about what

20  you're doing.

21         Turnover senior management.  Mr. Seller worked

22  continuously is a consultant and Mr. Nelson did not leave

23  until 2015, shortly before they terminated us.

24         Neese and Borne expense issues.  They occurred

25  even later in 2015.  This isn't 2012 or '13 or '14.  They

1 were unrelated to the sales effort.  Plaintiffs praise their

2 performance.  And Great-West did the right thing and they

3 did the investigation.  And when they saw that something

4 wrong was going on, they terminated us.

5         And this is Great-West who spent the money, not

6 the Mayors.  They didn't pay for the lunch.

7         Seller email.  Well, turns out Mr. Seller and

8 Ms. Kretschmer-Weyland are friends.  Their families took

9 cruises together, just weeks before this email was sent, to

10 the Galapagos.

11         There's no proof of who drafted what parts of the

12 email.

13         Mr. Seller denies the statements are true in the

14 email.

15         We have no idea who wrote the email.  Contains

16 statements which other documents show he doesn't agree with.

17         In other words, he's going to deny it.  It

18 contains things he should not have written because no

19 knowledge.

20         They may bring in a computer expert.  And that

21 computer expert, to say it was off of Mr. Seller's email,

22 who cares?  Ms. Kretschmer-Weyland might have drafted the

23 numbered paragraphs in the email.  I don't know.  He doesn't

24 know.  Mr. Seller's drafted only the opening paragraph.  He

25 doesn't know.

1          Mr. Seller's reply simply incorporated someone

2     else's original text.  There will be evidence that

3     Mr. Seller and Ms. Weyland are very good friends,

4     Ms. Weyland respected his writing ability and would

5     sometimes send to Mr. Seller and ask him to edit.  He would

6     be for this program to edit even before this program.  But

7     it doesn't matter.  The statements in the email are not true

8     and we'll prove it.

9          A couple of examples.  Email says, some prospects

10    weren't contacted at all, if once.  See El Paso, Texas.  San

11    Antonio.  San Antonio public service.  City of Bedford.  All

12    contacted multiple times.

13         Well, you know, you weren't keeping -- some email

14    says you weren't keeping us in contact with what was going

15    on.  There were agendas.

16         There were sales discussions.

17         Sales force, a program.  You can log on from

18    anywhere to find out what's going on.  The salespeople would

19    input into it.

20         Sales activity logged in the sales force,

21    plaintiffs had access to it.

22         Hope was two years into the program, Ms. Weyland,

23    hadn't accessed it.

24         It's transparent.

25         You heard about tanking the deal.  Mr. Neese did

1  not want to tank the deal.  Mr. Seller simply misunderstood.

2  His email, Mr. Neese's email, attached an article critical

3  of affinity relationships, and lot of people are critical of

4  those relationships.

5           And the article specifically called out the $10

6  participant Great-West program.  That's a threat to sales.

7  In other words, there was a negative article about this

8  affinity relationship and about giving an endorser

9  organization $10 per participant.

10          He was worried about it.  And he simply told his

11 boss, it is easier to sell against the affinity relationship

12 than it is to sell the affinity relationships.

13          Mr. Seller somehow interprets that as tanking the

14 deal.

15          You might hear about payment for City of

16 Tallahassee.  Under that contract, plaintiffs were entitled

17 to $10 participant only on plans with over -- or less than,

18 excuse me, $25 million in assets.  For plans over 25

19 million, any compensation was discretionary.

20          Great-West had been working on the Tallahassee

21 program before this program had started in October of 2012.

22          Tallahassee did not want Great-West to compensate

23 plaintiffs.  They thought it was a conflict of interest.

24          So program is still not profitable for Great-West

25 or plaintiffs.  Great-West offered to restructure the

1   contract.  We said, let's change it, people don't seem to

2   like this affinity.  Why don't you become an advocate.

3   We'll pay you a fee and you advocate.  It will be

4   educational.  You will tell your people at conferences about

5   us.  We'll pay you a fee for that.

6          But Ms. Weyland said, August 20, 2014, USCM must

7   have a monetary path forward in the coming years.  It's all

8   about money.

9          Great-West continued our efforts.  We agreed to

10  side-by-side sales.  We said we were okay partnering with

11  other competitors, side-by-side sales.

12         Additional training, attended and praised by

13  plaintiffs, yet plaintiffs terminated the contract.

14         They praised Great-West's training.  This is from

15  Jeff Bean of the Mayors.  "Great job on the training

16  program.  It was all very informative and helpful."

17         And the final theme, and shortly after that,

18  hopefully, lunch, Great-West revolutionized the market.

19  Plaintiff participants won.

20         Participants got lower fees because of Great-West.

21  They got better investments because of Great-West.  They got

22  better returns because of Great-West.  They got better

23  service because of Great-West.  They got better education

24  because of Great-West.  And not just from Great-West, but

25  Nationwide and the other companies had to match it.

1            But Great-West lost.  We advanced $2.5 million to

2    the plaintiffs.  And plaintiffs have kept most of the

3    $2.5 million advance.  Both sides agreed in this case.  We

4    agreed on the sales strategy.  We've met and agreed on the

5    sales training.  They participated in the training, came out

6    very impressed with the training.

7            Participated and we agreed on sales literature.

8            We did city visits, sometimes apart, sometimes

9    together.

10           And both sides agreed on the investment portfolio.

11   Again, it's a joint marketing agreement.

12           There's no dispute, you've heard it from both

13   sides, Great-West is an industry leader in employee

14   retirement plans.

15           The program was lower cost and better overall for

16   participants.

17           Great-West was USCM's own retirement services

18   provider until several weeks ago when they gave us notice.

19           Two years after terminating us.

20           Great-West revolutionized the retirement plan

21   market for smaller cities.

22           So we believe plaintiffs' damage claims are

23   unfair.  They've hired an expert who we assume will come

24   testify to calculate huge numbers that you heard.  The kind

25   of money would have happened if all 300,000 participants had

1  converted, if the doors had been opened, if the influence

2  had been there.  And the number's based on money plaintiffs

3  claim Nationwide would pay, but only if Nationwide did not

4  cut its fees, they didn't want Nationwide because they're

5  asked to do more and Nationwide wouldn't agree to cut its

6  fees.

7       Their expert ignores that Nationwide was reducing

8  their fees.  1.5 million in 2015 and 2016, they were

9  cutting.

10      Great-West came up with all sorts of different

11 scenarios.

12      One of the worst-case scenarios was if they had

13 14,000 participants per year, in 2012 that made 107,000 in

14 revenue; 2013, 1.63.

15      And the idea was it grows, it takes time, it's a

16 ten-year contract.  Ours was terminated after three years

17 and two months.

18      Contract started October 1, Great-West contract.

19 Contract terminated December 22, 2015.  Contract supposed to

20 expire 2022.  That's all the yellow.  That's Great-West.

21 And the red is the new Nationwide contract.  January 1,

22 2017, and they're back with Nationwide, getting money from

23 Nationwide.

24      What'll the evidence show?  The plaintiffs sought

25 out Great-West because we were the best, we are the best.

1    The contract would make money for both sides if participants

2    from Nationwide or there were new sales.  No guarantees.

3             And plaintiffs said large numbers of Nationwide

4    participants would convert to the new program through its

5    clout, through its influence.

6             Plaintiffs wanted to revolutionize the retirement

7    plan market for small and mid sized cities.

8             Great-West accomplished that goal.  Nationwide and

9    other competitors were forced to lower their fees and

10   provide better service.

11            As Ms. Weyland will tell you, the only people who

12   didn't win in this case was the Conference and Great-West.

13            The participants won, but plaintiffs did not

14   profit.

15            Ladies and gentlemen, at the close of all the

16   evidence, on behalf of Great-West, I'm going to ask you to

17   deny their claims for liability and damages.  Instead,

18   I'm going to ask you to have them return the several million

19   dollars that we advanced in this program.

20            I want to thank you for your service, for your

21   time and on behalf of Great-West employees, thank you very

22   much.

23            THE COURT:  All right.  Thank you, Mr. O'Donnell.

24            Ladies and gentlemen, those, again, unless they're

25   stipulated, records are not evidence in the case as to the

1   arguments or statements of counsel.  We'll start the trial

2   now very shortly with the testimony of the witnesses, but

3   it's 12:25 so we're going to take our luncheon recess.

4          We're going to return at 1:30.  So I'll have about

5   an hour for lunch.  You're welcome to go wherever you wish

6   for lunch, to the cafeteria downstairs, which is actually a

7   pretty good cafeteria, or to outside, if you wish, but you

8   have to be back here at and ready to go sitting here at

9   1:30.

10         We'll bring you in from the jury room when you're

11  all assembled again.

12         This is the first break.  I want to give you a

13  reminder, a little more detail in the future, because this

14  is the first lengthy break.  Remember, again, you don't

15  discuss the case with anyone, not with the parties, the

16  witnesses, attorneys or any connected with the case.  You

17  don't talk to your fellow jurors again, friends or family.

18  You have to keep an open mind throughout this evidentiary

19  part of the trial, you have to be fair to both sides.  And

20  you don't reach a conclusion until after you've had your

21  final deliberations after the evidence is in and you've

22  heard my instructions on the law.

23         Secondly, don't permit anyone to try to discuss

24  the case with you.  It applies to anyone, including members

25  of your family or friends, the courtroom spectators,

1  witnesses, reporters, the parties to the case.  If someone

2  tries to discuss the case with you, tell them not to talk to

3  you.  If you overhear any discussion about the case or

4  someone is approaching you about it, you have to report it

5  to me right away.  But don't talk to your fellow jurors if

6  that occurred.

7            Now, when you go to the cafeteria, for instance,

8  right now, there will be people connected with this case

9  that may come down there at the time.  You may end up in the

10 elevator with people.  You must not talk to any of the

11 parties or their counsel here or any witnesses at any time.

12 It's not impolite not to talk to them.  They understand

13 that.  Avoid having conversations with anyone connected with

14 this case outside this courtroom.

15           If you walk by the group of attorneys that are

16 talking about the case, you immediately leave the area and

17 avoid hearing any discussions by the attorneys about the

18 case.  If you do hear anything about the case, you have to

19 report that to me.

20           Now, just remember, you want to decide this case

21 from the evidence presented in this courtroom and nothing

22 else.  So that means, again, no contact with the social

23 media about anything dealing with this case or attempts to

24 research and look anything up about these issues in this

25 case.

1          All right.  With that advice I'm going to excuse

2   you for lunch.  We'll have you back in the jury room,

3   please, by 1:30 and then we'll have you out here to take the

4   first witness.

5               (Jury exited the courtroom.)

6               (Proceedings concluded at 12:26 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

       I, William P. Zaremba, RMR, CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-titled matter.


Date: January 9, 2018_____   /S/__William P. Zaremba_____

                       William P. Zaremba, RMR, CRR