IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES CONFERENCE          )
OF MAYORS, ET AL.,                )
                                  )   CA No. 16-660
        Plaintiffs,               )
                                  )   Washington, D.C.
        vs.                       )   January 10, 2018
                                  )   9:30 a.m.
GREAT-WEST LIFE & ANNUITY         )
INSURANCE CO.,                    )   Morning Session
                                  )
        Defendant.                )
_____ )


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE THOMAS F. HOGAN
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:        Margaret H. Warner
                           Michael S. Nadel
                           Jennifer B. Routh
                           Erika N. Pont
                           MCDERMOTT WILL & EMERY LLP
                           McDermott Building
                           500 North Capitol Street, NW
                           Washington, D.C. 20001
                           (202) 756-8000
                           mnadel@mwe.com
                           mwarner@mwe.com

APPEARANCES CONTINUED

For the Defendant:                Michael L. O'Donnell
                                  Edward C. Stewart
                                  Shawn K. Neal
                                  WHEELER TRIGG O'DONNELL LLP
                                  370 17th Street
                                  Suite 4500
                                  Denver, CO 80202
                                  (303) 244-1800
                                  odonnell@wtotrial.com

                                  Mary Patrice Brown
                                  O'MELVENY & MYERS LLP
                                  1625 Eye Street, NW
                                  Washington, D.C. 20006
                                  (202) 383-5376
                                  mpbrown@omm.com

Court Reporter:                   William P. Zaremba
                                  Registered Merit Reporter
                                  Certified Realtime Reporter
                                  Official Court Reporter
                                  U.S. Courthouse
                                  333 Constitution Avenue, NW
                                  Room 6511
                                  Washington, D.C. 20001
                                  (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

– – –

WITNESS INDEX

– – –

WITNESSES                  DIRECT CROSS REDIRECT RECROSS

PLAINTIFF's:

KATHRYN KRETSCHMER—WEYLAND   35

P R O C E E D I N G S

1   DEPUTY CLERK:  All rise.

2   All rise.  This Honorable Court is now in session,

3   the Honorable Thomas F. Hogan presiding.  Please be seated

4   and come to order.

5   THE COURT:  Good morning.

6   Call the case first and then --

7   DEPUTY CLERK:  Your Honor, this morning this is in

8   re: United States Conference of Mayors versus Great-West

9   Life & Annuity insurance company.

10  Civil Action Number 16-660.

11  THE COURT:  All right.  Thank you.

12  Yes.

13  MR. NADEL:  Good morning, Your Honor.  Plaintiffs

14  just have two brief issues.

15  THE COURT:  All right.

16  MR. NADEL:  Dr. Jones, who is one of plaintiffs'

17  experts, is in the courtroom this morning and the parties

18  have agreed that the exclusion of Rule 615 does not apply to

19  him and he can stay.

20  And then second, after Ms. Weyland testifies

21  today, we would propose to play the deposition video for

22  Melvyn Leshinsky, and the Court has the annotated copy of

23  that transcript, but there are some objections that both

24  sides have, so at some point if we can either discuss those

1  rulings we can cut --

2          THE COURT:  I'm not sure she'll be finished before

3  lunch.  I assume that she won't be, so I believe we can do

4  it over the lunch hour if we have to, all right.

5          MR. O'DONNELL:  Thank you, Your Honor.

6          MS. BROWN:  Yes.

7          I just have a couple of preliminary matters as

8  well.

9          As the Court knows, we have, we, the defendant,

10 have filed a bench memorandum regarding the Board of

11 Directors' minutes.  Ms. Weyland is on the stand, I expect

12 that plaintiffs will, today, elicit testimony from her about

13 those Board of Directors' minutes.

14         We would ask that that testimony not be elicited

15 until we have an opportunity to be heard on those board

16 minutes.

17         THE COURT:  Uh-huh.

18         MS. BROWN:  Secondly, yesterday, both in opening

19 and in the examination of Mayor Benjamin, the plaintiffs

20 introduced some of the expense reports regarding Mr. Neese.

21 In addition, however, in opening, there was a reference to

22 reasons why he was fired; and a little after 10:00 last

23 night, plaintiffs filed another bench memorandum regarding

24 the allegations of sexual harassment by Mr. Neese.

25 Likewise, Your Honor, we would like to be heard before any

1    testimony is elicited from Ms. Weyland as their brief -- or,

2    excuse me, their bench memo reflects yet again they are

3    insisting that Mr. Neese's alleged sexual misconduct somehow

4    relates to his performance on this contract, where no

5    evidence whatsoever has been introduced pretrial, during

6    discovery or at present about Mr. Neese either meeting,

7    making sales calls or having anything to do with directly

8    interacting with Mayors.  And so we would like to be heard

9    on that, Your Honor.

10           Similarly, inadvertently yesterday, the copy or

11   the cover of the internal investigative report prepared by

12   Great-West's attorneys was inadvertently published to the --

13   other documents were inadvertently published to the jury.

14   The Court has previously ruled that those -- that that

15   information be redacted.  It was not redacted.  We would ask

16   that those redactions take place now before we proceed any

17   further in the case.  And as additional evidence of that,

18   attached as an exhibit to the bench memorandum plaintiffs

19   filed under seal late last night, is another copy of the

20   internal investigative report.  We will be handing up to the

21   Court today, this morning, and we will be filing another

22   bench memorandum regarding the Kellogg Brown Root series of

23   cases in the D.C. Circuit, indicating that internal

24   investigations are both work product and privileged, and

25   we would like to renew our objection to that and be heard

1    before anything further comes in about Mr. Neese.

2           Finally, plaintiffs yesterday served personally

3    our Great-West's corporate representative sitting at counsel

4    table, Steven Bresler.  I was unable last night to research

5    the case law, but I'm aware of case law that stands for the

6    proposition that it is improper to serve a subpoena on an

7    individual who is present in court for this litigation

8    purposes.

9           However, he's here.  We understand that they're

10   entitled to call him, so we will not make an issue of that.

11          But if for no other reason but for efficiency

12   sake, we would ask that we be permitted, on

13   cross-examination of Mr. Bresler, to bring out the defense

14   case, rather than have to recall Mr. Bresler next week.

15   Thank you for the Court's indulgence.

16          THE COURT:  All right.  Let me go through each of

17   those.

18          You're concerned, one, on the sexual misconduct

19   memo that the plaintiffs filed late last night, which I have

20   just seen, I've not had a chance to read the document, not

21   be brought until we rule upon that issue.

22          Two -- and that includes the reasons for firing

23   Mr. Neese.

24          Two, on the redacted report that we saw yesterday,

25   I didn't realize it had been exposed or not to the jury, I

1   didn't think it had, but redacted report would have to be

2   redacted before it's shown if this conduct is not allowed in

3   by me.

4          And the minutes of the directors meeting

5   reflecting this Weyland's discussion about a $5 million

6   offer should be called from Nationwide to be ruled upon as

7   soon as possible.

8          And then additionally, renewing a motion to strike

9   its internal affairs study report that was done, as

10  I understand it, that you wish to have revisited.

11         MS. BROWN:  And I would be handing up, before we

12  were able to file our one-page bench memorandum, one and a

13  half pages, the Kellogg Brown Root series of cases decided

14  in 2014 and 2015 here in the D.C. Circuit.

15         I do want to correct, I misspoke when I said that

16  the expense report had been published to the jury, it was

17  not.  The Court sustained my objection.

18         THE COURT:  Right.

19         MR. NADEL:  My point was this.  Inadvertently,

20  earlier in the day, a document that had not yet been

21  admitted into evidence was inadvertently published to the

22  jury so I wanted to make doubly sure that redactions are

23  made of those matters as the Court ordered previously.

24  Thank you.

25         THE COURT:  All right.  Thank you.

1          All right.

2          And then as it just indicated the plaintiffs have

3     filed a brief regarding evidence of Brent Neese's sexual

4     harassment conduct as well as to his operation of the

5     contract involved herein, Great-West's failure to properly

6     oversee it, because they did not take up appropriate action.

7          MS. BROWN:  I have the cases.

8          THE COURT:  Mr. Nadel.

9          MR. NADEL:  I think the first thing to say,

10    Your Honor, would be on the issue of the Mr. Neese's sexual

11    harassment allegations.  We don't intend to get into that

12    with our witness this morning or at all with Ms. Weyland or

13    with the next witness so the Court would have time to review

14    the materials the parties have submitted and we can take

15    that up without it needing to affect the proceedings this

16    morning.

17         THE COURT:  Uh-huh.

18         MS. BROWN:  Thank you.

19         MR. NADEL:  On the minutes, we would be expecting

20    to introduce those through Ms. Weyland, but I would suggest,

21    Your Honor, that the issue has now been mooted because

22    yesterday Mayor Benjamin testified, without objection, that

23    Nationwide had offered to almost double the $3 million

24    payment, and that is now in evidence.  That's the hearsay

25    that they're objecting to in the board minutes so we think

1   it was not hearsay at all but to the extent that it was,

2   it's already now gone in without objection.

3            MS. BROWN:  Sir.

4            THE COURT:  Let me hear you to that point.

5            MS. BROWN:  Yes, Your Honor.  Here's the copies of

6   the cases, counsel.

7            MR. NADEL:  Thank you.

8            MS. BROWN:  You're welcome.

9            Your Honor, Mayor Benjamin made no reference to

10  Ms. Weyland's sidebar conversation with Mr. Stevenson from

11  Nationwide, nor did Mayor Benjamin speak to anything related

12  to the board minutes.  Obviously we have not waived our

13  objection to that.  It couldn't be clearer from the papers

14  we filed with the Court.

15           MR. NADEL:  If I may, Your Honor, the objection to

16  the board minutes, as I understand them, is not to the

17  minutes themselves, which are business records but to the

18  contents, which was Nationwide's offer.  While Mayor

19  Benjamin did not get into a specific, as Ms. Brown says,

20  sidebar conversation, we don't think that's what it was.

21  While he didn't get into that, he did testify yesterday,

22  without objection, that Nationwide had offered to almost

23  double the $3 million payment that it had been making during

24  the negotiations.  That is the hearsay supposedly in the

25  board minutes that they're objecting to.

1          MS. BROWN:  The other thing, Your Honor, I wanted

2     to mention, I was very careful in how I phrased my bench

3     memorandum about the Board of Directors minutes.  I used the

4     word "might."  While I was very careful about how I phrased

5     my bench memorandum about the board minutes, by no means did

6     I concede that they are business records.  I said, while

7     they might be business records, under the Federal Rules of

8     Evidence, and I said "might" because I've not heard a

9     proffer yet from the plaintiffs about the admissibility of

10    the document of which they are the proponent.

11          Those, as we will point out to Your Honor when we

12    have an opportunity to be heard on it, those board minutes

13    were written a year, maybe two years, after the alleged

14    conversation with Nationwide, and we believe we can

15    demonstrate that those board minutes were created in

16    anticipation of litigation.

17          THE COURT:  Uh-huh.

18          MS. BROWN:  Thus they are not reliable.

19          THE COURT:  Let me just ask a more fundamental

20    question about Ms. Weyland's statement.  The board minutes

21    reflect, we're talking about Ms. Weyland said, Nationwide

22    offered 5 million for ten years at the very end of the

23    negotiations between the conference and Great-West but would

24    not lower its pricing for its product as to the employees;

25    and I am concerned about it, frankly, and if you look at

 1  that Baker case, the defendants have suggested as one of the

 2  cases on point, that does raise some issues.

 3          Can she talk about that directly herself, not in

 4  the sense of it was true there was such an offer made, but

 5  that was what her thinking process was about accepting

 6  Great-West or not.

 7          MS. BROWN:  Here's what I would say to that,

 8  Your Honor.

 9          Under basic contract law, a hypothetical offer is

10  not an offer under contract law.  It was posed as a

11  hypothetical to her.  What if we were to give you

12  $5 million.  That's hearsay, and it's not a verbal act,

13  because it's not an offer to contract.  Moreover, she

14  immediately rejected that offer.

15          Now, were Ms. Weyland to say Mr. Stevens said this

16  to me, that is classic hearsay, being offered for the truth

17  of the matter asserted.

18          THE COURT:  No, it wouldn't be offered for the

19  truth.  It would be offered what her state of mind was about

20  rejecting it, what she understood when she rejected it and

21  went to Great-West instead.

22          I'm not sure it would support, this is the other

23  problem the plaintiffs are going to have, I think, I'm sure

24  that then supports the damage claim, because if it doesn't

25  come in for the truth, I'm not sure what evidence of this

1    exists then.

2            MS. BROWN:  Correct.

3            THE COURT:  I think that's a problem.

4            MS. BROWN:  I'm sorry, Your Honor.

5            Moreover, even if the Court were to admit it as to

6    her state of mind, we would be requesting a very strict

7    limiting instruction; and, of course, as the Court

8    recognizes, it would not be direct proof or even

9    circumstantial proof of the offer.

10           THE COURT:  Let me back up and ask Mr. Nadel a

11   little bit on the fundamental question you raised as to

12   these are not normal business record kept in the normal

13   course of business, they don't qualify in any event.  This

14   is an after-created document in anticipation of litigation.

15           MR. NADEL:  This is a document created in 2014,

16   two years before litigation began.  It's a board meeting --

17   minutes from a board meeting of a Board of Directors where

18   minutes are routinely taken.

19           Obviously when Ms. Warner questions Ms. Weyland

20   about this document, she'll have to establish that these for

21   prepared in the regular course of business and that they

22   qualify for the exception.  But board minutes are a classic

23   example of what would qualify for this exception.  If

24   Great-West thinks, as Ms. Brown said, that it can establish

25   that these were prepared in anticipation of litigation or

1  are not true, they should do so on cross-examination.

2          MS. BROWN:  I would ask the opportunity, if the

3  Court is inclined to do so, that we do so by voir dire

4  outside of the presence of the jury.

5          THE COURT:  Sure.

6          MS. BROWN:  Moreover, Your Honor, in the content

7  of what Ms. Weyland apparently said during the course of the

8  Board of Directors meeting, that too remains hearsay and

9  that's not reliable for the reasons we pointed out.  But

10  Ms. Weyland is reporting an out-of-court statement made by

11  somebody to her who is not present.  We understand they have

12  no intention of calling Mr. Stevens.

13          THE COURT:  All right.

14          MS. BROWN:  Thank you.

15          THE COURT:  Well, I will allow it, outside of the

16  jury questioning Ms. Weyland as to the establishment of

17  these notes being taken in the normal course of business,

18  the normal course of business, keep those kind of records

19  and the record reflect what the course of business normally

20  is, and I think that's fair.

21          The issue just is whether or not the cite as to

22  the $5 million where she said it was offered Nationwide for

23  5 million, I think is a concern admitting it as for the

24  truth of the matter asserted therein, frankly, where she can

25  talk about that she has -- what was in her mind at the time

1   when she was making recommendations or not about what should

2   be accepted.  But I have trouble, I rejected a verbal offer

3   would be a basis for a damage claim that there's no evidence

4   that would ever really happen.  But I think it's a close

5   question, frankly, whether it's admissible at all.

6        The reviewing, as I said, the United States versus

7   Baker case that was provided by counsel, that's 693 F.2d,

8   actually, at 188, also *United States versus Gurr*, which we

9   looked at 471 F.3d at 151, about double hearsay or whenever

10  a business record prepared by one employee from information

11  supplied by someone else, and the rule is the source and

12  recorded the information as well as every other participant

13  in the chain producing the record must be acting in the

14  regular course of business, without evidence that the

15  outsider has a duty to report the information or standard

16  practice or prepared to verify information from outside

17  sources, information, statements by outsiders are not

18  admissible for their truth under 8036.

19        And that's followed up by some of our judges,

20  Judge Friedman in the Boca Investments Partnership case

21  versus U.S., 128 F. Supp at 21, F. Supp 2d.  It has to be

22  admissible through another hearsay exception if it's an

23  outsider statement, in the course, and made in the course of

24  regular basis.  It doesn't raise statements contained in the

25  business record made by one who is not part of the business

1   if they're offered for their truth.

2          So I think the best it can be said in this matter

3   and what I'm going to do is, depending on the testimony

4   about how this document was created, I would tend to

5   overrule the objection to the extent that it can come in not

6   for the truth under a limiting instruction by the Court but

7   only as to Ms. Weyland's state of mind in what she was

8   recommending as to the Great-West contract or not.  And I

9   doubt it can be a basis for claiming damages and to that

10  extent, that they would have gotten, the plaintiffs would

11  have gotten $5 million a year from Nationwide if they had

12  accepted the offer, which they didn't accept.  So I think

13  that's another problem.

14          So I'll rule that depending on what develops in

15  her testimony about the report of the business records, how

16  that was done.

17          You're not going to go into the Neese misconduct

18  with her at this time.

19          MR. NADEL:  That's correct, Your Honor.

20          THE COURT:  So I can hold that for a little bit

21  until I read the memos.

22          Reports should be redacted ordered yesterday are

23  not used until I make a final ruling on that.

24          MR. NADEL:  Your Honor.

25          THE COURT:  $5 million taken up.

1          What about the internal study is not admissible?

2    We have two cases just handed to me.  I've not read them.

3    Kellogg and Brown and Root, 756 F.3d at 7- --

4          MS. BROWN:  I can describe them to the Court.

5          THE COURT:  -- 754.

6          And then the second case, just for the record, the

7    second Kellogg case, 1 is 2014, one is 2015, en banc

8    decision, the first one, the second one is a second appeal,

9    I take it.

10          MS. BROWN:  As I said, Your Honor, we'll file a

11   page and a half bench memorandum, but I'm happy to describe

12   the holdings to the Court right now.

13          THE COURT:  All right.  Why don't I wait till I

14   get your bench memo so I can put it all together in my mind

15   at the same time.  We'll look at the Leshinsky objections

16   over the lunch hour and try to square those away.

17          MS. BROWN:  And Mr. Bresler, our corporate

18   representative who was served with the subpoena in court

19   yesterday, will the Court permit the defense, on

20   cross-examination, to elicit testimony it had intended to do

21   in its case in chief?

22          THE COURT:  I haven't heard it from Mr. Nadel

23   about that.  It's the last thing he raised.

24          MS. BROWN:  Very well.

25          MR. NADEL:  No objection to that, Your Honor.

1          THE COURT:  Okay.

2          All right.  Thank you.  That'll save everybody a

3   lot of time as to the defendant's corporate representative

4   testifying both in direct and cross and direct again, and

5   maybe the redirect would be recross.

6          MS. BROWN:  Thank you, Counsel.

7          THE COURT:  And we'll do that.

8          And you're right about the subpoena, I don't think

9   it counts as served, if he has to be here anyway.

10  All right.

11         MR. NADEL:  Regarding the investigative report,

12  Your Honor, we do intend to use the financial related

13  portions of that, which we understand the Court already

14  admitted.  We have prepared a thoroughly redacted version

15  that we will use until the Court rules on the sexual

16  harassment material.

17         MS. BROWN:  And, of course, we'd like to see that

18  before the witnesses approach, thank you.

19         THE COURT:  Yeah, you will.

20         All right, I'd like to get the jury out here to

21  work.

22         Oh, I'm sorry, there's two other quick matters

23  before we can do that.

24         Counsel, I'm sorry, there are two other quick

25  matters.  We had two notes from the jury, and I'll also note

1  yesterday, I did not advise the jury they could ask the

2  mayor questions.  I told them I would.  I was anxious to get

3  him out and get going with the case.  Today or tonight,

4  whenever they finish Ms. Weyland, you can remind me.

5            Juror No. 8 said as follows.  "I don't know, and

6  I have never met Governor Malloy."  Is that Governor Malloy,

7  is he the witness from Connecticut, not a witness but the

8  mayor mentioned him, he was a mayor and then became governor

9  of Connecticut.

10           MS. WARNER:  Yes.

11           THE COURT:  All right.

12           But my husband and I contributed to his

13  gubernatorial campaign at behest of one of my husband's

14  business acquaintances."  And she thought we should know

15  that.  I don't see that as a problem.  I don't know.  She

16  had never met him, she had nothing to do with it, but her

17  husband contributed, actually, to one of his business

18  acquaintances to the gubernatorial campaign.

19           MS. WARNER:  Your Honor, Governor Malloy will be a

20  witness.

21           THE COURT:  Oh, he will.

22           MS. WARNER:  In person at this trial.

23           THE COURT:  All right.

24           Well, you all may want to talk that over.  They

25  contributed to his campaign at the behest of her husband's

1    business acquaintance, although she's never met him.

2            MR. O'DONNELL:  Your Honor, we'll need to discuss

3    that with our client if we have a position.

4            THE COURT:  You should both discuss it.

5            MR. O'DONNELL:  After the break.

6            THE COURT:  See what you think.  And I don't know

7    what the relationship is and what that's about.

8            The second note was just a scheduling note.  This

9    is from Carolyn Dorgan, that's juror No. 1, I believe, yeah,

10   I think it's No. 1.  She is the one who has a telephone

11   conference call she has to make next Tuesday, she can't

12   reschedule it, it's got to be between 10 and 11.  She can

13   make it from the jury lounge or some other room, if we'll

14   get one for her, and I think, unless we're going to lose

15   her, we're going to have to just do that.  I don't know

16   whether yet depending where we're in the case, we come in

17   early and do an hour or just start at 11:00.

18           MS. WARNER:  Plaintiffs are more than pleased to

19   accommodate her.

20           THE COURT:  And we'll probably start at 11:00, but

21   I'll see.

22           MR. O'DONNELL:  I'll completely defer to you.

23           THE COURT:  All right.  It will be next Tuesday,

24   and I'll talk to, the Clerk will talk to her about it and

25   working that out.

1          MR. NADEL:  Your Honor, when did the Court want to

2   conduct the voir dire of Ms. Weyland about the handwritten

3   notes outside the presence of the jury?

4          THE COURT:  Do you want to do that now?

5          MR. NADEL:  We're ready to do that now.

6          THE COURT:  Okay, that's fine.

7          Would you tell the jury we're going to be another

8   15 minutes, please.

9          All right.  If you're ready to go.

10          MS. WARNER:  I'm ready.

11          THE COURT:  All right.

12          Ms. Weyland, we're going to take this testimony

13   out of the presence of the jury about the business record

14   identification.

15          MS. WARNER:  Good morning, Ms. Weyland.

16          THE WITNESS:  Good morning.

17                    VOIR DIRE EXAMINATION

18   BY MS. WARNER:

19     Q     Does United States Mayors Enterprises have a Board

20   of Directors?

21     A     We do.

22     Q     Are you a member of the Board of Directors of

23   United States Mayors Enterprises?

24     A     I'm the chief operating officer of U.S. Mayor

25   Enterprises but I am not specifically a board member.

1     Q    Do you attend the meetings of the board of the

2   United States Mayors Enterprises?

3     A    Yes, I do.

4     Q    Did you attend the meetings of the board of the

5   USME during the period from 2012 through 2014?

6     A    Yes.

7     Q    Was it the practice of U.S. Mayor Enterprises to

8   have Mr. Tom Cochran attend those meetings as well?

9     A    Yes.

10    Q    And, for the record, who is Mr. Tom Cochran?

11    A    He's the chief executive officer of U.S. Mayor

12  Enterprises.

13    Q    I would appreciate if you would turn, in your

14  notebook that you have on the stand, to Plaintiff's

15  Exhibit 115.

16         This bears Bates numbers Mayors 000398432846.

17  Do you have that in front of you, ma'am?

18    A    I don't think I have that exhibit.  I'm sorry.

19         MS. WARNER:  May I approach the witness?

20         THE COURT:  Yes.

21         THE WITNESS:  116, right?

22         THE COURT:  Further down the book.

23  BY MS. WARNER:

24    Q    Ms. Weyland, the first page of

25  Plaintiff's Exhibit 115 is an email from a John Daniel

1  Reeves.  Who is John Daniel Reeves?

2      A    He's the general counsel for U.S. Mayor

3  Enterprises.

4      Q    For how long has he been the general counsel of

5  U.S. Mayor Enterprises?

6      A    Since its inception.

7      Q    Do you see on the first page of Plaintiffs' 115

8  the date February 27, 2015?

9      A    Yes.

10     Q    Now, as part of the duties of Mr. John Daniel

11 Reeves as the general counsel of U.S. Mayor Enterprises,

12 does he keep the minutes of the Board of Directors meetings?

13     A    Yes, he does.

14     Q    And has he done that continuously throughout the

15 period when U.S. Mayors Enterprises has been in existence?

16     A    Yes.

17     Q    And is it his practice generally to circulate

18 those board minutes subsequent to the meetings?

19     A    Yes.

20     Q    Are you a CC on the first page of Exhibit 115?

21     A    Yes, I am.

22     Q    And what is the subject of that email?

23     A    2014 Minutes Final.

24     Q    Can you also put into the record the subject line.

25     A    Yes.

1            USME Minutes and Resolution.

2      Q    I now direct your attention to the second page of

3  Exhibit 115, and what is in the second page, ma'am?

4      A    Those that were present at the meeting.  It was --

5      Q    And what are these?

6      A    The minutes of the Board of Directors U.S. Mayor

7  Enterprise.

8      Q    Where was the meeting held?

9      A    At 1620 I Street, Northwest, in Washington, D.C.

10     Q    What floor?

11     A    Fourth floor.

12     Q    What business is conducted from that location?

13     A    That's the headquarters of U.S. Conference of

14 Mayors.

15     Q    Are meetings of U.S. Mayor Enterprises on a

16 regular and frequent basis held at 1620 I Street, Northwest,

17 Fourth Floor, in Washington, D.C.?

18     A    Yes.

19     Q    What is the date of minutes?

20     A    December 15th, 2014.

21     Q    Did you attend that meeting?

22     A    Yes, I did.

23     Q    Was there a quorum?

24     A    Yes, there was.

25     Q    Did the Board of Directors proceed in regular

1    order at that meeting?

2        A    Yes, it did.

3        Q    Now, if we go back to page 1 of Exhibit 115, the

4    date on that is 2-27-2015, correct?

5        A    Correct.

6        Q    February 27, '15, what was the relationship in

7    time to December 15, 2014, when the meeting occurred?

8        A    This memo was being sent to our accountants, our

9    auditor and our accountant.

10       Q    Was it normal for Mr. Reeves to send the minutes

11   of the board meetings to the accountants?

12       A    Yes, it was.

13       Q    Now, as the Chief Operating Officer of U.S. Mayor

14   Enterprises, are you aware of the manner in which the

15   records of USME are kept?

16       A    Yes.

17       Q    Are the minutes of the Board of Directors of U.S.

18   Mayor Enterprises kept in the course of the regularly

19   conducted business of USME?

20       A    Yes.

21       Q    Are those records kept by the general counsel,

22   Mr. Reeves?

23       A    Yes, they are.

24       Q    At what location?

25       A    At his office in Washington, D.C.

1    Q    Was it a regular practice of U.S. Mayor

2  Enterprises to have Mr. Reeves as the general counsel record

3  the minutes of the board meetings?

4    A    Yes, it was.

5    Q    And, again, for the record, ma'am, you were

6  present on December 15, 2014, when this board meeting

7  happened?

8    A    Yes, I was.

9        MS. WARNER:  Your Honor, I believe that we have

10  qualified these minutes under the exception to the hearsay

11  rule, 8036.

12        THE COURT:  All right.  Who has the examination of

13  counsel by Great-West?

14        MR. STEWART:  Thank you, Your Honor.

15  BY MR. STEWART:

16    Q    Good morning, Ms. Weyland.

17    A    Good morning.

18    Q    How often did U.S. Mayors Enterprises have board

19  meetings like the ones we see that you've talked about this

20  morning?

21    A    About once a year, we had numerous conversations.

22  We have a very small board in which -- who I -- we all keep

23  each other apprised of what is going on with the

24  organization.

25    Q    There's a number of board members that were

1  present at this meeting.  Is that all of the members of the

2  Board of Directors of USME in December of 2014 or were there

3  others?

4        A    That was -- that is all of the members.

5        Q    Okay.

6             Were the meetings always at the end of the year on

7  or about the middle of December?

8        A    It was -- the end of the year, sometimes we'd have

9  some in late spring, about then.

10       Q    Would you sometimes have more than one Board of

11 Directors meeting in a year?

12       A    Yes.

13       Q    And that would have been the case in 2011?

14       A    I don't specifically recall which years, how many

15 meetings there were.

16       Q    Let me ask you this.  As Chief Operating Officer,

17 did you understand there was a legal requirement for USME to

18 have at least one board meeting every year?

19       A    Absolutely.

20       Q    And would you have done that for 2011?

21       A    We would have had at least one meeting, yes.

22       Q    Would the same be true of 2012.

23       A    Yes.

24       Q    And 2013?

25       A    Yes.

1    Q    And this was your meeting for 2014?

2    A    Yes.

3    Q    Ma'am, you answered some written discovery in this

4  case, do you remember that, written questions and then you

5  signed off that they were accurate?

6    A    Yes.

7    Q    You were asked to produce communications between

8  the Board of Directors regarding the performance of the

9  program between 2012 and 2017.  Do you recall getting that

10 request?

11   A    I'm sure I got the request.  I don't specifically

12 recall.

13   Q    Am I right, ma'am, despite your testimony today

14 that you have these board meetings at least once a year and

15 sometimes more, that this is the only board minutes USME has

16 produced in this case?

17        MS. WARNER:  Objection, Your Honor.

18        THE COURT:  Okay.  Does she know?  She can just

19 answer if she knows or not.  She may not know.

20        THE WITNESS:  I don't know.  I'm sorry.

21 BY MR. STEWART:

22   Q    Okay.  You don't have with you any other board

23 minutes you have reviewed other than the ones that we've

24 talked about from December of '14, do you?

25   A    I don't retain the minutes.

1    Q    As was brought out by counsel, these are dated

2  February 27th, 2015, correct?

3    A    Yes, sir.

4    Q    And with respect to this offer, am I correct

5  you're reporting on a conversation you alleged to have had

6  with Mr. Stevenson in the fall of 2012?

7    A    Yes.

8    Q    And am I right, ma'am, according to these minutes,

9  he offered you a total of $50 million over ten years?

10   A    That was my understanding.

11   Q    And am I also correct that you rejected that offer

12  because he would not cut fees to participants?

13   A    That's correct.

14   Q    If he had offered you $60 million but not cut fees

15  to participants, would you have rejected that as well?

16   A    Yes.

17   Q    And am I correct, ma'am, you rejected, as a

18  wholly-owned subsidiary of a non-profit this $50 million

19  without contacting Mr. Cochran?

20   A    It was not rejected on the spot.

21        THE COURT:  Let me talk about the admissibility of

22  this and you can cross-examine her later about her

23  statements.

24        MR. STEWART:  Fair enough, Your Honor.

25  BY MR. STEWART:

1     Q    Am I correct, you have not seen board minutes like

2  this from 2012, a few months after you rejected the offer,

3  documenting your conversation, have you?

4     A    I'd have to -- I don't recall.

5     Q    Do you recall any board meeting minutes from

6  around the time that you allegedly had this conversation

7  with Mr. Stevenson?

8     A    In 2012?  I don't recall the specific minutes.  I

9  recall being -- trying to get ready for the launch of our

10  new program.

11     Q    Do you remember any minutes from 2013 documenting

12  this supposed phone call with Mr. Stevenson?

13     A    From 2014?

14     Q    From 2013, ma'am.

15     A    No, sir.

16     Q    Am I correct what we have in the record from

17  December 15th of 2014 are the only board meeting minutes

18  you're aware of where this supposed offer was discussed?

19     A    You're the only -- these are the only ones that I

20  currently recall.

21     Q    And am I correct, ma'am, that December 15th, 2014,

22  was just days after the meeting in your offices that

23  Mr. Benjamin talked about where Brent Neese presented a

24  proposal for restructuring the contract and Mr. Reeves asked

25  him to leave?

1    A    I don't recall if that was -- I think the board

2   meeting was the day before, and then we were to meet with

3   the representatives from Great-West.

4    Q    And am I right, at the board meeting, according to

5   this, at least two lawyers were in attendance, Mr. Reeves

6   and Mr. Leshinsky?

7    A    That's correct, but Mr. Leshinsky was there as a

8   financial advisor to U.S. Mayor Enterprises.

9    Q    He's got a JD, correct, ma'am, next to his name?

10   A    He does.

11        MR. STEWART:  One second, Your Honor.

12        THE COURT:  All right.

13        (Defense counsel conferred with defense counsel

14   off the record.)

15   BY MR. STEWART:

16   Q    And, ma'am, finally on these discovery responses

17   we've talked about, am I correct you remember certifying

18   that they were true and accurate and everything responsive

19   had been produced with respect to board meeting minutes?

20   A    Yes.  My recollection, yes.

21        MR. STEWART:  Thank you, Your Honor.

22        We would object that these are not the

23   contemporaneous records of a regularly conducted business

24   activity.  If it was regularly conducted, we would have seen

25   others other than this one example.  So we continue to

1    object that it's both hearsay and not a business record.

2            THE COURT:  All right.  Thank you.

3            MS. WARNER:  Your Honor.

4            THE COURT:  Yes.

5            MS. WARNER:  I understand that the objection now

6    is that the board minutes aren't real.  Is that your

7    objection?  They're not real board minutes.

8            THE COURT:  Well, I think the objection, as I

9    understood it, what he just said, was that they're not

10   regularly conducted minutes regularly conducted meetings

11   because there are no other board minutes were ever produced

12   to show that this is done normally in the course of business

13   of the company, that there are no other records produced

14   showing that every year, there was a meeting and they made

15   minutes.

16           MS. WARNER:  If I may have a moment, sir.

17           THE COURT:  All right.

18           MS. WARNER:  Your Honor, for the record, there are

19   regularly conducted board meetings of U.S. Mayor Enterprises

20   with board minutes.  During discovery in this case, the

21   defendant never requested the minutes of the board meetings

22   of either plaintiffs, USME or USCM.

23           THE COURT:  All right.

24           I'm going to allow the, over objection, exhibit as

25   a redacted 115 of plaintiffs, as far as a regularly

1    conducted business record conducted in the normal course of

2    business to make such records and done so in the normal work

3    of their company by the officers or Board of Directors of

4    the company, with the understanding that the materials

5    referring to Ms. Weyland talking with someone else who's not

6    identified in the notes about an offer two years earlier, it

7    comes in only as to her state of mind and discussions about

8    what they accept or didn't accept about Great-West and

9    issues they had, but not as to the truth that ever such

10   offer was made that could be relied upon to establish that

11   as a basis for damages.  All right.

12          MR. O'DONNELL:  Will there be a limiting

13   instruction as soon as that evidence comes in?

14          THE COURT:  Counsel asked for that already.

15          MR. O'DONNELL:  Okay.  Thank you.

16          THE COURT:  All right.  Let's go to work.  Okay.

17          DEPUTY CLERK:  All rise.

18          (Jury entered the courtroom.)

19          The jury is present, Your Honor.

20          THE COURT:  All right.  Thank you.

21          Good morning, ladies and gentlemen, thank you for

22   your patience.

23          As I explained in the beginning of the trial, the

24   times that we have to have hearings outside of the presence

25   of the jury to make some rulings to move the case along, and

1    we've been doing that since 9:30.

2           I've got a couple other matters for you.  One is,

3    I neglected yesterday to see if you all wanted to ask any

4    questions of the mayor in written questions, I said you

5    could do that with each witness, I was anxious to get going

6    and that opportunity passed.  I'll try to remember from now

7    on to see if you have any questions you would like to write

8    out and ask.

9           You don't have to do that, it's really up to you.

10          Secondly, I'd had a couple of notes from the jury,

11   we'll respond to one in a little while.  The other note will

12   be regarding, we'll probably have a -- starting a late

13   morning next Tuesday because one juror has an unavoidable

14   conflict, we're going to work that out.  So we'll take care

15   of that.

16          And hopefully we can proceed without too much

17   delays.

18          All right.  I'm going to have you return your

19   case -- attention back to the case at this time.

20   Ms. Weyland was testifying yesterday as we finished the day,

21   and I will get counsel to go back to the questioning of her

22   concerning she had been talking about Great-West and dealing

23   with Mr. Sellers and where she knew him.  All right.

24          MS. WARNER:  May I proceed, Your Honor?

25          THE COURT:  Yes, please.

1          MS. WARNER:  Thank you.

2                     - - -

3     KATHRYN KRETSCHMER-WEYLAND, WITNESS FOR THE PLAINTIFF,

4     HAVING BEEN PREVIOUSLY SWORN, RESUMED THE STAND AND

5     TESTIFIED FURTHER AS FOLLOWS:

6               DIRECT EXAMINATION (CONTINUED)

7                     - - -

8     BY MS. WARNER:

9          Q    Good morning, Ms. Weyland.

10         A    Good morning.

11         Q    Was Great-West among the companies the Mayors

12    considered to replace Nationwide?

13         A    Yes, they were.

14         Q    Did the Mayors approach Great-West?

15         A    Yes, we did.

16         Q    And what happened at that time?  When was it that

17    you approached Great-West?

18         A    The summer of 2011.

19         Q    Now, when the parties were speaking with each

20    other, Great-West and the Mayors, in the summer of 2011, did

21    they have any exchange of information?

22         A    Yes, we did.

23         Q    And during this time, was there any sort of name

24    that Great-West attributed to this discussion that they were

25    having with the Mayors?

1       A      Sure.

2              Mr. Sellers told me that they usually name their

3       projects something, that Great-West had the City of

4       Los Angeles, and our incoming president was Mayor

5       Villaraigosa from Los Angeles, and so the project became

6       known as Project Villa.

7       Q      Now, was there information that was exchanged

8       between Great-West and the Mayors in the summer of 2011?

9       A      Yes.

10      Q      If you could please turn to tab, Plaintiffs' 126

11      in your notebook that's up on the stand with you.

12             And I would ask you, ma'am, is this an email from

13      Mr. Seller to you, dated July 12, 2011?

14      A      Yes, it is.

15      Q      And what is the subject?

16      A      The subject is Project Villa, confidential and

17      proprietary.

18      Q      Do you recognize exhibit, Plaintiffs' 126?

19      A      Yes, I do.

20      Q      Did you receive it in the normal and ordinary

21      course of your business in the summer of 2011?

22      A      Yes, I did.

23             MS. WARNER:  Plaintiffs offer Plaintiffs' 126?

24             MR. STEWART:  No objection, Your Honor.

25             THE COURT:  No objection.  126 is admitted and

1    shown to the jury.

2    BY MS. WARNER:

3        Q    I'd now appreciate if you would look at the third

4    sentence of the second paragraph of 126.  And could you

5    please just read the two sentences there that begin with "as

6    we discussed."

7        A    "As we discussed, Great-West has focused on larger

8    cities.  USCM has many smaller cities, but combined, the

9    total market presence for U.S. cities would be a huge market

10   share.  This would permit USCM to go up market, and

11   Great-West to go down market, so could be a great

12   combination."

13       Q    When you received Plaintiff's 126 in the summer of

14   2011, did you have an understanding of what was meant by

15   "USCM to go up market"?

16       A    Yes.

17       Q    What did that mean?

18       A    One of the things Mr. Sellers and I discussed was

19   growing the business, and so the opportunity to reach out

20   and have a good product to both the large cities as well as

21   the small and medium-sized cities was a good business

22   opportunity for the Conference of Mayors and it appears as

23   well for Great-West.

24       Q    And when it says here Great-West to go down

25   market, did you have an understanding at that time what was

1  meant by that?

2      A    Yes.

3      Q    What was it?

4      A    It was meant that that was one way they could

5  increase their business also.

6      Q    In 2011, how many entities participated in the

7  Mayors 457 program?

8      A    About -- over 3,000.

9      Q    How many participants did that translate into?

10     A    We had -- over 300,000 participants.

11     Q    And about how much money did the over 300,000 city

12 employees put into the 457 program at that time in 2011?

13     A    Just over $6 billion.

14     Q    Were all of the 4,000 or 3,000 entities that

15 participated in the program cities?

16     A    No.

17     Q    So could you explain to us what an entity is with

18 regard to a 457 plan.

19     A    Sure.

20          So it is a city or it could be a municipal golf

21 course, it could be a water district, it could be a utility.

22 We call it anything that has a relationship to city or

23 municipal government.

24     Q    In 2011, as you have just testified, did you have

25 an expectation that if the Mayors went with Great-West,

1   there could be this ability to do both go up market and go

2   down market?

3        A    Yes.

4             And expand our presence.  When you have something

5   that's good, you want to as many people to participate.  So

6   we thought not only could we look at supplemental

7   retirement, we could look at defined contribution

8   retirement.

9        Q    What's a "defined contribution retirement" plan?

10       A    It's where the employer and the employee give

11   their -- contribute a defined amount of money into their

12   pension plan, and as cities became more and more strapped

13   for resources, more and more cities were looking at, instead

14   of saying, you retire at age 65 and you get X percent of

15   your salary for the rest of your life, it's kind of a shared

16   partnership.  And we wanted to make sure that as that

17   evolved in cities and they were faced with that kind of

18   choice, the best choices would be available, the best

19   administrators, the best financial options for the

20   employees.

21       Q    Was that part of the thought process at the Mayors

22   in terms of what partner it would choose after it left

23   Nationwide?

24       A    Yes.

25       Q    Why?

1     A     Because Great-West knew how to do it, they did it

2     well, and we thought that -- and that was not available

3     under -- with Nationwide at the time.

4     Q     Anything else that was important to the Mayors in

5     the summer of 2011 and 2012 about the ability of Great-West

6     to become the program administrator?

7     A     Anything else that was important?

8     Q     Yes.

9     A     Besides improving the program, better education,

10    lower fees, having the ability -- I mean, they were the

11    leaders in the industry, that was a great opportunity for

12    us.  And it appeared to be a way that we could improve our

13    program and also grow our revenue.

14    Q     Was anyone else associated with USME involved in

15    evaluating the data that came over from Great-West in the

16    summer of 2011 and through 2012?

17    A     Sure.

18          Jeannie Fanning, Melvyn Leshinsky, evaluating the

19    data that came over.

20          We were pretty small so we worked kind of

21    collaboratively.  So I'm sure there were others.

22    Q     Who's Melvyn Leshinsky?

23    A     He's a financial advisor to U.S. Mayor

24    Enterprises.

25    Q     For how long in 2011 had he been a financial

1    advisor to USME?

2         A    Since its inception, from the very beginning.

3         Q    Is that about 20 years prior to that?

4         A    Yes.

5         Q    Did Mr. Leshinsky ever provide counsel to USME as

6    an attorney?

7         A    No.

8              He was also a CPA.  I'm lucky to surround myself

9    with some really smart people, and so his services were used

10   as a financial advisor.

11        Q    Did you ultimately execute contracts with

12   Great-West for the 457 retirement program?

13        A    We did.

14        Q    Do you recall the term, the length of those

15   contracts?

16        A    Yes, I do.  It's ten years.

17        Q    Under the contracts were the Mayors intending to

18   accept payments for the work that they were doing to support

19   the 457 program?

20        A    Yes, we were.

21        Q    And how was that payment to be structured under

22   the contracts?

23        A    The payment was $10 a year per participant or

24   $2.50 per quarter per participant.

25        Q    Ma'am, I'd like you to please now turn to tab PX-1

1    in your notebook.  Do you recognize this document?

2        A    Yes, I do.

3        Q    What is it?

4        A    It's called the Joint Marketing and Training

5    Agreement.  It's the contract with U.S. Mayor Enterprises

6    and Great-West.

7        Q    And now could you please turn to

8    Plaintiff's Exhibit 2 in your notebook?

9        A    Yes.

10       Q    And what is that?

11       A    That's the licensing agreement with the Conference

12   of Mayors and Great-West.

13       Q    Do you recognize that agreement and were you

14   involved in negotiations relating to it?

15       A    Yes.

16            The Joint Marketing and Training Agreement, I

17   signed on behalf of U.S. Mayors Enterprises and worked on

18   the negotiations for that.

19            And as a representative of -- with U.S. Conference

20   of Mayors, as often I'm called to do, I worked on the

21   license agreement with counsel on this agreement.

22            MS. WARNER:  Plaintiffs offer Plaintiff's Exhibit

23   1 and 2 into evidence.

24            MR. STEWART:  No objection.

25            THE COURT:  No objection.  They're admitted as

 1    plaintiffs' PX-1 and PX-2 admitted into evidence.

 2    BY MS. WARNER:

 3        Q    If you could please now look at page 14 of

 4    Exhibit 1, it's actually, yes, page 14.

 5             Who signed and executed the agreement on behalf of

 6    Great-West, the Joint Marketing and Training Agreement?

 7        A    Gregory Seller.

 8        Q    Now, ma'am, could you please turn to

 9    Plaintiff's Exhibit 2 and page 14 of that as well,

10    I believe.

11             Who signed the license agreement on behalf of

12    Great-West.

13             Page 16.

14        A    Gregory Seller.

15        Q    And at the time, back in 2012, was Mr. Seller the

16    senior vice president of government markets at Great-West to

17    the best of your knowledge?

18        A    Yes.  That's what it says.

19        Q    And did you understand at that time that he was an

20    authorized executive at Great-West to execute both

21    Plaintiffs' 1 and Plaintiffs' 2 as -- and make them viable,

22    if you will, for Great-West?

23        A    Yes.

24        Q    Now, let's talk about the contract.  If you could

25    please turn to section 2 of the contract, which is on page 3

1    of Exhibit 1.

2              And Ms. Radford is going to blow that up.

3    Thank you.

4        A    Okay.

5        Q    Under section 2.1, what were the responsibilities

6    of Great-West under the Joint Marketing and Training

7    Agreement?

8        A    Did you want me to read it?

9        Q    Just read the first paragraph there of 2.1, yes.

10       A    Okay.

11             "Under the terms of this agreement, Great-West

12   will have responsibility for development and delivery of

13   products and services to cities and the employees thereof;

14   2, the provision of necessary support to the offering of

15   products and services and promotion of the program (and

16   continuance follow up with respect thereto); and 3, where

17   and as indicated, sole or shared responsibility with USME

18   for those activities described in the business plan."

19       Q    Do you see Section 2.2 of Exhibit 1,

20   "responsibilities of USME"?

21       A    Yes.

22       Q    And could you please read to us Section 2.2?

23       A    Okay.

24             "Under the terms of the agreement, USME will have

25   responsibility for, one, sponsoring and overseeing the

1    program, including oversight of the products and services to

2    be offered under the program" --

3         Q    I'll stop you there.

4              Did United States Mayors Enterprises, to the best

5    of your knowledge as the COO, fulfill that requirement of

6    the contract throughout the period of 2012 to 2015?

7         A    To the best of our ability, we did.

8         Q    Please proceed with two?

9         A    "Two, promoting the program among cities through

10   direct communications, whether in print, electronic or

11   media, to city mayors and other city officials."

12        Q    To the best of your knowledge, did USME attempt,

13   to the best of its abilities, to fulfill that requirement?

14        A    In promotion, absolutely.

15        Q    Please proceed with three?

16        A    "Three, maintaining appropriate Website

17   information concerning the program."

18        Q    Did USME do that?

19        A    Yes.

20        Q    Four?

21        A    "Assisting Great-West in the distribution of

22   program materials."

23        Q    Did the Mayors do that?

24        A    Yes, we did.

25        Q    Five?

1     A     "Developing a series of educational seminars in

2  collaboration with Great-West for general publication to,

3  and for the betterment of, city deferred compensation and

4  retirement savings plans offered by Great-West."

5     Q     Did the Mayors do that?

6     A     Yes, we did.

7     Q     Six?

8     A     "Where and as indicated, sole or shared

9  responsibility with Great-West for those activities

10  described in the business plan."

11     Q     Did you do that?

12     A     Yes, we did.

13     Q     Now, there's a sentence at the end of this, could

14  you read that to us, please.

15     A     Sure.

16           "The parties intend, however, that nothing in this

17  agreement shall require or obligate USME to register as, or

18  to engage in any activity that requires registration as a

19  broker dealer, investment advisor or insurance broker."

20     Q     What was your understanding, in 2012, and through

21  2015, as to why that sentence was in this contract?

22     A     One, we were not -- we were not registered

23  municipal advisors.  And there were people, other than my

24  staff in the conference, there were people at Great-West

25  that were far superior in terms of describing and selling

1    the products.

2         Q    Did you have an understanding that it would not

3    have been allowed under the law for USME or USCM to actually

4    sell the products offered in the 457 program?

5         A    We absolutely could not under the law.  We were --

6         Q    Based upon your discussions with Great-West, did

7    they understand that as well?

8         A    They did.

9         Q    Now, let's switch now to the business plan, which

10   is attached as Attachment A to Exhibit 1.  Do you have that

11   in front of you, ma'am?

12            And I'm going to direct your attention

13   specifically to the bottom of page 2 of Attachment A of the

14   business plan.

15            Do you see there, USME's responsibilities?

16        A    I'm sorry, I'm a little bit lost.

17            MS. WARNER:  May I approach?

18            THE COURT:  You might have to show that to her,

19   it's about halfway back from all the documents.

20            See, after page 14 of the contract.

21            MS. WARNER:  Your Honor, we'll make sure we don't

22   have that delay next time.  I apologize.

23            THE WITNESS:  Sorry.

24   BY MS. WARNER:

25        Q    Now, Ms. Weyland, what were the responsibilities

1    of USME under the business plan?

2        A    So these are outlined and it talks about entering

3    into an administrative agreement and promoting the program,

4    as we talked about, developing outreach programs with a view

5    towards enhancing knowledge and improving education,

6    participating in scheduled training programs, maintaining

7    appropriate and updated Website information, the things that

8    we discussed prior to in our earlier, your earlier question.

9        Q    What about the last bullet point there?

10       A    "Conducting periodic reviews and surveys to ensure

11   that the costs, benefits, product offerings, and services

12   under the program remain competitive."

13       Q    As the COO of the Mayors, did you make sure that

14   the Mayors undertook to fulfill their obligations under the

15   business plan?

16       A    To the best of our ability, we did.

17       Q    Now, if we could turn back to Section 2.4 on

18   page 4 of Exhibit 1.

19            It's on the screen, Ms. Weyland, and it's 2.4,

20   best efforts?

21       A    Yes.

22       Q    Do you recognize this provision of the contract?

23       A    Yes, I do.

24       Q    And was it important to the Mayors to have a best

25   efforts provision included in this contract?

1        A    Yes, it was.

2        Q    Why?

3        A    Because, as things changed, as the market changes

4   or whatever, in this case, it was, as the market or trends

5   in the industry, we wanted to make sure that we kept up, our

6   best practice -- that it remained a best practice and a best

7   program.

8        Q    Ms. Weyland, I think if you slow down a little

9   bit, it might help the reporter.

10            THE COURT:  It might pull the mic closer to you

11  too, please.

12            THE WITNESS:  Sorry.

13            THE COURT:  That's all right.

14            THE WITNESS:  I apologize.

15  BY MS. WARNER:

16       Q    Now, if you could look at Section 5.2.7, which

17  Ms. Radford will call up on the screen as page 8 of the

18  contract.

19       A    Yes.

20       Q    Do you see that in front of you on the screen?

21       A    Yes.

22       Q    And that was entitled "Standard of performance,"

23  correct?

24       A    Yes.

25       Q    Was it important to the Mayors that this provision

1    be included in the contract with Great-West?

2       A    It's very important.

3       Q    Why?

4       A    Because as a partner, when we enter into a

5    partnership program, we -- each partner takes on the label

6    of the other partner.

7            And the only product that we have at the

8    Conference of Mayors is our reputation and what we do, and

9    so that is really, in licensing, what we're offering is our

10   works.  And so our partner should exemplify that as well.

11      Q    So now let's go back to Exhibit 2, or forward.

12   And I'd like to ask you to turn to Section 3.2 of this

13   agreement.  This is the licensing agreement?

14      A    Okay.

15      Q    And Ms. Radford has called this up on the screen.

16           And could you tell us what Great-West's

17   obligations were under the license agreement?

18      A    "Great-West will ensure that due and appropriate

19   recognition of USCM's involvement is given in connection

20   with the products and services, through the public and

21   prominent display of and reference to the USCM marks on

22   promotional, informational and other materials, in whatever

23   form or media distributed, disseminated, or otherwise made

24   available in connection with the program, all in accordance

25   with the license agreement."

1        Q     Was it important to the United States Conference

2    of Mayors that Great-West fulfill its obligations with

3    regard to the trademarks and other marks of the Conference

4    of Mayors?

5        A     Yes, it was.

6        Q     Why are the marks of the Conference of Mayors

7    important to it?

8        A     Because we have -- we're like the Good

9    Housekeeping Seal of Approval.  So if we've done our due

10   diligence and we're -- we think there's a program that will

11   benefit cities or its constituents, then we want to share

12   that, we want them to know that we are a partner in this

13   involvement.

14       Q     Now, you see here on the screen, there's 3.3,

15   USCM's obligations.  And under that section of the contract,

16   the license agreement, USCM granted a license to Great-West

17   to use the Conference of Mayors' marks.

18             Did the Conference of Mayors grant that license to

19   Great-West?

20       A     Yes, we did.

21       Q     And was that license grant in effect throughout

22   the period when the license agreement was in effect, from

23   October of 2012 through 2016?

24       A     Yes, it was.

25       Q     Now I'd like to direct your attention to

1   Section 7.2.6 of Exhibit 2, which is on page 10.

2          And you see on the screen here, this is 7.2.6,

3   non-compete.  Are you familiar with this section of the

4   license agreement?

5      A    Yes, I am.

6      Q    And were you involved in discussions with

7   Great-West to arrive at the language in Section 7.2.6?

8      A    Yes, I was.

9      Q    And did those discussions happen in 2011 and 2012?

10     A    Yes, they did.

11     Q    I'd like to direct your attention now to the

12  sentence that begins notwithstanding?

13     A    Okay.

14          "Notwithstanding the foregoing, USCM acknowledges

15  and agrees that Great-West engages in the business of

16  providing retirement products and services to governmental

17  entities, and that Great-West has existing relationships

18  with some governmental retirement plans that may be

19  construed to require Great-West to market only the state

20  program to eligible political subdivisions in the applicable

21  state."

22     Q    Could you explain to us why this provision was put

23  into the contract.

24     A    Yes, because, for instance, in the state of South

25  Carolina, a city is required to participate in the state

1    plan.  And so we were acknowledging that we knew there were,

2    in several instances, that would be -- that we would not be

3    able to market the U.S. Conference of Mayors program with

4    Great-West.

5        Q    Did you discuss this issue of the fact that

6    Great-West had relationships with certain states and

7    provided 457 plans for certain states while you were

8    negotiating with Great-West?

9        A    Absolutely.  It was very important, because

10   Great-West is a leader in the industry, had a lot of states.

11   And so we had discussions about how much business will be

12   precluded for us to capture with -- if Great-West has all

13   these states, and I was assured that there were a few, and

14   they were going to let us know, they were in -- some of them

15   they were working to get that excluded, because even though

16   they may be had a state, that didn't mean that they had

17   every -- and every entity in that state or every city in

18   that state.  And so that was an additional opportunity.

19          And so we had likely discussions about it, but the

20   Conference was satisfied in, U.S. Mayor Enterprises, that we

21   were dealing -- we were going in the same direction

22   together.

23       Q    At the time that you had the discussions about

24   this part of the contract, did you believe that Great-West

25   was providing you with fulsome information about its intents

1   with regard to marketing states?

2       A    I did.

3       Q    Did you, at that time, in 2011 and 2012, believe

4   that there had been a full disclosure by Great-West of its

5   intention to attempt to not have a situation where its state

6   plans would compete with the Mayors' plan?

7       A    Yes.

8       Q    With whom did you have that conversation or

9   conversations?

10      A    I had it with Mr. Seller; I had it, as I recall,

11  with Mr. Neese and with Mr. Nelson.

12           And that was the nice thing about this.  With

13  Great-West, in the beginning, we had conversations at the

14  very highest level, and their senior executives were very

15  engaged with us, and it was a real bonus.

16      Q    Could you now read to us the next sentence of

17  Section 7.2.6.

18      A    "USCM further acknowledges that Great-West shall

19  not be considered to have violated this Section 7.2.6 by

20  virtue of fulfilling those pre-existing obligations to its

21  existing plans and customers provided, however, that

22  Great-West will use best efforts to seek approval of any

23  such state to allow Great-West to market the program under

24  the JMTA in lieu of any other process or requirement."

25      Q    Ms. Weyland, was it important to the Mayors that

1    there be some fixing, if you will, of exactly what

2    pre-existing obligations Great-West had with regard to its

3    state plans?

4         A    In terms -- fixed, I don't know if I would --

5    fixing.  I would have said that I knew there were ongoing

6    discussions with a couple of their states, and we were

7    being -- we were kept apprised that those were going well

8    and that we would be able to market, in most, our program.

9         Q    Did Great-West ever tell you that, in fact, the

10   result of some of its efforts, its best efforts to seek

11   approval of certain states where it previously had a

12   relationship, were not successful?

13        A    At what point?

14             I mean, at what time did you mean?

15        Q    At the time in October of 2012?

16        A    There were -- I think there was one or two.  But

17   there was ongoing discussion about whether they would be

18   able -- would be able to do that.

19        Q    Were you reassured by Great-West that this would

20   not be a problem in those pre-existing states?

21        A    Absolutely.

22             And I was also reassured, because, by law, you

23   have to go out to bid frequently and we were successful,

24   we would be bidding on larger cities and other places.

25             So given time, we're not going to start out with

1  the entire universe.  So there would always be opportunity.

2       Q    Could you now read the next sentence of Exhibit 1,

3  17.2.6?

4       A    "USCM acknowledges that the sale of new state

5  plans by Great-West may require the ability to sell the

6  state plan to local entities that compete with the program."

7       Q    And please read the next sentence.

8       A    "However, Great-West will use its best efforts to

9  permit the program to be sold, in addition to, or as

10 competition with, any new state plan where possible."

11      Q    In 2012, immediately before the Conference of

12 Mayors and Mayor Enterprises executed this contract, did

13 they have an understanding that Great-West would use its

14 best efforts to permit the Mayors program to be sold as well

15 as any other programs that it added on in the state

16 business?

17      A    Yes.

18      Q    Who gave you reassurances in that regard?

19      A    Everyone.

20      Q    And by "everyone," whom do you mean?

21      A    Mr. Nelson, Mr. Seller, Mr. Neese, Ms. Teresa

22 Myer.

23      Q    Ms. Weyland, when you executed the contracts and

24 when Mr. Cochran executed the contracts in October of 2012,

25 did you have any understanding that Great-West would be

1   seeking to add multiple states to sell their state programs

2   to local cities?

3       A    No.

4            I understood we were both going toward -- you

5   know, expanding in the areas that we both hadn't been in

6   before, and so that was where the opportunity was.

7       Q    Did you understand that was going to be a

8   partnership between the Mayors and Great-West in that

9   regard?

10      A    I did.

11      Q    After the contract was signed in October of 2012,

12  did the issue of Great-West's state relationships have any

13  impact on the Mayors' program?

14      A    Immediately.

15      Q    How so?

16      A    I recall myself going, when we went on the road

17  and launched the program, had the Mayor of Bridgeport and

18  his staff meet with us and we had a new -- we were all a

19  little new, but a new person with Great-West come with us on

20  the sales call; and we started talking about the Conference

21  of Mayors program and he goes, oh, I thought I was selling

22  our old program.  And the Mayors is looking at me like, what

23  are you doing, Kath, you know?

24           So we backed up a little.  And there was some

25  confusion.  So we went outside, and it worked out fine.  But

1    we went outside and he goes, oh, I haven't been trained on

2    this new program and so I don't know, and I'm confused.

3           So we went to some places in Massachusetts where

4    Great-West had the state plan, well, we have the state plan,

5    so then we had to explain, well, you do have the -- the

6    state does offer a Great-West program but we're offering a

7    new program, which was allowable, but it caused for a little

8    confusion.

9        Q    Now, after the rollout in 2012 and throughout

10   2013, 2014, and 2015, did the issue of Great-West's state

11   business become a problem for you?

12       A    A very big problem.

13       Q    Did you discuss with executives at Great-West this

14   big problem?

15       A    Yes, I did.

16       Q    Did you discuss it with the executives at

17   Great-West in 2012?

18       A    Yes.

19       Q    2013?

20       A    Yes.

21       Q    2014?

22       A    Yes.

23       Q    2015?

24       A    Yes.

25       Q    Did Great-West ever attempt to rectify the problem

1  that it was selling state plans that were directly in

2  conflict with the Mayors' plans to local subdivisions?

3      A    It was explained to me in two ways, that's just

4  how it is, that's what this state requires; and the other

5  was, it's a lot easier to sell to state, you respond to the

6  RFP, you give a presentation and we win.  With the city

7  program, you have to go one by one and you have to explain

8  it and you have to build the confidence.

9      Q    As the COO of Mayor Enterprises and the person

10 responsible, as you've testified, for this program, was this

11 of great concern to you?

12     A    It was a huge concern to me.

13     Q    Do you believe that Great-West fulfilled its

14 obligations, as you understood they would be fulfilled,

15 under the non-compete provisions in both of the contracts?

16     A    I do not.

17     Q    Now, during the negotiations with Great-West, did

18 Great-West offer the Mayors an advance payment on earnings?

19     A    Yes, they did.

20     Q    Could you tell us a little bit about that?

21     A    Great-West was well aware of where we were with

22 Nationwide, and I asked, that was my job, to develop

23 programs and try to preserve revenue, if they might consider

24 some type of payment, sort of a gap payment to the

25 organization; and what ended up, and we both agreed and it

1   was a terrific concept, was they would give us a certain

2   amount of money in advance of earnings, and as we earned

3   with the program, as the program grew, Great-West would be

4   paid back through those earnings.

5         Q    Was the intention of the U.S. Conference of Mayors

6   and U.S. Mayor Enterprises to make sure that payment was

7   repaid, if, in fact, the earnings provided for that?

8         A    Yes, it was.  And it was paid back that way, as

9   far as we earned.

10        Q    How much was paid back; do you recall?

11        A    Not a lot.  I don't recall the exact number.

12        Q    Was the reason that not a lot was paid back was

13   because Great-West was not able to sign up many

14   participants?

15             MR. STEWART:  Objection, Your Honor; leading.

16             THE COURT:  Sustained.

17   BY MS. WARNER:

18        Q    Do you know that the payments -- withdrawn.

19             Now, I direct your attention to the attachment C1

20   to Exhibit 1, and that's toward the back.  It's actually the

21   last page of Exhibit 1.

22        A    Yes.

23        Q    Now, Ms. Weyland, when you were negotiating these

24   contracts on behalf of the Mayors, were you involved in

25   discussions with regard to Attachment A1?

1      A    Yes, I was.

2      Q    And was the purpose of Attachment A1 to provide an

3  example of how the advance would be repaid?

4      A    Yes, I was; and yes, it is.

5      Q    Now, I would also direct your attention to

6  Exhibit 2 to Attachment A1 of Exhibit 2.

7           And we can just have that pulled up on the screen

8  by Ms. Radford.

9           Is Attachment A1, to the best of your

10  recollection, based upon your negotiation of Exhibit 2, the

11  attachment in the contract that related to the advance

12  repayment?

13      A    Yes, it is.

14      Q    And who provided the data that went into

15  Attachment C1 to Exhibit 1 and Attachment A1 to Exhibit 2?

16      A    Mr. Nelson required that this be part of the

17  contract and we had no problem with that.

18      Q    And the attachments are noted as examples.

19           Do you recall who at Great-West provided the data

20  that went into exhibits -- the attachments here that are on

21  the screen?

22      A    Yes.

23           The numbers in the examples were provided by

24  Great-West.

25           The -- and while we were developing the contract,

1   there were numerous iterations of this; however, it was

2   important to me that I not, when describing the program,

3   have -- I wanted -- I said, please make sure these numbers

4   are -- you know, don't give me inflated numbers.

5           MR. NADEL:  Objection, Your Honor.  May we

6   approach?

7           THE COURT:  All right.  Sure.

8           (Bench conference)

9           MR. STEWART:  Your Honor, this is in direct

10  violation of the motion in limine in this issue.  When she's

11  describing that as a method an illustration for how the cash

12  advance was to be repaid, that did not violate the ruling.

13  We have now crossed into the request of the conservative

14  projections rather than an illustration, and I think it is

15  crossing the line into your motion in limine ruling.  We'd

16  move to strike the last question and answer.

17          MS. WARNER:  Your Honor, I've tried to be quite

18  careful about this.  I don't believe she said the word

19  "projection."  I believe she said the word "example."

20          THE COURT:  (Reading answer.)  I'm looking at the

21  statement.  (Reading answer.)  Iterations describing the

22  program and numbers don't give me inflating numbers.

23          MS. WARNER:  Well, we tried to be very careful and

24  cue the line on your ruling in limine.

25          THE COURT:  I'll allow the inflated numbers but

1    I think she's going to have to go on how to describe what

2    she thought was a conservative offer.

3              MS. WARNER:  Understood.

4              MR. STEWART:  So we'll allow the last question

5    answered.

6              THE COURT:  Yeah, I'll allow the last question

7    answered.

8              (Open court)

9    BY MS. WARNER:

10       Q    Did you have an understanding of who at

11   Great-West -- withdrawn.

12             Ms. Weyland, please just specifically answer this

13   question.  Did you have an understanding of who at

14   Great-West put together the information contained in these

15   examples?

16       A    I'm having a hard time answering your question

17   because it wasn't just -- it was my understanding it wasn't

18   just one individual.

19       Q    You can tell us which individual you believed it

20   was, your understanding at the time?

21       A    Mr. Seller, Mr. Nelson, Mr. Neese, and there were

22   some other folks I don't recall their name.  I think of them

23   as back office gurus.

24       Q    Now, on October 8th, 2012, did sales efforts

25   officially commence under this program?

1       A    Yes, they did.

2       Q    Can you describe briefly the sales efforts that

3  commenced on October 8?

4       A    Yes.

5            There was a nationwide approach and there were

6  people deployed from Great-West and myself and

7  Jeannie Fanning and Jeff Bean and some others, that we went

8  right on the road, filled our cars up, we call them -- I

9  called my car a virtual office, filled our car up with

10 binders, with the new brochures and promotional materials,

11 and just went entity by entity that we currently -- that we

12 had had in the Nationwide program, started with those first

13 and that's how it started.  We literally got on the road.

14      Q    You mentioned that your staff, Ms. Fanning,

15 Mr. Bean, and you went on the road.  Can you give us, again,

16 briefly, the places generally where you went right after

17 October 8.

18      A    We went to the state of New Jersey, Delaware,

19 Pennsylvania, Massachusetts, New York, that was Jeannie

20 and I.

21           I can't recall exactly where -- Jeff took off in

22 another direction.  So I don't want to mislead anybody.

23 I was driving the car and doing other business and kind of

24 keeping track.  Jeannie is a much better salesperson, so she

25 would actually go in and do the sales.  She can speak much

1    more succinctly than I.

2        Q    Now, I would direct your attention to Exhibit

3    Plaintiffs' 161.  That's in your binder.  Do you have it?

4        A    Yes, I do.

5        Q    And do you recognize this Exhibit 161?

6        A    Yes.

7        Q    This is, has a cover email to Brent Neese from

8    Kathryn Kretschmer-Weyland; subject:  Joint letter; dated

9    Monday, August 8, 2012.  Do you see that?

10        A    Yes, I do.

11    BY MS. WARNER:

12        Q    Did you send this to Mr. Neese on October 8th,

13    2012?

14        A    Yes, I did.

15            MS. WARNER:  Plaintiffs' offer 161.

16            MR. STEWART:  No objection, Your Honor.

17            THE COURT:  All right.  161 is admitted.

18    BY MS. WARNER:

19        Q    Now, if you could turn to page 2, and Ms. Radford

20    will put that up on the screen for us.

21            What is this page?

22        A    This is the letter that we sent on -- sent out on

23    the day we started the new Great-West program and the day we

24    terminated our relationship with Nationwide.  This was a

25    contractually required letter by the Conference and

1   Nationwide that we would send out joint information.

2          I tried to -- I was -- I tried that we could do it

3   separately, but that was -- that couldn't happen.

4      Q    Was it your understanding that the letter was

5   required by the terms of the contract with Nationwide?

6      A    It was.

7      Q    Did you work with Mr. Cochran and others on this

8   letter?

9      A    Yes, I did.

10     Q    I'd like to direct your attention now to the

11  statement "Nationwide will continue to administer your

12  program."  Do you see that?

13     A    Yes, I do.

14     Q    And I would then like you to look at the next

15  highlighted sentence on the screen.  And could you read that

16  to us, please.

17     A    "Do you need to do anything at the time?  No.

18  Your existing group annuity contract remains with Nationwide

19  and will continue without interruption."

20     Q    Why was that language included in the letter?

21     A    Because there were over 3,000 plan sponsors and

22  hundreds of thousands of participants that needed to know

23  that their money was okay until the changes happened.

24     Q    Did the Mayors send any other communications to

25  plan sponsors in addition to this particular letter on

 1   October 8, 2012?

 2       A    Yes, we did.

 3            Yes, we did.  We sent out a letter to all of the

 4   participants introducing the new program.  We called it a

 5   revolution.  We went back and forth, it was fun.  We wanted

 6   to shake up the market.  So we said, revolutionary new idea,

 7   send it out to all the same recipients of this letter.  This

 8   was like a fiduciary letter.  Your money is okay.  It didn't

 9   disappear.  It's not sitting in limbo.

10            And then we also sent out a press release.

11       Q    Now, if you could direct your attention to the

12   next tab in the book, which is Plaintiff's Exhibit 17.

13            What is this letter?

14       A    This is the letter that we sent out to everyone.

15       Q    And were you involved in drafting this letter?

16       A    Yes.  That word revolutionary right in there.

17   Revolutionary plan changes.

18       Q    Is the date of the letter October 8, 2012?

19       A    Yes, it is.

20            MS. WARNER:  I offer Plaintiff's Exhibit 17.

21            MR. STEWART:  No objection, Your Honor.

22            THE COURT:  All right.  No objection so 17 is

23   admitted.

24   BY MS. WARNER:

25       Q    Now, Ms. Radford has this up on the screen, and is

1    the letter on the letterhead of the U.S. Conference of

2    Mayors as it used in October of 2012?

3        A    Yes.

4        Q    And if you turn to the second page of Exhibit 17,

5    who signed this letter?

6        A    Tom Cochran.

7        Q    Who was Tom Cochran at that time?

8        A    CEO and Executive Director.

9        Q    This is a letter that is entitled -- the subject

10   matter, Revolutionary Plan Changes that will save your

11   employees money.

12       A    Correct.

13       Q    I'd like to go through the first paragraph of

14   Exhibit 17.

15            First of all, was this letter sent to the same

16   plan sponsors as noted to Mayors and 457 city plan sponsors

17   as the prior letter that we looked at, which is Exhibit 161?

18       A    Yes, it was.

19       Q    So on paragraph 1, I don't want you to have to

20   read the whole paragraph because I think it will take a lot

21   of team, but what was the purpose of that paragraph?

22       A    We were just talking about our commitment to

23   cities and that we were offering a new program that we

24   thought would be for the betterment of them, their

25   employees.

1      Q    Was Great-West mentioned in this paragraph?

2      A    Absolutely.

3      Q    Was Great-West identified as the new provider of

4 administrative recordkeeping and education services for the

5 457 program?

6      A    Yes.

7           There's also, if we hand delivered, and I can't

8 remember what documents, that its notes were available to

9 make the change to the new program.

10     Q    So let's go to the second paragraph.  But again,

11 I don't want you to have to read it because it's very long,

12 but did that also discuss the Great-West program?

13     A    Absolutely.

14     Q    And did it provide detail with regard to the

15 reasons why the Conference of Mayors had selected Great-West

16 as the new program administrator?

17     A    Yes.

18     Q    And what were some of the items that were

19 mentioned to Mayors and plan sponsors around the country

20 about the new Great-West program?

21     A    Elimination of administrative fees, enhanced

22 education services and communication materials, and expanded

23 and improved investment options.

24     Q    Let's go to the next paragraph and again, please

25 don't read it, but did this paragraph provide Mayors and 457

1   plan sponsors around the country who had been involved with

2   the Nationwide program with information about Great-West?

3        A    Yes, it did.

4        Q    Did it provide information about the level of

5   involvement of Great-West in the government markets

6   retirement benefits program?

7        A    In the retirement benefits program?

8        Q    Yes.

9        A    Yes, it does.

10       Q    Let's go to the next paragraph.

11            Did this paragraph advise Nationwide -- excuse me.

12   Withdrawn.

13            Did this paragraph advise Mayors and 457 plan

14   administrators across the country about the reasons why the

15   Mayors were entering the new partnership with Great-West?

16       A    Yes, it does.

17       Q    Next paragraph.

18            Did this paragraph of the letter that was sent on

19   the same day as Plaintiff's Exhibit 161 lay out a number of

20   documents that would have to be completed for purposes of

21   transferring assets from the old Nationwide plan to the new

22   Great-West plan?

23            MR. STEWART:  Still leading, Your Honor.

24            THE COURT:  Okay.  I'll sustain the objection.

25   BY MS. WARNER:

1     Q    Why don't you go ahead and read to us that

2  paragraph.

3          It's the paragraph that begins, "we look forward"?

4     A    "We look forward to your continuing participation

5  in our program.  There are two items that we need you to

6  complete.

7          "One, the attached form for asset transfer; and,

8  two, the updated city administrative agreement."

9     Q    Did this letter attach the asset transfer form and

10  an updated city administrative agreement?

11     A    Yes, it did.

12     Q    I now direct your attention to the second page.

13  And if you see there, it says, "If we do not hear from you

14  by December 31, 2012, the currently held city administrative

15  agreements will terminate."

16          To what city administrative agreements was that

17  referring?

18     A    In the city administrative agreements, one of the

19  things we were talking about was what the Conference of

20  Mayors' involvement would be in between the city and

21  Great-West.  It was not a fiduciary role, but it was an

22  advocacy role.

23          And this, Mr. Neese specifically asked that this

24  be included in here.

25     Q    Now, the last paragraph, can you read to us the

1  first sentence of the last paragraph.

2      A    "We are committed to making this transition as

3  simple and seamless as possible."

4      Q    Ms. Weyland, in addition to the letter that is

5  Plaintiff's Exhibit 17, dated October 8, 2012, exactly what

6  other items did the Conference of Mayors disseminate to the

7  public and to Mayors and to planned administrators of 457

8  programs on that date?

9      A    As I recall, we launched our Website on that day.

10  There was a press release, released to the financial press,

11  I think that might be on that day.

12          There were subsequent follow-ups in our newspaper.

13     Q    Now, Plaintiff's Exhibit 17, did you provide

14  Great-West with an opportunity to review that letter before

15  it was sent out to Mayors and 457 plan sponsors at

16  Nationwide?

17     A    This particular letter on our new program?

18     Q    Yes.

19     A    Yes, I did.  That's how the second to the last

20  paragraph got in.

21     Q    I think I asked a little bit of a confusing

22  question, so this one time I'm going to ask a similar

23  question just so that I clarify the record and I don't want

24  to confuse the jury.

25          Did the Mayors provide Great-West with the

1    opportunity to review Plaintiff's Exhibit 17 before it was

2    sent to mayors around the country?

3        A    Yes.

4        Q    When did you learn that Gregg Seller planned to

5    retire from Great-West?

6        A    Either right before or right after the program

7    started.

8        Q    How did you learn that he was going to retire?

9        A    He called me the night before the release was

10   going to go out from Great-West that he was retiring.

11       Q    Do you have a recollection that was somewhere in

12   the middle of September of 2012?

13       A    Yes.

14       Q    How did you react when you learned that Mr. Seller

15   intended to retire?

16       A    It was very difficult.  It was -- he was a senior

17   management, he was on our page, he understood what we wanted

18   to do.  And to know that I -- that things would be different

19   after he was gone.

20       Q    What did he tell you about his continuing

21   involvement with the program after he retired effective at

22   the end of 2012?

23       A    He told me that Mr. Nelson would call me the next

24   day and that he would continue to work with us and do

25   everything he could to assure that the program was

1    successful.

2        Q    Did Mr. Nelson call you the next day?

3        A    Yes, he did.

4        Q    Did you speak with him?

5        A    Yes, I did.

6        Q    And what was your understanding as to what would

7    happen with regard to the role that had previously been

8    played by Mr. Seller?

9        A    That Ms.  -- I think I lost part of the question.

10   I apologize.

11            That Mr. Seller would be a consultant to the

12   program and work hard and was committed to his seeing it

13   through, and that Mr. Neese would be his replacement.

14       Q    Had you had dealings with Mr. Neese prior to the

15   middle of September 2012?

16       A    I did.

17       Q    When did you first meet him?

18       A    I met him at a NAGDCA meeting in Albuquerque,

19   New Mexico, I think, a year before when we were discussing

20   how a relationship might work.

21       Q    What were your -- withdrawn.

22            When you learned that Mr. Seller would retire,

23   did you agree to continue to move forward with Great-West as

24   your new partner?

25       A    Yes.

1        Q    Why?

2        A    It was a better program.  I had assurances.

3   I believed Mr. Sellers would do everything that he could and

4   would stay by our side, and I had assurances from senior

5   management, which was Mr. Nelson, that, indeed, Great-West's

6   commitment would remain with this program.

7        Q    When you had the conversation with Mr. Nelson the

8   morning after Mr. Seller told you he was going to retire,

9   did you discuss Mr. Neese's involvement?

10       A    I don't recall.

11       Q    I'd now like to direct your attention to

12  Plaintiff's Exhibit 95.

13            This is a series of emails from you to Mr. Neese,

14  dated January 5 and January 6, 2014.  Do you recognize these

15  emails?

16       A    Yes, I do.

17            MS. WARNER:  We offer Plaintiff's 95 into

18  evidence.

19            THE COURT:  Let me get it up here.

20            MR. STEWART:  No objection, Your Honor.

21            THE COURT:  All right.  No objection.  This is a

22  January 6, 2014, email.

23            MS. WARNER:  January 5 is on the bottom.  And if

24  we could scroll down to the first email in the chain, you

25  see there that's from Ms. Weyland to Mr. Neese, Sunday,

1   January 5, 2014.

2   BY MS. WARNER:

3        Q     What was the subject of that email?

4        A     Okay.  So it's the new year and I'm trying to get

5   the program off to a good start, but I'm having a hard time.

6        Q     Why were you having a hard time?

7        A     Mr. Neese and I did not have the same type of

8   communication or -- communication.  We didn't work as well

9   together as I did with Gregg.

10       Q     And why did you write this email to Mr. Neese on a

11  Sunday in early January of 2014?

12       A     As I recall, I had called, I think, Tim.

13       Q     Who's Tim?

14       A     Tim Bock, who was the person I would talk to or

15  Jeannie, Jeff would talk to.  He's sort of the

16  communications person within Great-West that we dealt with.

17  And Tim said, you need to talk to John about that,

18  something.  There was --

19       Q     Who's John?

20       A     John Borne was the person who was temporarily in

21  charge of oversight of the program.

22       Q     And then there was a response from Mr. Neese to

23  you, dated January 6, up in the middle of the page of the

24  first page of 95?

25       A     Yeah.

1      Q    And did Mr. Neese answer some questions that you

2  had posed to him in your earlier email?

3      A    Did Mr. Neese answer?

4      Q    Yes.

5      A    Yes, he did.

6      Q    And why were you asking Mr. Neese questions like,

7  can I -- how can I be most effective with you and your team?

8      A    Because it wasn't clear who was doing or who was

9  responsible for what with the program.

10      Q    And then you responded on January 6th, 2014, and

11  could you explain to us why you responded the way you did in

12  this email.

13      A    That was my nicest way of telling him, I get

14  you're dissing me and I get you don't think I can keep up

15  with the changes, but I'll do my best to keep up with you.

16      Q    Were you concerned in early January '14, about the

17  way that you and Mr. Neese were interacting with each other?

18      A    Yes.

19      Q    I'd now ask you to go to Defendant's Exhibit 203.

20            This is an email from you to Mr. Neese, dated

21  Friday, November 2, 2012, and a response, and another email

22  and a response from Mr. Neese and then an email from you.

23  Do you see that?

24      A    Yes.

25      Q    Now, this was, oh, about a year or so earlier,

```
 1   correct?

 2       A     Yes.

 3       Q     And you recognize this.

 4             And did you write these emails?

 5       A     I did.

 6             MS. WARNER:  Plaintiffs offer

 7   Defendant's Exhibit 203 into evidence.

 8             MR. STEWART:  No objection.

 9             THE COURT:  No objection.  Submitted.

10   BY MS. WARNER:

11       Q     Ms. Weyland, on the first email of the chain, you

12   talked about your friendship with Mr. Neese being cemented.

13   And could you read to the jury the second sentence that you

14   wrote there?

15       A     "You've earned my faith and trust and I look

16   forward to building this partnership together. Thank you for

17   forever hanging tough with me as I regain my sea legs after

18   a long journey through hell."

19       Q     What did you mean by "after a long journey through

20   hell"?

21             MR. STEWART:  Objection, Your Honor, may we

22   approach?

23             THE COURT:  Sure.

24             (Bench conference)

25             MR. STEWART:  Your Honor, I don't know where this
```

1   is going.  My concern is that it is going towards the motion

2   in limine regarding Ms. Weyland's husband's health that was

3   the subject of the motion in limine.  I would know where it

4   was going had she given me an answer in deposition.  I asked

5   her what she meant at a deposition about "a long journey

6   through hell," and she said I don't remember.  So I'm going

7   to hear this for the first time despite asking her under

8   oath what she meant.

9        MS. WARNER:  She is not going to testify about

10   that, because it's not allowed.  She's not going to do this.

11        The reason we're going into these emails is

12   because in Mr. O'Donnell's opening, there were discussions

13   about -- my words, not yours -- insincerity of Ms. Weyland

14   in her email traffic, and I am trying to deal with that

15   upfront.

16        I do not intend to go into her husband's illness.

17        THE COURT:  What is she talking about?  The

18   illness?

19        MS. WARNER:  She's going to talk about the fact

20   that she had a very difficult relationship with him, that

21   she was trying very hard to motivate him, to work with her

22   and to do well in the program.  And if they're going to --

23   we can -- I don't need to do this.  If these guys promise me

24   that they're not going to put out these emails and tell this

25   jury that she writes insincere emails.

1          MR. STEWART:  I'll tell you the opposite.  We're

2     going to claim they're sincere.

3          THE COURT:  If she's still going to make an issue

4     about how it's raised that's fair.  I'll let her go into it

5     for that, her health that's totally irrelevant to this

6     contract.

7          MR. O'DONNELL:  It's not true.

8          MS. WARNER:  What do you mean?

9          MR. O'DONNELL:  Her hell was her husband's health.

10    That's the journey through hell.

11          This is the beginning of 2012.  The contract just

12    started.  The journey through hell was her husband's health,

13    Your Honor.  She's making it up.

14          MS. WARNER:  Wait a second.  That's out of line.

15    However, I will not inquire about the journey through hell.

16    I do not intend to get into that.

17          All I am trying, you guys made a big deal about

18    these emails.  I have a right to go and talk about it, but I

19    will not get into anything on the journey through hell.

20    How's that.

21          MR. O'DONNELL:  Because they're complimentary.

22          THE COURT:  I'll sustain the objection and we'll

23    deal with that and we'll stay out different for now.  If we

24    have to revisit it we will.

25          All right.  We're going to go to another question

1   then.

2               (Open court)

3   BY MS. WARNER:

4       Q    Ms. Weyland, I now direct your attention to the

5   top of this email in which you say to Mr. Neese, "you're a

6   smart, honest leader and a pretty cool guy"?

7       A    Yes.

8       Q    In November of 2012, did you believe that?

9       A    I had to show that I was trusting.  If you don't

10  show trust, you don't get trust, and he had told me, we were

11  going to get there.  And so he was the leader that I was

12  given to the work with at Great-West.

13               Pretty cool guy.  I don't know.  That's a nice --

14  you know, cool is the matter of opinion.

15      Q    Were you trying to develop a working relationship

16  with him?

17      A    Desperately.

18               That's why the line's in there, no snark and

19  insincerity, because sometimes I can be a little biting.

20      Q    Ms. Weyland, you were the Chief Operating Officer

21  of Mayor Enterprises at this time, correct?

22      A    That's correct.

23      Q    And in November of 2012, how important to you, as

24  the CEO, was this 457 retirement program?

25      A    Very.

1            THE COURT:  I'm going to ask to take a few minutes

2    break.  I'd like to get back on our regular schedule, where

3    we take a mid morning recess.  We started late today do so

4    rather than sit through till the lunch hour, I'll just take

5    a very short break.

6            Ladies and gentlemen, we're going to take a

7    ten-minute recess at this time.  Remember the admonition of

8    the Court, please, do not talk about the case among

9    yourselves or anyone else.  We'll take ten minutes.  I

10   believe it's about 11:30.  So we'll be back at 20 minutes of

11   12 then.  Have a recess about 12:30 for lunch.  All right?

12   Thank you.  Leave your notebooks, please.

13            (Jury exited the courtroom.)

14            THE COURT:  All right.  Be back in ten minutes.

15            DEPUTY CLERK:  All rise.

16            (Recess from 11:30 a.m. to 11:40 a.m.)

17            THE COURT:  Let's get the jury back and get going

18   again.

19            (Jury entered the courtroom.)

20            DEPUTY CLERK:  The jury is present.

21            THE COURT:  Thank you.

22            Ladies and gentlemen, we're ready to get back with

23   the testimony, continuing with Ms. Weyland at this time on

24   direct.  I appreciate your attention to it until lunch which

25   will be about 12:30.

1   BY MR. WARNER:

2       Q    Ms. Weyland, could you please turn now to

3   Exhibit D-225 in your notebook.

4       A    Yes.

5       Q    And can you tell us what that is?

6       A    This was the second type of announcement that we

7   used for the program.

8       Q    And who prepared this document that's marked as

9   Defendant's Exhibit 225?

10      A    Great-West and the Conference of Mayors.

11      Q    Do you recall when it was prepared, about when it

12  was prepared?

13      A    Early on.  I can't remember exactly when.

14      Q    When you say "early on," what do you mean?

15      A    Early in the launch of the program.  We were

16  getting questions that we thought it would be easier for

17  everyone to just answer them up front and leave them with

18  the plan sponsors, why the change.

19           MS. WARNER:  I would offer Defendant's Exhibit 225

20  into evidence.

21           MR. STEWART:  No objection, Your Honor.

22           THE COURT:  All right.  No objection.

23           Defendant's 225, and that is the new national

24  partner U.S. Conference of Mayors form.

25  BY MS. WARNER:

1      Q    Now, Ms. Weyland, you just testified that this was

2  put together by both Great-West and the Mayors?

3      A    Yes.

4      Q    And who actually disseminated this document that's

5  Exhibit Defendant's 225?

6      A    I think we all did.  It was on our Website.  We

7  distributed it when we would go on city visits or to see the

8  entities.  So both the field force, my staff, and on our

9  Website.

10      Q    And did the field staff -- withdrawn.

11          Did Great-West, to the best of your knowledge,

12  disseminate this document?

13      A    They had the ability to.  I'm assuming they did.

14      Q    Now, did you work with anybody at Great-West in

15  putting together the information that's contained in

16  Defendant's 225?

17      A    I think I worked with Ms. Myer and with Mr. Seller

18  on their side.

19      Q    I direct your attention now to the page that's

20  marked 004.

21          Now, up on the screen, Ms. Radford has this

22  document.  And could you read the paragraph that's actually

23  not highlighted.

24      A    "You need to know that USCM walked way from

25  3 million in annual royalty and oversight fees that were

1 paid by the prior vendor under the old program.  This is a

2 commendable action that member cities should not overlook."

3     Q    Can you now read the first two sentences of the

4 next paragraph.

5     A    "Had USCM continued to partner with the prior

6 vendor and ignore the reasons they wanted to enhance the

7 program, they would still be receiving the oversight fees of

8 3 million annually.  Prior to walking away, the prior vendor

9 offered to restore and, in fact, improve the royalty to

10 USCM.  When USCM terminated their relationship with the

11 prior vendor in order to offer the new, enhanced program,

12 they voluntarily walked away from this revenue.  The prior

13 vendor's proposal to cut USCM to 1.5 million was rescinded

14 in September 2012, and USCM could have remained with the

15 prior vendor and continued receiving the 3 million annual

16 payment without offering any enhancements to the country's

17 public employees.  This was not acceptable to USCM.  Going

18 forward --"

19     Q    Keep going.

20     A    "-- going forward, USCM will only receive payment

21 from Great-West based on the number of participants in the

22 plan."

23     Q    Was this information correct at the time that this

24 document, which is Defendant's 225, was sent to plan

25 sponsors around the country?

1      A      Yes, it was.

2      Q      And in this paragraph when you see mention of the

3   prior vendor, to whom did that apply?

4      A      Nationwide.

5      Q      Did you discuss the contents of what you just read

6   to us with Ms. Myer and Mr. Seller before this document was

7   put together?

8      A      Yes.

9      Q      Who actually published this document?

10      A      Great-West was responsible for publishing all

11   materials as they related to the program.

12      Q      Did they publish this document?

13      A      Yes.

14      Q      Now, on the next page, which is marked 005, can

15   you read the first full sentence of the paragraph that

16   carries over from the prior page.

17      A      "USCM hopes to lead the way as others follow with

18   program enhancements and fee reductions in order to stay in

19   line with the market's evolution."

20      Q      What did this sentence refer to?

21      A      It was part of the revolution that we were hoping

22   that, if you have a good idea and you start a revolution,

23   others will follow.

24      Q      And when this document said "The Conference of

25   Mayors hopes to lead the way," what exactly was the

1    conference hoping to lead the way on?

2        A    Better service, better funds, better education,

3    better treatment, fairness for municipal employees.

4        Q    Was this document that's Defendant's Exhibit 225

5    sent to plan sponsors?

6        A    Yes.

7        Q    Was it sent to plan sponsors that had actually

8    been participants in the Nationwide program before the

9    program was changed to Great-West?

10       A    Absolutely.

11       Q    Now, you testified earlier regarding the advance

12   that was paid to the Mayors.  Do you remember that?

13       A    Yes.

14       Q    Do you recall when those advance payments stopped?

15       A    Not specifically.

16       Q    Let's go back to Plaintiff's Exhibit 12.

17            Now, you are the corporate representative of the

18   Mayors in this case, correct?

19       A    Yes.

20       Q    And as the corporate representative, have you been

21   aware of answers to interrogatories and other statements

22   that Great-West has made in the course of this litigation?

23       A    Yes.

24       Q    And are you familiar with Plaintiff's Exhibit 12?

25       A    Yes.

1          MS. WARNER:  I would offer Plaintiff's Exhibit 12

2    into evidence.

3          MR. STEWART:  One moment, Your Honor.

4          THE COURT:  Sure.  So you can look at it and see,

5    it's a multipage document.

6          MR. STEWART:  No objection, Your Honor.

7    Thank you.

8          THE COURT:  All right then.

9          Thank you.  No objection.  The Great-West Answers

10   to Interrogatories First Set of Interrogatories and Request

11   for Production of Documents, PX-12, will be admitted.

12         Ladies and gentlemen, this is a legal document the

13   lawyers use for discovery in the case.  But it is signed and

14   verified by the responsible officials for the defendant

15   responding to this.  All right.

16   BY MS. WARNER:

17     Q    Now, Ms. Weyland, as you went through this

18   previously, do you recall now that Great-West's advance

19   payments stopped somewhere around the summer of 2014?

20     A    Yes.

21     Q    And was it your understanding that the advance

22   payments would only go to the summer of 2014 when you

23   entered the contract in October of 2012?

24     A    It was my understanding we possibly would move,

25   and would not need the advance payments then.

1    Q    Why you not need the advance payments by summer of

2    2014?

3    A    Because we would have had enough participants in

4    the program that that money would have been, the advance on

5    earnings would have been paid back and we would be getting

6    our $10 per participant.

7    Q    In the summer of 2014 when the advance payment

8    stopped per the understanding under the contract, did you

9    have any concerns about the financial future of USME?

10   A    Yes.

11   Q    And what were those concerns?

12   A    How we were going to move forward.  This was our

13   largest program.  I have excellent staff.  I was concerned

14   not only about what the program not succeeding would mean to

15   USME but to the Conference of Mayors, because they would be

16   receiving revenue to it, with the success of the program.

17   Q    Now, did there come a time in -- later in the

18   summer of 2014 when Great-West made a proposal to the Mayors

19   with regard to the ongoing nature of the program?

20   A    Yes, there was.

21   Q    I'd ask you to turn to Plaintiffs' 198.

22        And is this a letter that was written to you on

23   August 25, 2014, by Mr. Neese?

24   A    Yes, it is.

25   Q    Do you recognize this letter?

1       A     Yes, I do.

2             MS. WARNER:  Plaintiffs offer Exhibit 198 into

3  evidence.

4             MR. STEWART:  One second, Your Honor, I'm sorry.

5             THE COURT:  That's all right.  That's fine.  198

6  is a letter of August 25th, 2014, from Brent Neese to

7  Ms. Weyland.

8             MR. STEWART:  No objection, Your Honor.

9             THE COURT:  All right.  That's admitted as 198.

10  BY MS. WARNER:

11      Q     So if we could go to the last page of Exhibit 198,

12  and do you see there, Ms. Weyland, that Mr. Neese signed the

13  letter on behalf of Great-West?

14      A     Yes.

15      Q     And what was your understanding of what Mr. Neese

16  was writing a letter to you on August 28, 2014?  What was he

17  writing about?

18      A     In short, that we would amend the existing

19  ten-year contract, Great-West would provide -- would pay us

20  250,000 a year, it wasn't sure how many years, it was less

21  than three years, as I recall, and it was just for a very

22  broad brush endorsement of Great-West.

23      Q     What was the reaction of the Conference of Mayors

24  and U.S. Mayor Enterprises to this letter?

25      A     You've got to be kidding.  We had a ten-year

1   relationship.  This must be the first play.  Nothing to say

2   about it.

3        Q    Did it cause distress at the Mayors?

4        A    It caused a great deal of consternation.

5        Q    Now, I'd like to direct your attention to

6   Plaintiffs' 115.

7             This is an exhibit that contains the minutes of

8   the Board of Directors of U.S. Mayor Enterprises on

9   December 15, 2014, and an email attached to it.  Do you see

10  that?

11       A    Yes, I do.

12            MS. WARNER:  I offer Exhibit 115 into evidence.

13            MR. STEWART:  Renew our objections for the reasons

14  stated earlier, Your Honor.

15            THE COURT:  All right.  I've already ruled upon

16  this and I'll allow it, subject to the limiting instruction

17  I'll give when we discuss that information therein.

18            MR. STEWART:  Thank you, Your Honor.

19            THE COURT:  All right.

20  BY MS. WARNER:

21       Q    Now, this mentions a Board of Directors meeting on

22  December 15, 2015?

23       A    Yes.

24       Q    Do you have any recollection whether there were

25  any other meetings that week that related to Great-West?

1      A      There was a meeting the next day.

2      Q      And what was the purpose of the meeting the next

3  day?

4      A      To, in our minds, at the conference, to restart

5  the program.

6      Q      And was the letter that Mr. Neese had sent to you

7  in August of 2014 one of the items that was going to be

8  discussed during the meeting with Great-West on

9  December 16th, 2015?

10     A      We hope.

11     Q      Excuse me, 2014?

12     A      We hoped not.

13            We were hoping there would be a new proposal.

14     Q      Was there a new proposal that day?

15     A      No.

16     Q      And when the board met on December 15, the day

17  before, December 15, 2014, was the board apprised about the

18  meeting that was going to be held the next day with

19  Great-West?

20     A      Yes, they were.

21     Q      Now, I'm going to direct your attention now to the

22  third page of Exhibit 115, which are the minutes of the

23  board meeting?

24     A      Yes.

25     Q      Were you asked at that board meeting to present

1    information to the board about the state of the relationship

2    with Great-West?

3         A    Yes, I was.

4         Q    Were you asked to provide information about the

5    state of the relationship of the 457 program in context to

6    the historic 457 program of the Mayors?

7         A    Yes, I was.

8         Q    And at that time, can you explain to us what, in

9    your mind, you were trying to convey to the board about the

10   decision of the Mayors to start the relationship with

11   Great-West?

12        A    I was trying to relay that we believed there was a

13   lot of opportunity for growth, and -- with Great-West, that

14   Nationwide, we'd given up a lot when we left our partnership

15   with Nationwide and that I was -- and I told them, this is

16   kind of the unfortunate scenario of events, board meeting,

17   or decisions, here's what we were offered -- we were offered

18   many things, but here are the offers and here's where we

19   were ending up at the day before this meeting, the best

20   offer on the table.

21        Q    Were you trying to convey to the board what was in

22   your mind in October of 2012 in terms of making the decision

23   to go to Great-West?

24        A    Yes.

25        Q    And can you tell us, when you were making the

1   decision to recommend back in October of 2012 that the

2   relationship with Great-West be commenced, what were you

3   thinking about?

4       A    I was thinking that we're giving up something in

5   the short run, or lot in the short run, because of the

6   offers that had been made during the course of that year.

7   And we were still trying to do the right thing.

8       Q    And when you say, "we were still trying to do the

9   right thing," what was -- what were you thinking about?

10      A    I was thinking about my understanding that the

11  Mayors and had given up an opportunity to have $5 million a

12  year for each of ten years to do the right thing and be

13  patient and grow the program.

14      Q    Now, was it important to you, on December 15,

15  excuse me, December 15, 2014, to convey to the board the

16  seriousness of the situation with Great-West at that time?

17      A    It was important for me to say it.  They knew it,

18  the board knew it, but it was important that I convey that

19  information.

20      Q    And when you were conveying information, were you

21  discussing with the board the meeting the next day that was

22  going to happen with Great-West executives?

23      A    Yes.  I was still hopeful and told them this was

24  the scenario.  I still believed in Great-West.  I was really

25  hoping that they would come to the table with a different

1 offer.  We didn't -- that's -- sorry.

2     Q   Now, I direct your attention to the first sentence

3 of the material that's in the red box.  Could you read to us

4 just that first sentence.

5     A   "Ms. Kretschmer-Weyland said Nationwide offered

6 $5 million for ten years at the very end of negotiations

7 between the Conference and Great-West, but would not lower

8 its pricing for its products to city employees."

9     Q   When you were talking to the board about the

10 upcoming meeting the next day with Great-West, did you have

11 in your mind what had happened back in October, September of

12 2012?

13     A   I had in my mind that, at this point, we had a

14 revolutionary idea, we had a good product, we had not been

15 successful in sharing that product with all of the public

16 employees.

17         And we'd still try; we'd tried to do the right

18 thing.

19     Q   To the best of your recollection, do these minutes

20 of the December 15, 2014, board meeting of U.S. Mayor

21 Enterprises reflect what was discussed at that meeting?

22     A   Yes, as was my understanding, they do.

23     Q   Now, did the meeting with Great-West happen the

24 next day?

25     A   It did.

1      Q      Where was that meeting held?

2      A      Conference of Mayors office, 1620 I Street,

3   Washington, D.C.

4      Q      Who attended the meeting for Great-West?

5             THE COURT:  Ladies and gentlemen, before we go to

6   that next statement, I just want to give you a little

7   instruction on the law that applies to this exhibit that's

8   just been discussed and admitted before you, that's

9   Exhibit 115, that is, the board of minutes, Board of

10  Directors minutes that on December 14, 2014.

11            Two things; one is, if you look at those, it says

12  redacted, non-responsive.  Those are irrelevant matters in

13  the minutes that has nothing to do with the case and we took

14  those out so they weren't distractions to you.

15            Secondly, the reference by Ms. Kretschmer-Weyland

16  to Nationwide offering $5 million for ten years is accepted

17  for a limited purpose only, not to prove that that is true

18  and that necessarily Nationwide made that offer, but in her

19  mind it established what she was thinking at the time when

20  she was giving this report, that that was her recollection

21  of what she had believed she heard, but it is not coming in

22  for the truth.  You heard some discussion by Ms. Brown on

23  the defense side earlier with the mayor about hearsay.

24  Hearsay is a statement that was made out of the presence of

25  the court and the person who made it can't be cross-examined

1   so it's normally does not come into evidence.

2          I'm allowing it here under an exception only in

3   the sense that it shows the state of mind of Ms. Weyland

4   when she was giving this report, but it does not prove that

5   there was an actual offer made of $5 million.

6          MR. STEWART:  Your Honor, may we approach?

7          THE COURT:  Sure.

8          MR. STEWART:  Just to clarify the limit.

9          (Bench conference)

10          MR. STEWART:  Just to clarify, Your Honor.

11   I appreciate the limiting instruction.  My understanding was

12   that the Court was going to also instruct them they may not

13   use the purported offer in calculating damages in the case.

14          THE COURT:  I'm going to do that at the end of the

15   case.  I wasn't going to do the damages part yet.  I'll do

16   it at the end of the case.

17          MR. STEWART:  Thank you.  We would request that.

18          THE COURT:  Okay.

19          MR. STEWART:  Thank you.

20          (Open court)

21          THE COURT:  All right.  We're ready to go on to

22   the next question.  Thank you.

23   BY MS. WARNER:

24      Q    I believe the question was who attended the

25   meeting for Great-West?

1     A    Mr. Charlie Nelson, Mr. Brent Neese, Mr. Don

2  Jurgens, and Mr. Gregg Seller.

3     Q    Who attended on behalf of the Mayors?

4     A    Myself, Mr -- our general counsel, Mr. Reeves; our

5  Chief Financial Officer for Conference of Mayors, Mr. Ward;

6  Mr. Cochran attended part of the meeting.

7     Q    And can you tell us what happened at the meeting

8  with regard to the discussion of the proposal that

9  Great-West had made in August of 2014 to restructure the

10  relationship?

11     A    They presented the very same offer and the meeting

12  was then adjourned by the general counsel of the Conference

13  of Mayors.

14     Q    When you say they made the same offer, what was

15  that offer?

16     A    $250,000 a year for -- it was undetermined how

17  long it would continue.  They said, I think they would

18  review it after the first year.

19     Q    Why did the Mayors reject that proposal?

20     A    We had a ten-year contract in force.

21     Q    Did the Mayors make any counterproposal after the

22  December 16, 2014, meeting?

23     A    No.  We asked them to go back and come back with

24  something that was realistic.

25     Q    After the meeting in December 2014, did sales

1    improve in 2015?

2        A    No.

3        Q    Did there come a time in 2015 when the Mayors

4    requested a high level meeting with Great-West to discuss

5    the state of the contract?

6        A    Yes.

7        Q    Where was that meeting held?

8        A    We asked that it be held in conjunction with our

9    San Francisco meeting.

10       Q    And when was that?

11       A    It was in June of the same year.

12       Q    Who came to the meeting on behalf of Great-West?

13       A    Mr. Neese, Mr. Jurgens, and Mr. Seller.

14       Q    Who came to the meeting for the Mayors?

15       A    Mayor Benjamin, former Mayor Scott Smith, myself,

16   and our general counsel.

17       Q    Where did the meeting take place?

18       A    It took place at the San Francisco Hilton in one

19   of their meeting rooms.

20       Q    And what was the purpose of this meeting in June

21   of 2015?

22       A    This was one more attempt to restart the program.

23       Q    Did the Mayors believe this was an important

24   meeting?

25       A    This was a very important meeting and --

1          Q     What --

2          A     -- and surprising to me, they decided that there

3    was no new proposal, so they decided that former Mayor Scott

4    Smith would work with Mr. Neese and see if we couldn't come

5    up with some solution going forward.

6          Q     Did you see Mr. Neese at any other times during

7    the San Francisco meeting?

8          A     I saw him one time at a reception.

9          Q     Did he --

10         A     I saw him when he gave the award.  I saw him one

11   time when he presented an award and I saw him at one

12   reception.

13         Q     And did you see him at any of the other activities

14   over the four-day period of the annual meeting?

15         A     No, I did not.

16         Q     About how many cities were represented at that

17   meeting?

18         A     Over 500 cities were represented.  There was well

19   over 1,500 people from different cities in attendance.

20         Q     Do you recall any specific event at which you saw

21   Mr. Neese?

22         A     I saw him in the new City Hall reception that we

23   had at the very end of the reception.

24               I was looking for him then.

25         Q     Did you find him during the reception?

1     A     Not till the very end.  He came in with his

2  brother and Mr. Borne and two ladies.

3     Q     And what was his condition in your view?

4         MR. STEWART:  Objection, Your Honor.

5         THE COURT:  All right.  She can give her own

6  personal view of what he looked like, the witness is able to

7  do that, to say how the person appeared to her.

8         THE WITNESS:  He looked like he had a wonderful,

9  been at a wonderful party, and I was glad I didn't see him

10  until the end of the meeting.  He wasn't -- he couldn't have

11  talked business then.

12  BY MS. WARNER:

13     Q     Why?

14     A     It was my opinion he'd had been at a wonderful

15  party and had a wonderful time.

16     Q     Now, I'd like to direct your attention to what

17  we're going to mark as Exhibit 66A, which is an excerpt from

18  Exhibit Plaintiffs' 66.

19         And, Ms. Weyland, what is 66A, which has on the

20  bottom of the page Neese 00100?

21     A     A check detail from the Ritz Carlton.

22         MR. STEWART:  Objection, Your Honor.

23         THE COURT:  Okay.

24         MR. STEWART:  Can we approach?

25         THE COURT:  Sure.

1          (Bench conference)

2          MR. STEWART:  Two things quickly, I realize this

3   is in evidence through Mr. Benjamin.  She doesn't have any

4   knowledge about this.  In fact, her testimony is going to

5   be, I was never there.

6          MS. WARNER:  That's the point.

7          MR. STEWART:  It's cumulative at this point

8   because it's already come in for that purpose.

9          THE COURT:  Wait a minute.  All right.  So she has

10  knowledge about it and direct knowledge, what's the

11  objection?

12         MR. STEWART:  It's cumulative of Benjamin, it's

13  cumulative of Mr. Benjamin's testimony.

14         THE COURT:  I thought you had two objections to

15  decide things she couldn't testify.

16         MR. STEWART:  Yeah, lack of personal knowledge.

17         MS. WARNER:  Your Honor, there are going to be,

18  I believe, three of these where Mr. Neese submitted expense

19  reports that said that he was having lunch or dinner with

20  her, and she was going to testify that she was not there.

21  These are the improprieties with regard to his business

22  expenses.

23         THE COURT:  What's the basis of admitting it if

24  you're just saying to her, if you were at a certain time and

25  place, if you had lunch with Mr. Neese.  No, I did not.  Are

1    you going to put these in for some other method?

2           MS. WARNER:  This is in an investigative report,

3    and this was the basis of him being terminated by the

4    company, and he was terminated with regard to business

5    expense improprieties related to his job performance with

6    regard to the Mayors program.  We believe that the jury

7    absolutely should hear this.  He was supposed to be at this

8    meeting to deal with the very serious problems associated

9    with the program.  He was the man in charge at Great-West.

10          MR. STEWART:  And around --

11          THE COURT:  Did she testify at deposition on this?

12          MS. WARNER:  We didn't have them then because they

13   didn't produce them.

14          THE COURT:  They wouldn't produce the deposition.

15          MS. WARNER:  And I tried to subpoena him.

16          THE COURT:  Right.

17          MS. WARNER:  And he has been out of the country,

18   apparently.

19          THE COURT:  Okay.

20          MR. STEWART:  For relevance and 403, Your Honor,

21   it's dated the day before the conference starts.  The

22   undisputed testimony is that he was at the conference, did

23   his job and provided a speech and an award, and this was not

24   billed to the Mayors, and by their own claim, wasn't related

25   to the Mayors.  They claim it should have been.

1          MS. WARNER:  But it's important for the jury to

2    hear that at the annual meeting where over 500 mayors were

3    in attendance and he's the man in charge, he was

4    specifically asked to meet with them at this annual meeting

5    because they would be there, that he was submitting

6    fraudulent expense reports, saying that he was having

7    meetings about the program that he didn't have.

8          The jury needs to hear this.

9          THE COURT:  Yeah.  I still want to get a

10   foundation for admitting these.

11         MS. WARNER:  Now --

12         THE COURT:  Now, is there some stipulation saying

13   they were produced?

14         If these aren't hers, she hasn't seen these,

15   because they were produced in discovery, I think you can

16   certainly ask her -- by making sure these aren't getting

17   them admitted, you can ask her did she have lunch at a

18   certain time and date with this person at that time in each

19   of these meetings.

20         MS. WARNER:  Okay.

21         We had under --

22         THE COURT:  But may be able to have her, when the

23   records are turned in, identify them later when they d come

24   in then.  I know these came from the internal investigation,

25   but they're not considered to be admitted overall.

1          MS. WARNER:  And my understanding sir, was that at

2    the pretrial, you had indicated that at least business

3    expense part of the internal investigation would be admitted

4    into evidence as relevant.

5          THE COURT:  I believe that.

6          MS. WARNER:  The other issue is different.

7          THE COURT:  I was given a couple of cases I

8    haven't read yet this morning, in fairness.  I should look

9    at that and they said there's a memo coming on, I don't know

10   what's coming on it.  But why don't you have her identify

11   them and identify the dates and time and she's going to

12   lunch with him and dates and time, and then I'll reserve at

13   a minimum until I see what we're doing.

14         MS. WARNER:  Thank you.

15         MR. STEWART:  Thank you.

16         THE COURT:  Then we'll take a lunch break.

17         (Open court)

18         THE COURT:  All right.  166A, we can show to the

19   witness to identify for the record and then I'll hold off on

20   the admission till later.

21   BY MS. WARNER:

22     Q    Now, Ms. Weyland, could you please look at your

23   binder, that this excerpt from Exhibit 66, and you just

24   testified that it appears to be a check from a restaurant;

25   is that correct?

1     A     Yes.

2     Q     And what restaurant is it, as you see it on the

3   page?

4     A     It's a restaurant, Ritz Carlton in San Francisco.

5     Q     What is the date of the check?

6     A     I lost the page, because I was watching the

7   screen.  I apologize.

8     Q     No.  It's okay.  We can't put it up on the screen.

9           THE COURT:  Exhibit 66.

10          MS. WARNER:  May I approach, Your Honor?

11          THE COURT:  Sure.

12          THE WITNESS:  Please.

13   BY MS. WARNER:

14    Q     Now, Ms. Weyland, you're looking at the page

15   that's marked Neese 000100, correct?

16    A     Yes.

17    Q     And is the receipt here dated June 15 -- June 16,

18   2015?

19    A     Yes.

20    Q     And where is that check from, as you said, the

21   Ritz Carlton in San Francisco?

22    A     Yes.

23    Q     What is written in handwriting on this paper?

24    A     "Submitted as lunch with Gregg Seller and Kathryn

25   Kretschmer."

1     Q    And the lunch, who else was claimed on this

2  document to be at lunch?

3     A    Gregg Seller and myself.

4     Q    Was Mr. Neese also claimed to be there?

5     A    Yeah -- I don't see it on --

6     Q    Okay.  Did you go to lunch at the lobby bar at the

7  Ritz Carlton hotel on June 16, 2015?

8     A    No.

9     Q    What were you doing at lunch on June 16 -- excuse

10 me, June 18, 2015?

11    A    That was during the course of our annual meeting

12 and all staff is required to attend every event that is

13 hosted by the conference, sponsored by the conference.  So

14 from, if we had a breakfast or continental all the way

15 through to the city hosted social event.

16         So I would not be leaving the property unless it

17 was a sponsored event.

18    Q    Would that have been the same on the day before

19 the official start of the conference?

20    A    Absolutely.  Even -- absolutely.

21    Q    Now, would you turn to the next page, which is

22 Neese 00102.  What does that appear to be?

23    A    It's another receipt from 25 Lusk in

24 San Francisco.

25    Q    What is the date on that receipt?

```
1       A     June 19th.

2       Q     2015?

3       A     2015.  I'm sorry.

4             Yes.

5       Q     What does the handwriting say on this document?

6       A     "Submitted as dinner with Seller, Kretschmer and

7   Jeff Bean and Neese."  It's a -- now I see it's a Neese

8   submittal.

9       Q     Did you go to dinner with Mr. Neese, Mr. Seller,

10  and Jeff Bean at 25 Lusk on the evening of June 19, 2015?

11      A     No.

12      Q     Have you ever been to a restaurant named 25 Lusk

13  in San Francisco?

14      A     No.

15      Q     Can you go to the next page, Neese 00096?

16      A     Yes.

17      Q     Do you see that on this page, there is a picture

18  of the San Francisco airport?

19      A     I do.

20      Q     What is written on the bottom in handwriting?

21      A     "Restaurant is located inside secure area at

22  Southwest terminal, promenade, where Mandy's flight leaves."

23      Q     Ms. Weyland, did you go to lunch inside the

24  secured area of the Southwest terminal at San Francisco

25  International Airport on Sunday, June 21st, 2015?
```

1    A    No.  Our meeting was still taking place.

2    Q    Where were you?

3    A    At the San Francisco Hilton.

4    Q    Where is that compared to San Francisco airport?

5    A    20 minutes at least away.

6    Q    Did you have a ticket to board a plane on

7 June 21st, 2015, that would have allowed you to get into the

8 secured area at the San Francisco International Airport?

9    A    No, ma'am.

10        MS. WARNER:  Your Honor, this might be a good time

11 if you want.

12        THE COURT:  All right.  Thank you.

13        All right, ladies and gentlemen, we're going to

14 take our luncheon recess.  We're going too back at 1:30.

15 Remember, please, the admonition again of the Court.  We're

16 moving along, so I appreciate your attention to this

17 morning's work.

18        Again, you're free, if it's a nice day, to go

19 outside if you like, or stay here for lunch and return to

20 the jury lounge by 1:30, please.  Thank you.

21        Remember the admonition of the Court again about

22 not talking about the case.

23        (Jury exited the courtroom.)

24        THE COURT:  How about we come back, I need to take

25 few minutes break and pull a deposition up to look at.

1          MS. BROWN:  I have what we're about to file with

2     the Clerk's Office at 12:30.  I've hand served it on

3     opposing counsel and I have a copy for the Court.

4          THE COURT:  All right.  Thank you.  So we'll come

5     back at 1:15 to take up the Leshinsky deposition before

6     trial.  So 1:15.  All right.  Thank you.

7          (Proceedings concluded at 12:28 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: January 10, 2018_____   /S/__William P. Zaremba_____

                              William P. Zaremba, RMR, CRR

BY MR. STEWART: [4]  26/14 28/20 29/24 31/14
BY MR. WARNER: [1]  82/25
BY MS. WARNER: [24]  21/17 22/22 35/7 37/1 43/1 47/23
49/14 60/16 63/8 65/10 65/17 67/23 70/24 76/1 78/9 81/2
83/24 88/15 90/9 91/19 97/22 101/11 105/20 106/12
DEPUTY CLERK: [5]  4/1 4/7 33/16 82/14 82/19
MR. NADEL: [15]  4/13 4/16 8/18 9/8 9/18 10/6 10/14 13/14
16/18 16/23 17/24 18/10 20/25 21/4 62/4
MR. O'DONNELL: [9]  5/4 20/1 20/4 20/21 33/11 33/14
80/6 80/8 80/20
MR. STEWART: [39]  26/13 29/23 31/10 31/20 36/23 42/23
60/14 62/8 63/3 65/15 67/20 70/22 75/19 78/7 78/20 78/24
79/25 83/20 88/2 88/5 90/3 90/7 91/12 91/17 97/5 97/7 97/9
97/16 97/18 101/3 101/21 101/23 102/1 102/6 102/11
102/15 103/9 103/19 105/14
MS. BROWN: [23]  5/5 5/17 8/10 9/6 9/17 10/2 10/4 10/7
10/25 11/17 12/6 13/1 13/3 14/1 14/5 14/13 17/3 17/9 17/16
17/23 18/5 18/16 109/25
MS. WARNER: [49]  19/9 19/18 19/21 20/17 21/9 21/14
22/18 26/8 28/16 32/2 32/4 32/15 32/17 34/23 34/25 36/22
42/21 47/16 47/20 62/16 62/22 63/2 65/14 67/19 75/16
75/22 78/5 79/8 79/18 80/7 80/13 83/18 87/25 90/1 91/11
102/5 102/16 103/1 103/11 103/14 103/16 103/25 104/10
104/19 104/25 105/5 105/13 106/9 109/9
THE COURT: [110]  4/5 4/11 4/15 5/1 5/16 7/15 8/17 8/24
9/7 9/16 10/3 11/16 11/18 12/17 13/2 13/9 14/4 14/12 14/14
16/19 16/24 17/4 17/12 17/21 17/25 18/6 18/18 19/10 19/20
19/22 20/3 20/5 20/19 20/22 21/3 21/5 21/10 22/19 22/21
26/11 28/17 29/20 31/11 32/1 32/3 32/7 32/16 32/22 33/13
33/15 33/19 34/24 36/24 42/24 47/17 49/9 49/12 60/15 62/6
62/19 62/24 63/5 65/16 67/21 70/23 75/18 75/20 78/8 78/22
79/16 80/2 80/21 81/25 82/13 82/16 82/20 83/21 88/3 88/7
90/4 90/8 91/14 91/18 96/4 97/6 97/13 97/17 97/20 101/4
101/22 101/24 102/8 102/13 102/22 103/10 103/13 103/15
103/18 104/8 104/11 104/21 105/4 105/6 105/15 105/17
106/8 106/10 109/11 109/23 110/3
THE WITNESS: [8]  21/15 22/20 28/19 47/22 49/11 49/13
101/7 106/11

## $

$10 [2]  41/23 89/6
$2.50 [1]  41/24
$250,000 [1]  98/16
$3 [2]  9/23 10/23
$5 [9]  8/5 12/12 14/22 16/11 16/25 94/11 95/6 96/16 97/5
$5 million [2]  12/12 95/6
$50 [2]  29/9 29/18
$6 [1]  38/13
$60 [1]  29/14

## '

'14 [2]  28/24 77/16
'15 [1]  25/6

## /

/S [1]  111/7

## 0

000100 [1]  106/15
000398432846 [1]  22/16
00096 [1]  108/15
00100 [1]  101/20
00102 [1]  107/22
004 [1]  84/20
005 [1]  86/14

## 1

1,500 [1]  100/19

.5 million [1]  95/13
10 [4]  1/5 20/12 52/1 111/7
10:00 [1]  5/22
11 [1]  20/12
115 [11]  22/15 22/25 23/7 23/20 24/3 25/3 32/25 91/6 91/12
92/22 96/9
116 [1]  22/21
11:00 [2]  20/17 20/20
11:30 [2]  82/10 82/16
11:40 [2]  82/16
12 [6]  36/13 82/11 87/16 87/24 88/1 88/11
126 [6]  36/10 36/18 36/23 36/25 37/4 37/13
128 [1]  15/21
12:28 [1]  110/7
12:30 [3]  82/11 82/25 110/2
14 [5]  43/3 43/4 43/9 47/20 96/10
15 [11]  21/8 25/7 26/6 91/9 91/22 92/16 92/17 94/14 94/15
95/20 106/17
151 [1]  15/9
15th [3]  24/20 30/17 30/21
16 [5]  43/13 98/22 106/17 107/7 107/9
16-660 [2]  1/4 4/11
161 [6]  65/3 65/5 65/15 65/17 68/17 70/19
1620 [3]  24/9 24/16 96/2
1625 [1]  2/8
166A [1]  105/18
16th [1]  92/9
17 [8]  67/12 67/20 67/22 68/4 68/14 72/5 72/13 73/1
17.2.6 [1]  56/3
17th [1]  2/4
18 [1]  107/10
1800 [1]  2/5
188 [1]  15/8
19 [1]  108/10
198 [5]  89/21 90/2 90/5 90/9 90/11
19th [1]  108/1
1:15 [2]  110/5 110/6
1:30 [2]  109/14 109/20

## 2

2-27-2015 [1]  25/4
2.1 [2]  44/5 44/9
2.2 [2]  44/19 44/22
2.4 [2]  48/17 48/19
20 [3]  41/3 82/10 109/5
20001 [2]  1/16 2/14
20006 [1]  2/8
2011 [16]  27/13 27/20 35/18 35/20 36/8 36/13 36/21 37/14
38/6 38/12 38/24 40/5 40/16 40/25 52/9 54/3
2012 [40]  22/5 27/22 28/9 29/6 30/2 30/8 40/5 40/16 43/15
45/6 46/20 51/23 52/9 54/3 55/15 56/11 56/24 57/11 58/9
58/17 63/24 65/9 65/13 67/1 67/18 68/2 71/14 72/5 73/22
73/22 74/15 77/21 80/11 81/8 81/23 85/14 88/23 93/22 94/1
95/12
2013 [5]  27/24 30/11 30/14 58/10 58/19
2014 [38]  8/14 13/15 17/7 22/5 23/23 24/20 25/7 26/6 27/2
28/1 30/13 30/17 30/21 58/10 58/21 75/14 75/22 76/1 76/11
77/10 88/19 88/22 89/2 89/7 89/18 89/23 90/6 90/16 91/9
92/7 92/11 92/17 94/15 95/20 96/10 98/9 98/22 108/24
2015 [22]  8/14 17/7 23/8 25/4 29/2 45/6 46/21 58/10 58/23
91/22 92/9 99/1 99/3 99/21 106/18 107/7 107/10 108/2
108/3 108/10 108/25 109/7
2016 [1]  51/23
2017 [1]  28/9
2018 [2]  1/5 111/7
202 [3]  1/17 2/9 2/14
203 [2]  77/19 78/7
21 [1]  15/21
21st [2]  108/25 109/7

## 2

225 [8]  83/3 83/9 83/19 83/23 84/5 84/16 85/24 87/4
244-1800 [1]  2/5
25 [4]  89/23 107/23 108/10 108/12
250,000 [1]  90/20
25th [1]  90/6
27 [2]  23/8 25/6
27th [1]  29/2
28 [1]  90/16
2d [1]  15/21

## 3

3 million [1]  84/25
3,000 [3]  38/8 38/14 66/21
3.2 [1]  50/12
3.3 [1]  51/14
300,000 [2]  38/10 38/11
303 [1]  2/5
31 [1]  71/14
3249 [1]  2/14
333 [1]  2/13
354-3249 [1]  2/14
370 [1]  2/4
383-5376 [1]  2/9

## 4

4,000 [1]  38/14
403 [1]  103/20
4500 [1]  2/4
457 [16]  38/7 38/12 38/18 41/12 41/19 47/4 53/7 68/16 69/5
69/25 70/13 72/7 72/15 81/24 93/5 93/6
471 [1]  15/9

## 5

5.2.7 [1]  49/16
500 [3]  1/16 100/18 104/2
5376 [1]  2/9

## 6

615 [1]  4/19
65 [1]  39/14
6511 [1]  2/13
66 [3]  101/18 105/23 106/9
660 [2]  1/4 4/11
66A [2]  101/17 101/19
693 [1]  15/7
6th [1]  77/10

## 7

7.2.6 [5]  52/1 52/2 52/7 54/17 54/19
754 [1]  17/5
756 [1]  17/3
756-8000 [1]  1/17

## 8

8000 [1]  1/17
80202 [1]  2/5
8036 [2]  15/18 26/11
8th [2]  63/24 65/12

## 9

95 [3]  75/12 75/17 76/24
9:30 [2]  1/6 34/1

## A

a.m [3]  1/6 82/16 82/16
A1 [5]  60/25 61/2 61/6 61/9 61/15
abilities [1]  45/13
ability [7]  39/1 40/5 40/10 45/7 48/16 56/5 84/13

able [8]  8/12 35/3 55/8 58/98 55/18 60/13 101/6 104/22
about [104]  5/12 6/6 7/1 8/5 11/3 11/4 11/5 11/9 11/20
11/21 11/25 12/3 12/5 12/19 13/20 14/25 15/1 15/9 16/4
16/15 17/1 17/23 18/8 20/7 20/24 21/2 21/13 26/19 26/21
27/7 27/9 28/24 29/21 29/22 30/23 31/17 33/6 33/7 33/8
34/22 38/8 38/11 40/5 41/3 43/24 47/19 48/2 48/4 48/9
53/11 53/19 53/23 53/25 54/12 55/17 57/20 59/20 62/18
68/22 69/20 70/2 70/4 70/14 71/19 73/20 76/17 77/16 77/25
78/12 79/5 79/9 79/13 79/17 79/19 80/4 80/15 80/17 80/18
82/8 82/10 82/11 82/25 83/11 89/9 89/14 90/17 91/2 92/17
93/1 93/4 93/9 94/3 94/9 94/10 95/9 96/23 100/16 102/4
102/10 104/7 109/21 109/22 109/24 110/1
above [1]  111/4
above-titled [1]  111/4
absolutely [11]  27/19 45/14 47/5 53/9 55/21 69/2 69/13
87/10 103/7 107/20 107/20
accept [4]  16/12 33/8 33/8 41/18
acceptable [1]  85/17
accepted [3]  15/2 16/12 96/16
accepting [1]  12/5
accommodate [1]  20/19
accordance [1]  50/24
according [2]  29/8 31/4
accountant [1]  25/9
accountants [2]  25/8 25/11
accurate [2]  28/5 31/18
acknowledges [3]  52/14 54/18 56/4
acknowledging [1]  53/1
acquaintance [1]  20/1
acquaintances [2]  19/14 19/18
across [1]  70/14
act [1]  12/12
acting [1]  15/13
action [3]  4/11 9/6 85/2
activities [3]  44/18 46/9 100/13
activity [2]  31/24 46/18
actual [1]  97/5
actually [10]  15/8 19/17 43/4 47/3 60/20 64/25 84/4 84/22
86/9 87/7
add [1]  57/1
added [1]  56/15
addition [4]  5/21 56/9 66/25 72/4
additional [2]  6/17 53/18
additionally [1]  8/8
adjourned [1]  98/12
administer [1]  66/11
administrative [8]  48/3 69/4 69/21 71/8 71/10 71/14 71/16
71/18
administrator [2]  40/6 69/16
administrators [3]  39/19 70/14 72/7
admissibility [2]  11/9 29/21
admissible [4]  15/5 15/18 15/22 17/1
admission [1]  105/20
admit [1]  13/5
admitted [13]  8/21 18/14 36/25 42/25 43/1 65/17 67/23
88/11 90/9 96/8 104/17 104/25 105/3
admitting [3]  14/23 102/23 104/10
admonition [3]  82/7 109/15 109/21
advance [13]  59/18 60/2 61/3 61/11 62/12 87/11 87/14
88/18 88/21 88/25 89/1 89/4 89/7
advise [3]  19/1 70/11 70/13
advisor [5]  31/8 40/23 41/1 41/10 46/19
advisors [1]  46/23
advocacy [1]  71/22
affairs [1]  8/9
affect [1]  9/15
after [21]  4/21 5/22 11/13 13/14 20/5 30/2 30/22 39/22
47/20 57/11 58/9 64/16 73/6 73/19 73/21 75/8 78/17 78/19
98/18 98/21 98/25

**A**

after-created [1]  13/14
again [10]  6/2 18/4 26/5 64/15 69/10 69/24 82/18 109/15
 109/18 109/21
age [1]  39/14
agree [1]  74/23
agreed [2]  4/19 59/25
agreement [23]  42/5 42/11 42/13 42/16 42/21 42/21 43/5
 43/6 43/11 44/7 44/11 44/24 46/17 48/3 50/13 50/13 50/17
 50/25 51/16 51/22 52/4 71/8 71/10
agreements [3]  71/15 71/16 71/18
agrees [1]  52/15
ahead [1]  71/1
aided [1]  2/16
airport [4]  108/18 108/25 109/4 109/8
AL [1]  1/3
Albuquerque [1]  74/18
all [76]  4/2 4/3 4/12 4/16 5/4 7/16 8/25 9/1 9/12 10/1 14/13
 15/5 17/13 17/14 18/2 18/10 18/20 19/11 19/23 20/20 20/23
 21/9 21/11 26/12 26/22 27/1 27/4 31/12 32/2 32/17 32/23
 33/11 33/16 33/17 33/20 34/3 34/18 34/23 38/14 47/19
 49/13 50/24 53/12 57/18 62/7 65/17 67/3 67/7 67/22 68/15
 75/21 80/17 80/25 82/11 82/14 82/15 83/22 84/6 86/10 88/8
 88/15 90/5 90/9 91/15 91/19 95/15 97/21 101/5 102/9
 105/18 107/12 107/14 109/12 109/3 110/4 110/6
all right [27]  4/16 5/4 9/1 14/13 18/2 18/10 19/1 21/9 26/12
 31/12 32/2 32/17 32/23 33/16 33/20 34/23 49/13 62/7 75/21
 82/14 90/5 90/9 91/15 101/5 102/9 109/13 110/4
allegations [2]  5/24 9/11
alleged [3]  6/3 11/13 29/5
allegedly [1]  30/6
allow [7]  14/15 32/24 54/23 62/25 63/4 63/6 91/16
allowable [1]  58/7
allowed [4]  8/2 47/3 79/10 109/7
allowing [1]  97/2
almost [2]  9/23 10/22
along [2]  33/25 109/16
already [5]  10/2 18/13 33/14 91/15 102/8
also [14]  15/8 18/25 23/24 29/11 38/5 40/13 41/8 55/22
 61/5 67/10 69/7 69/12 97/12 107/4
although [1]  20/1
always [2]  27/6 56/1
am [16]  11/25 21/25 23/21 28/13 29/4 29/8 29/11 29/17
 30/1 30/16 30/21 31/4 31/17 52/5 79/14 80/17
amend [1]  90/18
among [3]  35/11 45/9 82/8
amount [2]  39/11 60/2
and I [1]  64/20
Angeles [2]  36/4 36/5
annotated [1]  4/23
announcement [1]  83/6
annual [6]  84/25 85/15 100/14 104/2 104/4 107/11
annually [1]  85/8
annuity [3]  1/6 4/10 66/18
another [10]  5/23 6/19 6/21 15/22 16/13 21/7 64/22 77/21
 80/25 107/23
answer [9]  28/19 62/16 62/20 62/21 63/12 77/1 77/3 79/4
 83/17
answered [3]  28/3 63/5 63/7
answering [1]  63/16
answers [2]  87/21 88/9
anticipation [3]  11/16 13/14 13/25
anxious [2]  19/2 34/5
any [27]  5/25 6/16 13/13 28/22 30/5 30/11 34/3 34/7 35/21
 35/23 46/18 54/22 54/24 56/10 56/15 56/25 57/12 66/24
 85/16 89/9 91/24 91/25 98/21 100/6 100/13 100/20 102/3
anybody [2]  64/22 84/14
anyone [2]  40/14 82/9

anything [8]  6/7 7/10 11/9 36/22 40/4 40/7 86/17 80/19
anyway [1]  18/9
apologize [4]  47/22 49/14 74/10 106/7
apparently [2]  14/7 103/18
appeal [1]  17/8
appear [1]  107/22
APPEARANCES [2]  1/12 2/1
appeared [2]  40/12 101/7
appears [2]  37/22 105/24
applicable [1]  52/20
applies [1]  96/7
apply [2]  4/19 86/3
appreciate [5]  22/13 37/3 82/24 97/11 109/16
apprised [3]  26/23 55/7 92/17
approach [10]  18/18 22/19 35/14 47/17 62/6 64/5 78/22
 97/6 101/24 106/10
approached [1]  35/17
appropriate [4]  9/6 45/16 48/7 50/18
approval [3]  51/9 54/22 55/11
are [52]  4/24 6/2 6/24 8/22 10/17 11/6 11/10 11/18 12/23
 13/12 13/18 13/22 14/1 15/17 16/22 18/24 20/18 21/22
 23/20 24/5 24/15 25/14 25/15 25/17 25/21 25/23 29/1 30/17
 30/19 31/22 32/11 32/13 32/18 48/2 51/6 51/12 52/3 57/23
 61/18 61/20 62/4 71/5 72/2 87/17 87/24 92/22 93/18 96/12
 102/17 102/21 102/25 104/23
area [3]  108/21 108/24 109/8
areas [1]  57/5
aren't [3]  32/6 104/14 104/16
around [7]  30/6 69/19 70/1 73/2 85/25 88/19 103/10
arrive [1]  52/7
as [134]
ask [18]  5/14 6/15 7/12 11/9 13/10 14/2 19/1 27/16 34/3
 34/8 36/12 50/12 72/22 77/19 82/1 89/21 104/16 104/17
asked [12]  28/7 30/24 33/14 59/22 71/23 72/21 79/4 92/25
 93/4 98/23 99/8 104/4
asking [2]  77/6 79/7
asserted [2]  12/17 14/24
asset [2]  71/7 71/9
assets [1]  70/21
Assisting [1]  45/21
associated [2]  40/14 103/8
assume [1]  5/3
assuming [1]  84/13
assurances [2]  75/2 75/4
assure [1]  73/25
assured [1]  53/13
attach [1]  71/9
attached [4]  6/18 47/10 71/7 91/9
attachment [10]  47/10 47/13 60/19 60/25 61/2 61/6 61/9
 61/11 61/15 61/15
Attachment A [1]  47/10
Attachment A1 [3]  60/25 61/6 61/15
attachments [2]  61/18 61/20
attempt [4]  45/12 54/5 58/25 99/22
attend [5]  22/1 22/4 22/8 24/21 107/12
attendance [3]  31/5 100/19 104/3
attended [4]  96/4 97/24 98/3 98/6
attention [20]  24/2 34/19 47/12 51/25 52/11 60/19 61/5 65/2
 66/10 67/11 71/12 75/11 81/4 82/24 84/19 91/5 92/21 95/2
 101/16 109/16
attorney [1]  41/6
attorneys [1]  6/12
attributed [1]  35/24
auditor [1]  25/9
August [6]  65/9 89/23 90/6 90/16 92/7 98/9
authorized [1]  43/20
available [4]  39/18 40/2 50/24 69/8
Avenue [1]  2/13
award [3]  100/10 100/11 103/23

**A**

aware [5]  7/5 25/14 30/18 59/21 87/21
away [4]  17/16 85/8 85/12 109/5

**B**

back [29]  13/10 25/3 34/19 34/21 43/15 47/19 48/17 50/11
60/4 60/8 60/10 60/20 63/23 67/5 82/2 82/10 82/14
82/17 82/22 87/16 89/5 94/1 95/11 98/23 98/23 109/14
109/24 110/5
backed [1]  57/24
Baker [2]  12/1 15/7
banc [1]  17/7
bar [1]  107/6
based [3]  47/6 61/10 85/21
basic [1]  12/9
basis [7]  15/3 15/24 16/9 24/16 33/11 102/23 103/3
Bates [1]  22/16
be [118]
Bean [4]  64/7 64/15 108/7 108/10
bears [1]  22/16
became [3]  19/8 36/5 39/12
because [34]  9/6 9/21 11/8 12/13 12/24 29/12 32/11 34/13
40/1 49/3 50/4 51/8 52/24 53/9 53/15 55/22 60/13 63/17
66/21 68/20 69/11 77/8 79/10 79/12 80/21 81/19 89/3 89/15
94/5 102/8 103/12 104/5 104/15 106/6
become [2]  40/6 58/11
been [33]  6/5 7/25 8/16 8/20 9/21 10/23 23/4 23/15 27/13
31/19 34/1 34/22 35/4 40/25 47/3 54/4 57/5 58/1 70/1 74/7
87/8 87/20 89/4 89/5 94/6 95/14 96/8 101/9 101/14 103/17
103/25 107/18 108/12
before [27]  1/10 5/2 5/25 6/16 7/1 8/2 8/11 13/16 18/18
18/23 31/2 56/11 57/6 72/14 73/1 73/6 73/9 74/19 86/6 87/8
92/17 93/19 96/5 96/8 103/21 107/18 110/5
began [1]  13/16
begin [1]  37/5
beginning [4]  33/23 41/2 54/13 80/11
begins [2]  52/12 71/3
behalf [7]  42/17 43/5 43/11 60/24 90/13 98/3 99/12
behest [2]  19/13 19/25
being [7]  12/16 14/17 25/8 30/9 55/7 78/12 103/3
believe [17]  5/3 11/14 20/9 26/9 43/10 53/24 54/3 59/13
62/18 62/19 81/8 82/10 97/24 99/23 102/18 103/6 105/5
believed [5]  63/19 75/3 89/19 94/24 96/21
bench [14]  5/10 5/23 6/2 6/18 6/22 8/12 11/2 11/5 17/11
17/14 62/8 78/24 97/9 102/1
benefit [1]  51/11
benefits [3]  48/11 70/6 70/7
Benjamin [9]  5/19 9/22 10/9 10/11 10/19 30/23 99/15 102/3
102/12
Benjamin's [1]  102/13
Besides [1]  40/9
best [24]  16/2 39/18 39/18 39/19 43/17 45/4 45/7 45/12
45/13 48/16 48/20 48/24 49/6 49/6 49/6 54/22 55/10 56/8
56/14 61/9 77/15 84/11 93/19 95/19
better [7]  40/9 64/24 75/2 87/2 87/2 87/2 87/3
betterment [2]  46/3 68/24
between [8]  11/23 20/12 28/7 28/9 36/8 57/8 71/20 95/7
bid [1]  55/23
bidding [1]  55/24
big [3]  58/12 58/14 80/17
billed [1]  103/24
billion [1]  38/13
binder [2]  65/3 105/23
binders [1]  64/10
bit [6]  13/11 16/20 47/16 49/9 59/20 72/21
biting [1]  81/19
blow [1]  44/2
board [71]  5/10 5/13 5/15 9/25 10/12 10/16 10/25 11/3 11/5

11/12 11/13 11/20 13/16 14/9 17/13 17/22 14/8 21/19
21/22 21/25 22/1 22/4 23/12 23/18 24/6 24/25 25/11 25/17
26/3 26/6 26/18 26/22 26/25 27/2 27/10 27/18 28/8 28/14
28/15 28/22 30/1 30/5 30/17 31/1 31/4 31/19 32/6 32/7
32/11 32/19 32/20 32/21 33/3 91/8 91/21 92/16 92/17 92/23
92/25 93/1 93/9 93/16 93/21 94/15 94/18 94/21 95/9 95/20
96/9 96/9 109/6
Boca [1]  15/20
Bock [1]  76/14
bonus [1]  54/15
book [2]  22/22 67/12
Borne [2]  76/20 101/2
both [15]  4/24 5/18 6/24 18/4 20/4 32/1 37/20 39/1 43/20
57/4 57/5 59/15 59/25 84/2 84/8
bottom [4]  47/13 75/23 101/20 108/20
box [1]  95/3
break [5]  20/5 82/2 82/5 105/16 109/25
breakfast [1]  107/14
Brent [5]  9/3 30/23 65/7 90/6 98/1
Bresler [1]  7/4 7/13 7/14 17/17
Bridgeport [1]  57/17
brief [3]  4/15 6/1 9/3
briefly [2]  64/2 64/16
bring [1]  7/13
broad [1]  90/22
brochures [1]  64/10
broker [2]  46/19 46/19
brother [1]  101/2
brought [2]  7/21 29/1
Brown [7]  2/7 6/22 8/13 10/19 13/24 17/3 96/22
brush [1]  90/22
build [1]  59/8
building [2]  1/15 78/16
bullet [1]  48/9
business [44]  10/17 11/6 11/7 13/12 13/13 13/21 14/17
14/18 14/19 15/10 15/14 15/25 15/25 16/15 19/14 19/17
20/1 21/13 24/12 25/19 31/23 32/1 32/12 33/1 33/2 36/21
37/19 37/21 38/5 44/18 46/10 47/9 47/14 48/1 48/15 52/15
53/11 56/16 58/11 64/23 101/11 102/21 103/4 105/2

**C**

C1 [2]  60/19 61/15
CA [1]  1/4
calculating [1]  97/13
call [10]  4/7 7/10 20/11 30/12 38/22 49/17 57/20 64/8 73/23
74/2
called [8]  8/6 42/4 42/20 50/15 64/9 67/4 73/9 76/12
calling [1]  14/12
calls [1]  6/7
came [6]  40/15 40/19 99/12 99/14 101/1 104/24
campaign [3]  19/13 19/18 19/25
can [46]  4/20 4/25 5/1 5/3 9/14 11/14 12/3 13/24 14/24 16/2
16/5 16/9 16/20 17/4 17/14 18/23 19/4 20/12 23/24 28/18
29/22 34/16 61/7 63/19 64/2 64/15 64/25 71/25 77/7 77/7
77/14 79/23 81/19 83/5 85/3 86/14 88/4 93/8 93/25 98/7
101/5 101/24 104/15 104/17 105/18 108/15
can't [6]  20/11 64/21 69/7 83/13 96/25 106/8
Capitol [1]  1/16
capture [1]  53/12
car [3]  64/9 64/9 64/23
care [1]  34/14
careful [4]  11/2 11/4 62/18 62/23
Carlton [4]  101/21 106/4 106/21 107/7
Carolina [1]  52/25
Carolyn [1]  20/9
carries [1]  86/16
cars [1]  64/8
case [29]  4/6 17 7/5 7/5 7/14 12/1 15/7 15/20 17/6 17/7
17/21 19/3 20/16 27/13 28/4 28/16 32/20 33/25 34/19 34/19

C

case... [9]  49/4 82/8 87/18 88/13 96/13 97/13 97/15 97/16 109/22
cases [7]  6/23 8/13 9/7 10/6 12/2 17/2 105/7
cash [1]  62/11
cause [1]  91/3
caused [2]  58/7 91/4
CC [1]  23/20
cemented [1]  78/12
CEO [2]  68/8 81/24
certain [6]  53/6 53/7 55/11 60/1 102/24 104/18
certainly [1]  104/16
Certified [1]  2/11
certify [1]  111/2
certifying [1]  31/17
chain [3]  15/13 75/24 78/11
chance [1]  7/20
change [2]  69/9 83/18
changed [2]  49/3 87/9
changes [5]  49/3 66/23 67/17 68/10 77/15
charge [3]  76/21 103/9 104/3
Charlie [1]  98/1
check [4]  101/21 105/24 106/5 106/20
chief [7]  17/21 21/24 22/11 25/13 27/16 81/20 98/5
choice [1]  39/18
choices [1]  39/18
choose [1]  39/22
Circuit [2]  6/23 8/14
circulate [1]  23/17
circumstantial [1]  13/9
cite [1]  14/21
cities [19]  37/8 37/8 37/9 37/20 37/21 38/15 39/12 39/13 39/17 44/13 45/9 51/11 55/24 57/2 68/23 85/2 100/16 100/18 100/19
city [21]  36/3 38/11 38/20 38/22 45/11 45/11 46/3 52/25 53/17 59/6 68/16 71/8 71/10 71/14 71/16 71/18 71/20 84/7 95/8 100/22 107/15
Civil [1]  4/11
claim [5]  12/24 15/3 80/2 103/24 103/25
claimed [2]  107/1 107/4
claiming [1]  16/9
clarify [3]  72/23 97/8 97/10
classic [2]  12/16 13/22
clear [1]  77/8
clearer [1]  10/13
Clerk [1]  20/24
Clerk's [1]  110/2
client [1]  20/3
close [1]  15/4
closer [1]  49/10
CO [2]  1/7 2/5
Cochran [8]  22/8 22/10 29/19 56/24 66/7 68/6 68/7 98/6
collaboration [1]  46/2
collaboratively [1]  40/21
COLUMBIA [1]  1/1
combination [1]  37/12
combined [1]  37/8
come [15]  4/5 12/25 16/5 20/16 57/19 89/17 94/25 97/1 98/23 99/3 100/4 102/8 104/23 109/24 110/4
comes [3]  7/1 33/7 33/13
coming [3]  96/21 105/9 105/10
commence [1]  63/25
commenced [2]  64/3 94/2
commendable [1]  85/2
commitment [2]  68/22 75/6
committed [2]  72/2 74/12
communication [3]  69/22 76/8 76/8
communications [4]  28/7 45/10 66/24 76/16

companies [1]  35/18
company [5]  4/10 32/13 33/3 33/4 103/4
compared [1]  109/4
compensation [1]  46/3
compete [4]  52/3 54/6 56/6 59/15
competition [1]  56/10
competitive [1]  48/12
complete [1]  71/6
completed [1]  70/20
completely [1]  20/22
complimentary [1]  80/21
computer [1]  2/16
computer-aided [1]  2/16
concede [1]  11/6
concept [1]  60/1
concern [4]  14/23 59/11 59/12 79/1
concerned [4]  7/18 11/25 77/16 89/13
concerning [2]  34/22 45/17
concerns [2]  89/9 89/11
concluded [1]  110/7
condition [1]  101/3
conduct [3]  8/2 9/4 21/2
conducted [9]  24/12 25/19 31/23 31/24 32/10 32/10 32/19 33/1 33/1
Conducting [1]  48/10
conference [45]  1/3 4/9 11/23 20/11 24/13 37/22 42/11 42/19 46/24 50/8 51/1 51/3 51/6 51/17 51/18 53/3 53/20 56/11 57/20 60/5 62/8 65/25 68/1 69/15 71/19 72/6 78/24 83/10 83/24 86/24 87/1 89/15 90/23 92/4 95/7 96/2 97/9 98/5 98/12 102/1 103/21 103/22 107/13 107/13 107/19
conferred [1]  31/13
confidence [1]  59/8
confidential [1]  36/16
conflict [2]  34/14 59/2
confuse [1]  72/24
confused [1]  58/2
confusing [1]  72/21
confusion [2]  57/25 58/8
conjunction [1]  99/8
Connecticut [2]  19/7 19/9
connection [2]  50/19 50/24
conservative [2]  62/13 63/2
consider [1]  59/23
considered [3]  35/12 54/19 104/25
consternation [1]  91/4
constituents [1]  51/11
Constitution [1]  2/13
construed [1]  52/19
consultant [1]  74/11
contacting [1]  29/19
contained [3]  15/24 63/14 84/15
contains [1]  91/7
contemporaneous [1]  31/23
content [1]  14/6
contents [2]  10/18 86/5
context [1]  93/5
continental [1]  107/14
continuance [1]  44/16
continue [6]  31/25 66/11 66/19 73/24 74/23 98/12
continued [4]  2/1 35/6 85/5 85/15
continuing [3]  71/4 73/20 82/23
continuously [1]  23/14
contract [34]  6/4 9/5 12/9 12/10 12/13 16/8 30/24 42/5 43/24 43/25 45/6 46/21 47/20 48/22 48/25 49/18 50/1 51/15 52/23 53/24 56/12 57/11 61/11 61/17 61/25 66/5 66/18 80/6 80/11 88/23 89/8 90/19 98/20 99/5
contracts [8]  41/11 41/15 41/17 41/22 56/23 56/24 59/15 60/24
contractually [1]  65/25

**C**

contribute [1]  39/11
contributed [3]  19/12 19/17 19/25
contribution [2]  39/7 39/9
conversation [8]  10/10 10/20 11/14 29/5 30/3 30/6 54/8 75/7
conversations [3]  26/21 54/9 54/13
convey [4]  93/9 93/21 94/15 94/18
conveying [1]  94/20
COO [3]  45/5 48/13 59/9
cool [3]  81/6 81/13 81/14
copies [1]  10/5
copy [4]  4/23 6/10 6/19 110/3
corporate [5]  7/3 17/17 18/3 87/17 87/20
correct [26]  8/15 13/2 16/19 25/4 25/5 29/2 29/4 29/11 29/13 29/17 30/1 30/16 30/21 31/7 31/9 31/17 49/23 68/12 78/1 81/21 81/22 85/23 87/18 105/25 106/15 111/3
costs [1]  48/11
could [44]  19/1 33/10 34/5 36/10 37/4 37/11 38/4 38/17 38/20 38/21 38/21 39/1 39/6 39/7 40/12 42/7 43/3 43/8 43/24 44/22 46/13 47/5 48/17 49/16 50/16 52/22 54/16 56/2 59/20 65/19 66/2 66/15 67/11 73/25 75/3 75/24 77/11 78/13 83/2 84/22 85/14 90/11 95/3 105/22
couldn't [5]  10/13 66/3 100/4 101/10 102/15
counsel [22]  7/3 10/6 15/7 18/6 18/24 23/2 23/4 23/11 25/21 26/2 26/13 29/1 31/13 31/13 33/14 34/21 41/5 42/21 98/4 98/12 99/16 110/3
counterproposal [1]  98/21
country [6]  69/19 70/1 70/14 73/2 85/25 103/17
country's [1]  85/16
counts [1]  18/9
couple [5]  5/7 34/2 34/10 55/6 105/7
course [19]  13/7 13/13 13/21 14/7 14/17 14/18 14/19 15/14 15/23 15/23 18/17 25/18 32/12 33/1 36/21 38/21 87/22 94/6 107/11
court [35]  1/1 2/10 2/12 4/3 4/23 5/9 6/14 6/21 7/7 8/17 8/23 9/13 10/14 13/5 13/7 14/3 14/10 16/6 17/4 17/12 17/18 17/19 18/13 18/15 21/1 63/8 81/2 82/8 96/25 97/12 97/20 105/17 109/15 109/21 110/3
Court's [1]  7/15
Courthouse [1]  2/12
courtroom [5]  4/18 33/18 82/13 82/19 109/23
cover [2]  6/11 65/7
CPA [1]  41/8
created [4]  11/15 13/14 13/15 16/4
cross [7]  3/4 7/13 14/1 17/20 18/4 29/22 96/25
cross-examination [3]  7/13 14/1 17/20
cross-examine [1]  29/22
cross-examined [1]  96/25
crossed [1]  62/13
crossing [1]  62/15
CRR [2]  111/2 111/8
cue [1]  62/24
cumulative [3]  102/7 102/12 102/13
currently [3]  30/20 64/11 71/14
customers [1]  54/21
cut [4]  5/1 29/12 29/14 85/13

**D**

D.C [8]  1/5 1/16 2/8 2/14 24/9 24/17 25/25 96/3
D.C. [2]  6/23 8/14
D.C. Circuit [2]  6/23 8/14
damage [2]  12/24 15/3
damages [4]  16/9 33/11 97/13 97/15
Daniel [3]  22/25 23/1 23/10
data [4]  40/15 40/19 61/14 61/19
date [9]  23/8 24/19 25/4 67/18 72/8 104/18 106/5 107/25 111/7

dated [9]  29/1 36/13 65/8 72/5 75/14 76/23 77/20 103/21 106/17
dates [2]  105/11 105/12
day [23]  8/20 31/2 34/20 65/23 65/23 70/19 72/9 72/11 73/24 74/2 92/1 92/3 92/14 92/16 92/18 93/19 94/21 95/10 95/24 100/14 103/21 107/18 109/18
days [1]  30/22
deal [5]  79/14 80/17 80/23 91/4 103/8
dealer [1]  46/19
dealing [2]  34/22 53/21
dealings [1]  74/14
dealt [1]  76/16
December [20]  24/20 25/7 26/6 27/2 27/7 28/24 30/17 30/21 71/14 91/9 91/22 92/9 92/16 92/17 94/14 94/15 95/20 96/10 98/22 98/25
December 15 [1]  91/9
December 16th [1]  92/9
decide [1]  102/15
decided [3]  8/13 100/2 100/3
decision [4]  17/8 93/10 93/22 94/1
decisions [1]  93/17
defendant [5]  1/8 2/2 5/9 32/21 88/14
defendant's [10]  18/3 77/19 78/7 83/9 83/19 83/23 84/5 84/16 85/24 87/4
Defendant's 225 [1]  85/24
Defendant's Exhibit 203 [2]  77/19 78/7
Defendant's Exhibit 225 [3]  83/9 83/19 87/4
defendants [1]  12/1
defense [5]  7/13 17/19 31/13 31/13 96/23
defer [1]  20/22
deferred [1]  46/3
defined [3]  39/7 39/9 39/11
Delaware [1]  64/18
delay [1]  47/22
delays [1]  34/17
delivered [1]  69/7
delivery [1]  44/12
demonstrate [1]  11/15
Denver [1]  2/5
depending [3]  16/3 16/14 20/16
deployed [1]  64/6
deposition [7]  4/22 79/4 79/5 103/11 103/14 109/25 110/5
describe [4]  17/4 17/11 63/1 64/2
described [2]  44/18 46/10
describing [4]  46/25 62/2 62/11 62/21
Desperately [1]  81/17
despite [2]  28/13 79/7
detail [2]  69/14 101/21
develop [2]  59/22 81/15
developing [3]  46/1 48/4 61/25
development [1]  44/12
develops [1]  16/14
did [153]
did you [14]  27/17 36/20 37/14 48/13 72/13 73/4 73/8 73/14 74/17 74/23 75/9 76/10 78/4 84/14
didn't [13]  7/25 8/1 10/21 16/12 33/8 53/16 67/8 76/8 95/1 101/9 103/12 103/13 104/7
different [5]  73/18 80/23 94/25 100/19 105/6
difficult [2]  73/16 79/20
diligence [1]  51/10
dinner [3]  102/19 108/6 108/9
dire [3]  14/3 21/2 21/17
direct [26]  3/4 13/8 18/4 18/4 24/2 35/6 45/10 47/12 51/25 52/11 60/19 61/5 62/9 65/2 66/10 67/1 71/12 75/11 81/4 82/24 84/19 91/5 92/21 95/2 101/16 102/10
direction [2]  53/21 64/22
directly [3]  6/7 12/3 59/1
Director [1]  68/8
directors [17]  8/4 11/3 13/17 14/8 21/20 21/22 23/12 24/6

**D**

directors... [9]  24/25 25/17 27/2 27/11 28/8 33/3 91/8 91/21
96/10
Directors' [2]  5/11 5/13
disappear [1]  67/9
disclosure [1]  54/4
discovery [6]  6/6 28/3 31/16 32/20 88/13 104/15
discuss [11]  4/25 20/2 20/4 53/5 58/13 58/16 69/12 75/9
86/5 91/17 99/4
discussed [8]  30/18 37/6 37/7 37/18 48/8 92/8 95/21 96/8
discussing [2]  74/19 94/21
discussion [5]  8/5 35/24 55/17 96/22 98/8
discussions [10]  33/7 47/6 52/6 52/9 53/11 53/19 53/23
55/6 60/25 79/12
display [1]  50/21
disseminate [2]  72/6 84/12
disseminated [2]  50/23 84/4
dissing [1]  77/14
distractions [1]  96/14
distress [1]  91/3
distributed [2]  50/23 84/7
distribution [1]  45/21
district [4]  1/1 1/1 1/11 38/21
do [111]  5/3 6/7 8/15 14/1 14/3 14/3 16/3 17/20 18/7 18/12
18/23 19/16 20/15 20/17 21/4 21/4 21/5 21/21 22/1 22/3
22/17 23/7 28/4 28/9 28/24 30/5 30/11 34/5 34/9 36/18
36/19 39/1 40/1 41/14 41/16 42/1 42/2 42/13 42/20 44/19
45/18 45/23 46/5 46/11 47/10 47/15 48/22 48/23 49/20 50/8
55/18 56/20 58/5 59/13 59/16 60/10 60/18 61/19 64/25 65/3
65/4 65/5 65/9 65/10 66/2 66/12 66/13 66/17 66/17 71/13
73/11 73/18 73/24 75/3 75/14 75/16 77/15 77/23 79/10
79/16 79/22 79/23 80/8 80/16 82/3 82/8 83/11 83/14 87/12
87/14 88/18 89/25 90/1 90/12 91/9 91/11 91/24 94/7 94/8
94/12 95/17 95/19 95/22 96/13 97/14 97/15 97/15 100/20
101/7 108/17 108/19
do you [11]  22/1 28/9 28/24 30/5 41/14 60/10 61/19 66/17
87/14 88/18 100/20
Do you believe [1]  59/13
Do you have [4]  22/17 65/3 73/11 91/24
Do you know [1]  60/18
do you recognize [7]  36/18 42/1 42/13 48/22 65/5 75/14
89/25
Do you remember [1]  30/11
do you remember that [2]  28/4 87/12
do you see [10]  23/7 44/19 47/15 49/20 65/9 66/12 77/23
90/12 91/9 108/17
document [22]  7/20 8/20 11/10 13/14 13/15 13/20 16/4 42/1
83/8 84/4 84/12 84/22 85/24 86/6 86/9 86/12 86/24 87/4
88/5 88/12 107/2 108/5
documenting [2]  30/3 30/11
documents [5]  6/13 47/19 69/8 70/20 88/11
does [14]  4/19 12/2 21/19 23/12 23/13 28/18 31/10 58/6
70/9 70/16 97/1 97/4 107/22 108/5
doesn't [3]  12/24 15/24 102/3
doing [7]  34/1 41/18 57/23 64/23 77/8 105/13 107/9
Don [1]  98/1
don't [45]  9/11 10/20 13/13 17/13 18/8 19/5 19/15 19/15
20/6 20/15 22/18 27/14 28/11 28/20 28/22 28/25 30/4 30/8
31/1 34/9 47/21 55/4 58/2 60/11 62/4 62/18 62/22 63/22
64/22 68/19 69/11 69/25 71/1 72/23 75/10 77/14 78/25 79/6
79/23 81/9 81/10 81/13 105/9 105/10 107/5
done [7]  8/9 16/16 23/14 27/20 32/12 33/2 51/9
Dorgan [1]  20/9
double [3]  9/23 10/23 15/9
doubly [1]  8/22
doubt [1]  16/9
down [6]  22/22 37/11 37/24 39/2 49/8 75/24
Dr. [1]  4/17

Dr. Jones [1]  4/6
drafting [1]  67/15
driving [1]  64/23
due [2]  50/18 51/9
during [12]  6/5 10/23 14/7 22/5 32/20 35/23 59/17 92/8 94/6
100/6 100/25 107/11
duties [1]  23/10
duty [1]  15/15

**E**

each [8]  7/16 26/23 34/5 35/19 50/5 77/17 94/12 104/18
earlier [9]  8/20 33/6 48/8 48/8 77/2 77/25 87/11 91/14 96/23
early [6]  20/17 76/11 77/16 83/13 83/14 83/15
earned [3]  60/2 60/9 78/15
earnings [5]  59/18 60/2 60/4 60/7 89/5
easier [2]  59/5 83/16
education [5]  40/9 48/5 69/4 69/22 87/2
educational [1]  46/1
Edward [1]  2/2
effect [2]  51/21 51/22
effective [2]  73/21 77/7
efficiency [1]  7/11
efforts [9]  48/20 48/25 54/22 55/10 55/10 56/8 56/14 63/24
64/2
either [4]  4/25 6/6 32/22 73/6
electronic [1]  45/10
elicit [2]  5/12 17/20
elicited [2]  5/14 6/1
eligible [1]  52/20
Elimination [1]  69/21
else [7]  15/11 33/5 40/4 40/7 40/14 82/9 107/1
email [17]  22/25 23/22 36/12 65/7 75/22 75/24 76/3 76/10
77/2 77/12 77/20 77/21 77/22 78/11 79/14 81/5 91/9
emails [7]  75/13 75/15 78/4 79/11 79/24 79/25 80/18
EMERY [1]  1/15
employee [2]  15/10 39/10
employees [10]  11/24 38/12 39/20 44/13 68/11 68/25 85/17
87/3 95/8 95/16
employer [1]  39/10
en [1]  17/7
end [11]  11/22 27/6 27/8 46/13 73/22 95/6 97/14 97/16
100/23 101/1 101/10
ended [1]  59/25
ending [1]  93/19
endorsement [1]  90/22
engage [1]  46/18
engaged [1]  54/15
engages [1]  52/15
enhance [1]  85/6
enhanced [2]  69/21 85/11
enhancements [2]  85/16 86/18
enhancing [1]  48/5
enough [2]  29/24 89/3
ensure [2]  48/10 50/18
enter [1]  50/4
entered [3]  33/18 82/19 88/23
entering [2]  48/2 70/15
Enterprise [1]  24/7
Enterprises [29]  21/19 21/23 21/25 22/2 22/7 22/12 22/23
23/5 23/11 23/15 24/15 25/14 25/18 26/2 26/18 31/8 32/19
40/24 42/5 42/17 45/4 53/20 56/12 59/9 60/6 81/21 90/24
91/8 95/21
entire [1]  56/1
entities [5]  38/6 38/14 52/17 56/6 84/8
entitled [3]  7/10 49/22 68/9
entity [4]  38/17 53/17 64/11 64/11
Erika [1]  1/14
establish [3]  13/20 13/24 33/10
established [1]  96/19

## E

establishment [1]  14/16
ET [1]  1/3
evaluating [2]  40/15 40/18
even [4]  13/5 13/8 53/15 107/20
evening [1]  108/10
event [5]  13/13 100/20 107/12 107/15 107/17
events [1]  93/16
ever [7]  15/4 32/11 33/9 41/5 55/9 58/25 108/12
every [7]  15/12 27/18 32/14 53/17 53/17 53/17 107/12
everybody [1]  18/2
everyone [4]  56/19 56/20 67/14 83/17
everything [3]  31/18 73/25 75/3
evidence [21]  6/5 6/17 8/21 9/3 9/24 11/8 12/25 15/3 15/14
 33/13 42/23 43/1 71/18 78/7 83/20 88/2 90/3 91/12 97/1
 102/3 105/4
evolution [1]  86/19
evolved [1]  39/17
exact [1]  60/11
exactly [5]  55/1 64/21 72/5 83/13 86/25
examination [7]  5/19 7/13 14/1 17/20 21/17 26/12 35/6
examine [1]  29/22
examined [1]  96/25
example [4]  13/23 31/25 61/3 62/19
examples [3]  61/18 61/23 63/15
excellent [1]  89/13
exception [5]  13/22 13/23 15/22 26/10 97/2
excerpt [2]  101/17 105/23
exchange [1]  35/21
exchanged [1]  36/7
excluded [1]  53/15
exclusion [1]  4/19
excuse [5]  6/2 70/11 92/11 94/15 107/9
execute [2]  41/11 43/20
executed [4]  43/5 56/12 56/23 56/24
executive [3]  22/11 43/20 68/8
executives [4]  54/14 58/13 58/16 94/22
exemplify [1]  50/10
exhibit [60]  6/18 22/15 22/18 22/25 23/20 24/3 25/3 32/24
 36/18 42/8 42/22 43/4 43/9 44/1 44/19 47/10 48/18 50/11
 52/1 56/2 60/20 60/21 61/6 61/6 61/10 61/15 61/15 65/2
 65/5 67/12 67/20 68/4 68/14 68/17 70/19 72/5 72/13 73/1
 75/12 77/19 78/7 83/3 83/9 83/19 84/5 87/4 87/16 87/24
 88/1 90/2 90/11 91/7 91/12 92/22 96/7 96/9 101/17 101/18
 105/23 106/9
Exhibit 1 [5]  43/4 44/1 48/18 60/21 61/15
Exhibit 115 [6]  22/15 23/20 24/3 25/3 91/12 96/9
Exhibit 161 [2]  65/5 68/17
Exhibit 198 [2]  90/2 90/11
Exhibit 2 [1]  61/6
Exhibit D-225 [1]  83/3
exhibits [1]  61/20
existence [1]  23/15
existing [7]  52/17 54/20 54/21 55/2 55/20 66/18 90/18
exists [1]  13/1
exited [2]  82/13 109/23
expand [1]  39/4
expanded [1]  69/22
expanding [1]  57/5
expect [1]  5/11
expectation [1]  38/25
expecting [1]  9/19
expense [6]  5/20 8/16 102/18 103/5 104/6 105/3
expenses [1]  102/22
experts [1]  4/18
explain [6]  38/17 52/22 58/5 59/7 77/11 93/8
explained [2]  33/23 59/3
exposed [1]  7/25

extent [3]  10/1 16/5 16/10
Eye [1]  2/8

## F

F.2d [1]  15/7
F.3d [2]  15/9 17/3
faced [1]  39/17
fact [6]  53/5 55/9 60/7 79/19 85/9 102/4
failure [1]  9/5
fair [3]  14/20 29/24 80/4
fairness [2]  87/3 105/8
faith [1]  78/15
fall [1]  29/6
familiar [2]  52/3 87/24
Fanning [3]  40/18 64/7 64/14
far [3]  32/25 46/25 60/9
February [3]  23/8 25/6 29/2
Federal [1]  11/7
fee [1]  86/18
fees [6]  29/12 29/14 40/10 69/21 84/25 85/7
few [4]  30/2 53/13 82/1 109/25
fiduciary [2]  67/8 71/21
field [2]  84/8 84/10
file [3]  8/12 17/10 110/1
filed [6]  5/10 5/23 6/19 7/19 9/3 10/14
filing [1]  6/21
filled [2]  64/8 64/9
final [2]  16/23 23/23
finally [2]  7/2 31/16
financial [9]  18/12 31/8 39/19 40/23 40/25 41/10 72/10 89/9
 98/5
find [1]  100/25
fine [3]  21/6 57/25 90/5
finish [1]  19/4
finished [2]  5/2 34/20
fired [1]  5/22
firing [1]  7/22
first [23]  4/7 9/9 17/8 22/24 23/7 23/20 44/9 64/12 68/13
 68/15 72/1 74/17 75/24 76/24 78/11 79/7 85/3 86/15 88/10
 91/1 95/2 95/4 98/18
Five [1]  45/25
fixed [1]  55/4
fixing [2]  55/1 55/5
flight [1]  108/22
floor [3]  24/10 24/11 24/17
focused [1]  37/7
folks [1]  63/22
follow [4]  44/16 72/12 86/17 86/23
follow-ups [1]  72/12
followed [1]  15/19
follows [2]  19/5 35/5
force [2]  84/8 98/20
foregoing [2]  52/14 111/3
forever [1]  78/17
form [4]  50/23 71/7 71/9 83/24
former [2]  99/15 100/3
forth [1]  67/5
forward [9]  50/11 71/3 71/4 74/23 78/16 85/18 85/20 89/12
 100/5
foundation [1]  104/10
four [2]  45/20 100/14
four-day [1]  100/14
Fourth [2]  24/11 24/17
Francisco [12]  99/9 99/18 100/7 106/4 106/21 107/24
 108/13 108/18 108/24 109/3 109/4 109/8
frankly [3]  11/25 14/24 15/5
fraudulent [1]  104/6
free [1]  109/18
frequent [1]  24/16

Page 120

**F**

frequently [1]  55/23
Friday [1]  77/21
Friedman [1]  15/20
friendship [1]  78/12
front [4]  22/17 47/11 49/20 83/17
fulfill [4]  45/5 45/13 48/14 51/2
fulfilled [2]  59/13 59/14
fulfilling [1]  54/20
full [2]  54/4 86/15
fulsome [1]  53/25
fun [1]  67/5
fundamental [2]  11/19 13/11
funds [1]  87/2
further [5]  6/17 7/1 22/22 35/5 54/18
future [1]  89/9

**G**

gap [1]  59/24
gave [2]  56/18 100/10
general [9]  23/2 23/4 23/11 25/21 26/2 46/2 98/4 98/12 99/16
generally [2]  23/17 64/16
gentlemen [6]  33/21 82/6 82/22 88/12 96/5 109/13
get [27]  9/11 10/19 10/21 17/14 18/20 19/2 19/3 20/14 30/9 34/5 34/21 39/14 53/15 75/19 76/4 77/13 77/14 80/16 80/19 81/10 81/11 82/2 82/17 82/17 82/22 104/9 109/7
getting [4]  28/9 83/16 89/5 104/16
give [10]  12/11 39/10 59/6 60/1 62/4 62/22 64/15 91/17 96/6 101/5
given [7]  50/19 55/25 79/4 81/12 93/14 94/11 105/7
giving [3]  94/4 96/20 97/4
glad [1]  101/9
go [41]  7/16 16/17 21/9 25/3 33/16 34/21 37/10 37/11 37/15 37/24 39/1 39/1 50/11 55/23 59/7 63/1 64/25 68/13 69/10 69/24 70/10 71/1 73/10 77/19 79/16 80/4 80/18 80/25 84/7 87/16 88/22 90/11 93/23 96/5 97/21 98/23 107/6 108/9 108/15 108/23 109/18
go ahead [1]  71/1
goes [2]  57/21 58/1
going [64]  12/23 16/3 16/17 19/3 20/14 20/15 21/7 21/12 26/23 32/24 34/5 34/14 34/18 44/2 47/12 53/14 53/21 55/7 55/25 57/4 57/7 57/16 63/1 72/22 73/8 73/10 75/8 79/1 79/1 79/4 79/6 79/9 79/10 79/11 79/19 79/22 79/24 80/2 80/3 80/25 81/11 82/1 82/6 82/17 85/17 85/19 85/20 89/12 92/7 92/18 92/21 94/22 97/12 97/14 97/15 100/5 101/17 102/4 102/17 102/20 103/1 105/11 109/13 109/14
golf [1]  38/20
gone [2]  10/2 73/19
good [17]  4/6 4/14 21/15 21/16 26/16 26/17 33/21 35/9 35/10 37/20 37/21 39/5 51/8 76/5 86/22 95/14 109/10
Good morning [8]  4/6 21/15 21/16 26/16 26/17 33/21 35/9 35/10
got [7]  20/12 28/11 31/9 34/2 64/13 72/20 90/25
gotten [2]  16/10 16/11
government [3]  38/23 43/16 70/5
governmental [2]  52/16 52/18
governor [4]  19/6 19/6 19/8 19/19
grant [2]  51/18 51/21
granted [1]  51/16
great [150]
GREAT-WEST [138]
Great-West's [8]  6/12 7/3 9/5 50/16 57/12 58/10 75/5 88/18
Gregg [5]  73/4 76/9 98/2 106/24 107/3
Gregory [2]  43/7 43/14
grew [1]  60/3
group [1]  66/18
grow [2]  40/13 94/13

growing [1]  59/18
growth [1]  93/13
gubernatorial [2]  19/13 19/18
Gurr [1]  15/8
gurus [1]  63/23
guy [2]  81/6 81/13
guys [2]  79/23 80/17

**H**

had [84]  7/20 7/25 8/1 8/16 8/20 9/23 10/22 10/23 16/11 17/20 18/25 19/16 19/16 26/21 27/21 29/5 29/14 30/6 31/19 33/9 34/10 34/22 36/3 38/10 40/25 53/6 53/10 53/11 53/16 53/16 53/19 53/23 54/4 54/10 54/10 54/13 55/2 55/11 57/17 57/18 58/4 58/5 61/17 64/12 64/12 69/15 70/1 74/7 74/14 74/14 75/2 75/4 75/7 76/12 77/2 79/4 79/20 81/9 81/10 84/13 85/5 87/7 89/3 90/25 92/6 94/6 94/11 95/11 95/13 95/13 95/14 95/14 96/21 98/9 98/20 100/23 101/8 101/14 101/15 102/14 102/25 104/21 105/2 107/14
hadn't [1]  57/5
half [2]  8/13 17/11
halfway [1]  47/19
Hall [1]  100/22
hand [2]  69/7 110/2
handed [1]  17/2
handing [2]  6/20 8/11
handwriting [3]  106/23 108/5 108/20
handwritten [1]  21/2
hanging [1]  78/17
happen [6]  15/4 52/9 66/3 74/7 94/22 95/23
happened [5]  26/7 35/16 66/23 95/11 98/7
happy [1]  17/11
harassment [4]  5/24 9/4 9/11 18/16
hard [5]  63/16 74/12 76/5 76/6 79/21
has [30]  4/23 6/5 6/14 9/21 14/25 15/15 15/21 18/9 20/10 20/11 23/4 23/14 23/15 26/12 28/15 34/13 37/7 37/8 38/22 50/15 52/17 53/12 65/7 67/25 84/21 87/22 96/13 101/19 102/9 103/17
hasn't [1]  104/14
have [132]
haven't [3]  17/22 58/1 105/8
having [9]  6/7 35/4 35/25 40/10 63/16 76/5 76/6 102/19 104/6
he [61]  4/20 5/22 10/21 10/21 17/23 18/9 19/7 19/8 19/21 23/4 23/12 23/13 23/14 29/9 29/12 29/14 31/10 32/9 40/25 41/8 43/19 57/21 58/1 73/8 73/9 73/10 73/16 73/17 73/17 73/19 73/20 73/21 73/23 73/24 73/25 74/3 75/3 75/8 77/5 81/10 81/11 90/16 100/9 100/10 100/11 101/1 101/6 101/8 101/8 101/10 101/10 102/19 103/4 103/7 103/9 103/17 103/22 104/3 104/5 104/6 104/7
he didn't [1]  104/7
he'd [1]  101/14
he's [7]  7/9 22/11 23/2 31/9 40/23 76/15 104/3
headquarters [1]  24/13
health [4]  79/2 80/5 80/9 80/12
hear [6]  10/4 71/13 79/7 103/7 104/2 104/8
heard [9]  5/15 5/25 6/8 6/25 11/8 11/12 17/22 96/21 96/22
hearings [1]  33/24
hearsay [12]  9/24 10/1 10/24 12/12 12/16 14/8 15/9 15/22 26/10 32/1 96/23 96/24
held [7]  24/8 24/16 71/14 92/18 96/1 99/7 99/8
hell [8]  78/18 78/20 79/6 80/9 80/10 80/12 80/15 80/19
help [1]  49/9
her [41]  5/12 12/5 12/11 12/19 13/6 14/11 14/25 16/15 16/18 19/16 19/25 20/14 20/15 20/19 20/24 29/22 29/22 33/7 34/21 47/18 79/5 79/7 79/14 79/16 79/21 80/4 80/5 80/9 80/9 80/12 96/18 96/20 101/5 101/7 102/4 102/20 102/24 104/16 104/17 104/22 105/10
here [14]  7/9 8/14 18/9 18/20 37/24 51/14 52/2 61/20 71/24 75/19 93/18 97/2 106/17 109/19

**H**

here's [4]  10/5 12/7 93/17 93/18
herein [1]  9/5
hers [1]  104/14
herself [1]  12/3
high [1]  99/4
highest [1]  54/14
highlighted [2]  66/15 84/23
Hilton [2]  99/18 109/3
him [28]  4/20 7/10 19/3 19/8 19/16 20/1 30/25 34/23 74/4 74/17 74/18 77/2 77/13 79/20 79/21 81/16 100/8 100/10 100/10 100/11 100/13 100/22 100/24 100/25 101/9 103/3 103/15 105/12
his [18]  6/4 9/4 19/12 19/17 19/25 23/17 25/25 31/9 41/9 57/13 73/20 74/12 74/13 101/1 101/3 102/21 103/5 103/23
historic [1]  93/6
HOGAN [2]  1/10 4/4
hold [2]  16/20 105/19
holdings [1]  17/12
honest [1]  81/6
Honor [61]  4/8 4/14 5/5 5/25 6/9 9/10 9/21 10/5 10/9 10/15 11/1 11/11 12/8 13/4 14/6 16/19 16/24 17/10 17/25 18/12 19/19 20/2 21/1 26/9 26/14 28/17 29/24 31/11 31/21 32/3 32/18 33/19 34/24 36/24 47/21 60/15 62/5 62/9 62/17 65/16 67/21 70/23 75/20 78/21 78/25 80/13 83/21 88/3 88/6 90/4 90/8 91/14 91/18 97/6 97/10 101/4 101/22 102/17 103/20 106/10 109/10
HONORABLE [3]  1/10 4/3 4/4
hope [1]  92/10
hoped [1]  92/12
hopeful [1]  94/23
hopefully [1]  34/16
hopes [2]  86/17 86/25
hoping [4]  86/21 87/1 92/13 94/25
hosted [2]  107/13 107/15
hotel [1]  107/7
hour [4]  5/4 17/16 20/17 82/4
Housekeeping [1]  51/9
how [34]  11/2 11/4 16/4 16/15 23/4 26/18 27/14 38/6 38/9 38/11 40/1 40/25 41/21 53/11 57/15 59/4 60/10 61/3 62/11 63/1 64/13 72/19 73/8 73/14 74/20 77/7 80/4 81/23 89/12 90/20 98/16 100/16 101/7 109/24
How's [1]  80/20
however [7]  5/21 7/9 46/16 54/21 56/8 62/1 80/15
huge [2]  37/9 59/12
huh [3]  5/17 9/17 11/17
hundreds [1]  66/22
husband [2]  19/12 19/17
husband's [6]  19/13 19/25 79/2 79/16 80/9 80/12
hypothetical [2]  12/9 12/11

**I**

I am [4]  11/25 21/25 79/14 80/17
I apologize [4]  47/22 49/14 74/10 106/7
I appreciate [1]  97/11
I assume [1]  5/3
I believe [8]  5/3 20/9 26/9 43/10 62/19 97/24 102/18 105/5
I believed [1]  75/3
I can [5]  16/20 17/4 17/14 77/14 81/19
I did [5]  19/1 54/2 76/7 76/9 78/5
I didn't [1]  7/25
I didn't see [1]  101/9
I don't [6]  27/14 28/11 28/25 62/18 79/6 79/23
I don't know [9]  19/5 19/15 20/6 20/15 28/20 55/4 58/2 81/13 105/9
I don't recall [5]  30/4 30/8 31/1 60/11 75/10
I don't think [1]  22/18
I don't want [3]  64/22 69/11 72/23
I have [7]  97/3 99/6 80/18 83/13 110/1 110/3
I haven't [1]  17/22
I just [2]  5/7 96/6
I know [1]  104/24
I mean [2]  40/10 55/14
I recall [3]  54/10 57/16 76/12
I should [1]  105/8
I Street [1]  96/2
I think [23]  9/9 12/23 14/20 14/23 15/4 16/12 20/14 31/1 32/8 49/8 55/16 63/1 63/22 68/20 72/11 72/21 74/9 74/19 76/12 84/6 84/17 98/17 104/15
I thought [2]  57/21 102/14
I told [2]  19/2 93/15
I understand [3]  8/10 10/16 32/5
I wanted [3]  8/22 11/1 62/3
I was [19]  7/4 11/2 11/4 34/5 57/21 64/23 66/2 81/9 81/11 89/13 93/12 93/15 94/4 94/10 94/24 100/24 101/9 102/5 105/7
I worked [2]  42/20 84/17
I would [15]  9/20 12/7 14/2 16/4 19/2 22/13 55/5 61/5 65/2 66/14 76/14 79/3 83/19 88/1 107/16
I'd [16]  18/20 30/4 34/10 37/3 41/25 50/12 51/25 52/11 66/10 68/13 75/11 77/19 82/2 89/21 91/5 101/16
I'll [20]  16/14 18/25 20/21 20/22 20/24 34/6 45/3 62/25 63/6 70/24 77/15 80/1 80/4 80/22 82/4 91/16 91/17 97/15 105/12 105/19
I'm [37]  5/2 7/5 12/22 12/23 12/25 13/4 16/3 17/11 18/22 18/24 21/10 21/24 22/18 28/11 28/20 32/24 34/18 40/21 41/8 42/20 47/12 47/16 47/16 58/2 62/20 63/16 72/22 76/4 76/5 79/6 82/1 84/13 90/4 92/21 97/2 97/14 108/3
I'm going [7]  32/24 34/18 47/12 72/22 79/6 92/21 97/14
I'm not sure [2]  5/2 12/22
I'm sorry [7]  18/22 18/24 22/18 28/20 47/16 90/4 108/3
I'm sure [2]  12/23 28/11
I've [7]  7/20 11/8 17/2 34/2 62/17 91/15 110/2
idea [3]  67/6 86/22 95/14
identification [1]  21/14
identified [2]  33/6 69/3
identify [4]  104/23 105/10 105/11 105/19
ignore [1]  85/6
illness [2]  79/16 79/18
illustration [2]  62/11 62/14
immediately [3]  12/14 56/11 57/14
impact [1]  57/13
important [17]  40/4 40/7 48/24 49/25 50/2 51/1 51/7 53/9 54/25 62/2 81/23 94/14 94/17 94/18 99/23 99/25 104/1
improper [1]  7/6
improprieties [2]  102/21 103/5
improve [3]  40/12 85/9 99/1
improved [1]  69/23
improving [2]  40/9 48/5
inadvertently [5]  6/10 6/12 6/13 8/19 8/21
inception [2]  23/6 41/2
inclined [1]  14/3
included [4]  48/25 50/1 66/20 71/24
includes [1]  7/22
including [1]  45/1
incoming [1]  36/4
increase [1]  38/5
indeed [1]  75/5
INDEX [1]  3/2
indicated [4]  9/2 44/17 46/8 105/2
indicating [1]  6/23
individual [3]  7/7 63/18 63/19
indulgence [1]  7/15
industry [3]  40/11 49/5 53/10
inflated [2]  62/4 62/25
inflating [1]  62/22
information [22]  6/15 15/10 15/12 15/15 15/16 15/17 35/21

**I**

information... [15]  36/7 45/17 48/7 53/25 63/14 66/1 70/2 70/4 84/15 85/23 91/17 93/1 93/4 94/19 94/20
informational [1]  50/22
inquire [1]  80/15
inside [2]  108/21 108/23
insincere [1]  79/25
insincerity [2]  79/13 81/19
insisting [1]  6/3
instance [1]  52/24
instances [1]  53/2
instead [2]  12/21 39/13
instruct [1]  97/12
instruction [6]  13/7 16/6 33/13 91/16 96/7 97/11
insurance [3]  1/7 4/10 46/19
intend [5]  9/11 18/12 46/16 79/16 80/16
intended [2]  17/20 73/15
intending [1]  41/17
intention [3]  14/12 54/5 60/5
intents [1]  53/25
interacting [2]  6/8 77/17
internal [7]  6/11 6/20 6/23 8/9 17/1 104/24 105/3
International [2]  108/25 109/8
interrogatories [3]  87/21 88/10 88/10
interruption [1]  66/19
introduce [1]  9/20
introduced [2]  5/20 6/5
introducing [1]  67/4
investigation [2]  104/24 105/3
investigations [1]  6/24
investigative [4]  6/11 6/20 18/11 103/2
investment [2]  46/19 69/23
Investments [1]  15/20
involved [7]  9/5 40/14 42/14 52/6 60/24 67/15 70/1
involvement [6]  50/19 51/13 70/5 71/20 73/21 75/9
irrelevant [2]  80/5 96/12
is [155]
is that correct [1]  105/25
is there [1]  104/12
issue [11]  7/10 7/21 9/10 9/21 14/21 53/5 57/12 58/10 62/10 80/3 105/6
issues [3]  4/15 12/2 33/9
it [215]
it would be [1]  83/16
it's [47]  8/2 10/2 12/12 12/13 13/16 15/4 15/5 15/22 17/23 20/10 20/12 32/1 34/9 39/10 39/15 41/16 42/4 42/5 43/4 47/19 48/19 48/19 50/2 59/5 60/20 67/9 69/11 71/3 76/4 79/10 80/4 80/7 82/10 88/5 97/1 102/7 102/8 102/12 102/12 103/21 104/1 106/4 106/8 107/23 108/7 108/7 109/18
items [4]  69/18 71/5 72/6 92/7
iterations [2]  62/1 62/21
its [22]  8/9 11/24 11/24 17/21 23/6 41/2 45/13 51/2 51/11 53/25 54/4 54/5 54/20 55/2 55/10 55/10 56/8 56/13 59/13 69/8 95/8 95/8

**J**

January [11]  1/5 75/14 75/14 75/22 75/23 76/1 76/11 76/23 77/10 77/16 111/7
JD [1]  31/9
Jeannie [5]  40/18 64/7 64/19 64/24 76/15
Jeannie Fanning [1]  64/7
Jeff [5]  64/7 64/21 76/15 108/7 108/10
Jennifer [1]  1/14
Jersey [1]  64/18
JMTA [1]  54/24
job [3]  59/22 103/5 103/23
John [6]  22/25 23/1 23/10 76/17 76/19 76/20
joint [6]  42/4 42/16 43/6 44/6 65/8 66/1

**Jones** [1]  4/17
journey [7]  78/18 78/19 79/5 80/10 80/12 80/15 80/19
JUDGE [2]  1/11 15/20
Judge Friedman [1]  15/20
judges [1]  15/19
July [1]  36/13
June [11]  99/11 99/20 106/17 106/17 107/7 107/9 107/10 108/1 108/10 108/25 109/7
June 21st [1]  109/7
Jurgens [2]  98/2 99/13
juror [3]  19/5 20/9 34/13
jury [31]  1/10 6/13 7/25 8/16 8/22 14/4 14/16 18/20 18/25 19/1 20/13 21/3 21/7 21/13 33/18 33/19 33/25 34/10 37/1 72/24 78/13 79/25 82/13 82/17 82/19 82/20 103/6 104/1 104/8 109/20 109/23
just [39]  4/15 5/7 7/20 9/2 11/19 14/21 17/2 17/6 20/8 20/15 20/17 28/18 30/22 32/9 37/5 38/13 38/24 44/9 59/3 61/7 63/12 63/17 63/18 64/11 68/22 72/23 80/11 82/4 83/17 84/1 86/5 90/21 95/4 96/6 96/8 97/8 97/10 102/24 105/23

**K**

Kath [1]  57/23
KATHRYN [3]  35/3 65/8 106/24
keep [6]  14/18 23/12 26/22 77/14 77/15 85/19
keeping [1]  64/24
Kellogg [4]  6/22 8/13 17/3 17/7
kept [6]  13/12 25/15 25/18 25/21 49/5 55/7
kidding [1]  90/25
kind [6]  14/18 39/15 39/17 40/20 64/23 93/16
knew [6]  34/23 40/1 53/1 55/5 94/17 94/18
know [25]  19/5 19/14 19/15 20/6 20/15 28/18 28/19 28/20 51/12 53/14 54/5 57/5 57/23 58/2 60/18 62/4 66/22 73/18 78/25 79/3 81/13 81/14 84/24 104/24 105/9
knowledge [9]  43/17 45/5 45/12 48/5 84/11 102/4 102/10 102/10 102/16
known [1]  36/6
knows [2]  5/9 28/19
KRETSCHMER [6]  35/3 65/8 95/5 96/15 106/25 108/6
KRETSCHMER-WEYLAND [3]  35/3 65/8 96/15

**L**

label [1]  50/5
lack [1]  102/16
ladies [7]  33/21 82/6 82/22 88/12 96/5 101/2 109/13
language [2]  52/7 66/20
large [1]  37/20
larger [2]  37/7 55/24
largest [1]  89/13
last [14]  5/22 6/19 7/4 7/19 17/23 48/9 60/21 62/16 63/4 63/6 71/25 72/1 72/19 90/11
late [5]  6/19 7/19 27/9 34/12 82/3
later [4]  29/22 89/17 104/23 105/20
launch [2]  30/9 83/15
launched [2]  57/17 72/9
law [8]  7/5 7/5 12/9 12/10 47/3 47/5 55/22 96/7
lawyers [2]  31/5 88/13
lay [1]  70/19
lead [3]  86/17 86/25 87/1
leader [2]  53/10 81/6 81/11
leaders [1]  40/11
leading [2]  60/15 70/23
learn [2]  73/4 73/8
learned [2]  73/14 74/2
least [6]  27/18 27/21 28/14 31/5 105/2 109/5
leave [3]  30/25 82/12 83/17
leaves [1]  108/22
leaving [1]  107/16
left [2]  39/22 93/14
legal [2]  27/17 88/12

## L

legs [1]  78/17
length [1]  41/14
Leshinsky [8]  4/23 17/15 31/6 31/7 40/18 40/22 41/5 110/5
less [1]  90/20
let [9]  7/16 10/4 11/19 13/10 27/16 29/21 53/14 75/19 80/4
let's [9]  33/16 43/24 47/9 50/11 69/10 69/24 70/10 82/17
87/16
letter [31]  65/8 65/22 65/25 66/4 66/8 66/20 66/25 67/3 67/7
67/8 67/13 67/14 67/15 67/18 68/1 68/5 68/9 68/15 68/17
70/18 71/9 72/4 72/14 72/17 89/22 89/25 90/6 90/13 90/16
90/24 92/6
letterhead [1]  68/1
level [3]  54/14 70/4 99/4
license [10]  42/21 43/11 50/17 50/25 51/16 51/16 51/18
51/21 51/22 52/4
licensing [3]  42/11 50/9 50/13
lieu [1]  54/24
life [3]  1/6 4/10 39/15
like [26]  5/25 6/8 6/25 18/17 18/20 26/19 30/1 34/7 41/25
50/12 51/8 51/25 52/11 57/22 66/10 66/14 67/8 68/13 75/11
77/6 82/2 91/5 101/6 101/8 101/16 109/19
likely [1]  53/19
Likewise [1]  5/25
limbo [1]  67/9
limine [5]  62/10 62/15 62/24 79/2 79/3
limit [1]  97/8
limited [1]  96/17
limiting [5]  13/7 16/6 33/12 91/16 97/11
line [5]  23/24 62/15 62/24 80/14 86/19
line's [1]  81/18
literally [1]  64/13
litigation [6]  7/7 11/16 13/14 13/16 13/25 87/22
little [13]  5/22 13/11 16/20 34/11 47/16 49/8 57/19 57/24
58/7 59/20 72/21 81/19 96/6
LLP [3]  1/15 2/3 2/7
lobby [1]  107/6
local [3]  56/6 57/2 59/2
located [1]  108/21
location [2]  24/12 25/24
long [7]  23/4 40/25 69/11 78/18 78/19 79/5 98/17
look [16]  11/25 17/15 37/3 39/6 39/7 43/3 49/16 66/14 71/3
71/4 78/15 88/4 96/11 105/8 105/22 109/25
looked [4]  15/9 68/17 101/6 101/8
looking [5]  39/13 57/22 62/20 100/24 106/14
Los [2]  36/4 36/5
Los Angeles [1]  36/4
lose [1]  20/14
lost [3]  47/16 74/9 106/6
lot [9]  18/3 53/10 59/5 60/11 60/12 68/20 93/13 93/14 94/5
lounge [2]  20/13 109/20
lower [3]  11/24 40/10 95/7
lucky [1]  41/8
lunch [18]  5/3 5/4 17/16 82/4 82/11 82/24 102/19 102/25
104/17 105/12 105/16 106/24 107/1 107/2 107/6 107/9
108/23 109/19
luncheon [1]  109/14
Lusk [3]  107/23 108/10 108/12

## M

ma'am [16]  22/17 24/3 26/5 28/3 28/13 29/8 29/17 30/14
30/21 31/9 31/16 36/12 41/25 43/8 47/11 109/9
made [19]  8/23 10/9 12/4 14/10 15/23 15/25 32/14 33/10
50/23 80/17 87/22 89/18 94/6 96/18 96/24 96/25 97/5 98/9
98/14
maintaining [2]  45/16 48/6
make [17]  7/10 8/22 16/23 20/11 20/13 33/2 33/25 39/16
43/21 47/21 48/13 49/5 60/6 62/3 69/9 80/3 98/21

making [8]  8/9 10/23 15/19 32/2 60/13 93/22 93/25 104/16
Malloy [3]  19/6 19/6 19/19
man [2]  103/9 104/3
management [2]  73/17 75/5
Mandy's [1]  108/22
manner [1]  25/14
many [9]  27/14 37/8 38/6 38/9 39/5 60/13 90/20 93/18
100/16
Margaret [1]  1/13
mark [1]  101/17
marked [4]  83/8 84/20 86/14 106/15
market [15]  37/9 37/9 37/10 37/11 37/15 37/25 39/1 39/2
49/3 49/4 52/19 53/3 54/23 55/8 67/6
market's [1]  86/19
marketing [5]  42/4 42/16 43/6 44/6 54/1
markets [2]  43/16 70/5
marks [4]  50/21 51/3 51/6 51/17
Mary [1]  2/7
Massachusetts [2]  58/3 64/19
material [2]  18/16 95/3
materials [7]  9/14 33/4 45/22 50/22 64/10 69/22 86/11
matter [6]  12/17 14/24 16/2 68/10 81/14 111/4
matters [6]  5/7 8/23 18/22 18/25 34/2 96/12
may [16]  10/15 19/24 22/19 28/19 32/16 34/24 47/17 52/18
53/16 56/5 62/5 78/21 97/6 97/12 104/22 106/10
maybe [2]  11/13 18/5
mayor [38]  5/19 9/22 10/9 10/11 10/18 19/2 19/8 19/8 21/24
22/7 22/11 23/2 23/5 23/11 24/6 24/15 25/13 25/18 26/1
31/8 32/19 34/4 36/4 40/23 42/5 53/20 56/12 57/17 59/9
60/6 81/21 90/24 91/8 95/20 96/23 99/15 99/15 100/3
mayors [86]  1/3 4/9 6/8 21/19 21/23 22/2 22/16 23/15 24/14
26/18 35/11 35/14 35/20 35/25 36/8 37/22 38/7 38/25 39/21
40/4 41/17 42/12 42/17 42/20 45/4 45/11 45/23 46/5 48/13
48/14 48/24 49/25 50/8 51/2 51/4 51/6 51/18 53/3 54/25
56/12 56/14 57/8 57/21 57/22 59/18 60/5 60/24 66/24 68/2
68/16 69/15 69/19 69/25 70/13 70/15 72/6 72/7 72/15 72/25
73/2 83/10 83/24 84/2 86/25 87/12 87/18 89/15 89/18 90/23
91/3 93/6 93/10 94/11 96/2 98/3 98/5 98/13 98/19 98/21
99/3 99/14 99/23 103/6 103/24 103/25 104/2
Mayors' [5]  51/17 54/6 57/13 59/2 71/20
MCDERMOTT [2]  1/15 1/15
me [34]  6/2 7/16 8/3 10/4 11/19 12/16 13/10 17/2 19/4
27/16 29/21 36/2 44/8 57/22 59/3 59/12 62/2 62/4 62/22
70/11 73/3 73/23 73/23 75/19 77/14 78/17 79/4 79/23 81/10
92/11 94/15 94/17 100/2 107/10
mean [10]  37/17 40/10 53/16 55/14 55/14 56/20 78/19 80/8
83/14 89/14
means [1]  11/5
meant [5]  37/14 38/1 38/4 79/5 79/8
mechanical [1]  2/15
media [2]  45/11 50/23
medium [1]  37/21
medium-sized [1]  37/21
meet [4]  31/2 57/18 74/17 104/4
meeting [65]  6/6 8/4 13/16 13/17 14/8 24/4 24/8 24/21 25/1
25/7 26/6 27/1 27/18 27/21 28/1 30/5 30/17 30/22
31/2 31/4 31/19 32/14 74/18 91/21 92/1 92/2 92/8 92/18
92/23 92/25 93/16 93/19 94/21 95/10 95/20 95/21 95/23
96/1 96/4 97/25 98/6 98/7 98/11 98/22 98/25 99/4 99/7 99/9
99/12 99/14 99/17 99/19 99/20 99/24 99/25 100/7 100/14
100/17 101/10 103/18 104/2 104/4 107/11 109/1
meetings [18]  22/1 22/4 22/8 23/12 23/18 24/15 25/11 26/3
26/19 27/6 27/15 28/14 32/10 32/19 32/21 91/25 104/7
104/19
Melvyn [3]  4/23 40/18 40/22
member [3]  21/22 21/25 85/2
members [3]  26/25 27/1 27/4
memo [5]  6/2 7/19 17/14 25/8 105/9
memorandum [8]  5/10 5/23 6/18 6/22 8/12 11/3 11/5 17/11

**M**

memos [1]  16/21
mention [2]  11/2 86/2
mentioned [4]  19/8 64/14 69/1 69/19
mentions [1]  91/21
Merit [1]  2/11
met [5]  19/6 19/16 20/1 74/18 92/16
method [2]  62/11 103/1
Mexico [1]  74/19
mic [1]  49/10
Michael [2]  1/13 2/2
mid [1]  82/3
middle [4]  27/7 73/12 74/15 76/23
might [10]  11/4 11/7 11/8 47/18 49/9 49/10 59/23 72/11 74/20 109/10
million [20]  8/5 9/23 10/23 11/22 12/12 14/22 14/23 16/11 16/25 29/9 29/14 29/18 84/25 85/8 85/13 85/15 94/11 95/6 96/16 97/5
mind [12]  12/19 13/6 14/25 16/7 17/14 33/7 93/9 93/22 95/11 95/13 96/19 97/3
minds [1]  92/4
minimum [1]  105/13
minute [2]  82/7 102/9
minutes [58]  5/11 5/13 5/16 8/4 9/19 9/25 10/12 10/16 10/17 10/25 11/3 11/5 11/12 11/15 11/20 13/17 13/18 13/22 21/8 23/12 23/18 23/23 24/1 24/6 24/19 25/10 25/17 26/3 26/10 28/15 28/23 28/25 29/8 30/1 30/5 30/8 30/11 30/17 31/19 32/6 32/7 32/10 32/11 32/15 32/20 32/21 82/1 82/9 82/10 82/14 91/7 92/22 95/19 96/9 96/10 96/13 109/5 109/25
misconduct [3]  6/3 7/18 16/17
mislead [1]  64/22
misspoke [1]  8/15
mnadel [1]  1/17
moment [2]  32/16 88/3
Monday [1]  65/9
money [7]  38/11 39/11 60/2 66/23 67/8 68/11 89/4
months [1]  30/2
mooted [1]  9/21
more [10]  11/19 20/18 27/10 28/15 39/12 39/12 39/13 39/13 65/1 99/22
Moreover [3]  12/13 13/5 14/6
morning [20]  1/7 4/6 4/8 4/14 4/18 6/21 9/12 9/16 21/15 21/16 26/16 26/17 26/20 33/21 34/13 35/9 35/10 75/8 82/3 105/8
morning's [1]  109/17
most [2]  55/8 77/7
motion [5]  8/8 62/10 62/15 79/1 79/3
motivate [1]  79/21
move [5]  33/25 62/16 74/23 88/24 89/12
moving [1]  109/16
mpbrown [1]  2/9
Mr [7]  9/8 13/10 77/1 77/17 98/4 102/3 102/13
Mr. [100]  5/20 5/24 6/3 6/6 7/1 7/13 7/14 7/23 9/10 10/10 12/15 14/12 17/17 17/22 22/8 22/10 25/10 25/10 25/22 26/2 29/6 29/19 30/7 30/12 30/23 30/24 31/5 31/6 31/7 34/23 36/2 36/13 37/18 41/5 43/15 54/10 54/11 54/11 56/21 56/21 56/24 61/16 63/21 63/21 63/21 64/15 65/12 66/7 71/23 73/14 73/23 74/2 74/8 74/11 74/13 74/14 74/22 75/3 75/5 75/14 75/8 75/9 75/13 75/25 76/7 76/10 76/24 77/3 77/6 77/20 77/22 78/12 79/12 81/5 84/17 86/6 89/23 90/12 90/15 92/6 98/1 98/1 98/2 98/4 98/5 98/6 99/13 99/13 99/13 100/4 100/6 100/21 101/2 102/18 102/25 107/4 108/9 108/9
Mr. Bean [1]  64/15
Mr. Benjamin [1]  30/23
Mr. Borne [1]  101/2
Mr. Brent [1]  98/1
Mr. Bresler [3]  7/13 7/14 17/17

Mr. Charlie [1]  98/1
Mr. Cochran [3]  29/19 56/24 66/7 98/6
Mr. Don [1]  98/1
Mr. Gregg [1]  98/2
Mr. John [1]  23/10
Mr. Jurgens [1]  99/13
Mr. Leshinsky [3]  31/6 31/7 41/5
Mr. Nadel [1]  17/22
Mr. Neese [35]  5/20 5/24 6/6 7/1 7/23 54/11 56/21 63/21 65/12 71/23 74/13 74/14 75/13 75/25 76/7 76/10 76/22 77/3 77/6 77/20 77/22 78/12 81/5 89/23 90/12 90/15 99/13 100/4 100/6 100/21 102/18 102/25 107/4 108/9
Mr. Neese's [3]  6/3 9/10 75/9
Mr. Nelson [8]  54/11 56/21 61/16 63/21 73/23 74/2 75/5 75/7
Mr. O'Donnell's [1]  79/12
Mr. Reeves [6]  25/10 25/22 26/2 30/24 31/5 98/4
Mr. Seller [14]  36/13 43/15 54/10 56/21 63/21 73/14 74/8 74/11 74/22 75/8 84/17 86/6 99/13 108/9
Mr. Sellers [4]  34/23 36/2 37/18 75/3
Mr. Stevens [2]  12/15 14/12
Mr. Stevenson [4]  10/10 29/6 30/7 30/12
Mr. Tom [2]  22/8 22/10
Mr. Ward [1]  98/5
Ms [3]  9/20 74/9 96/15
Ms. [63]  4/21 5/11 6/1 9/12 10/10 10/19 11/20 11/21 12/15 13/19 13/19 13/24 14/7 14/10 14/16 16/7 19/4 21/2 21/12 21/15 22/24 26/16 26/16 33/5 34/20 35/9 44/2 47/25 48/19 49/8 49/17 50/15 54/25 56/21 56/23 60/23 61/8 63/12 64/14 65/19 67/25 72/4 75/25 78/4 81/20 82/23 83/2 84/1 84/17 84/21 86/6 88/17 90/7 90/12 95/5 96/22 97/3 101/19 105/22 106/14 108/23
Ms. Brown [3]  10/19 13/24 96/22
Ms. Fanning [1]  64/14
Ms. Kretschmer-Weyland [1]  95/5
Ms. Myer [2]  84/17 86/6
Ms. Radford [7]  44/2 49/17 50/15 61/8 65/19 67/25 84/21
Ms. Teresa [1]  56/21
Ms. Warner [1]  13/19
Ms. Weyland [43]  4/21 5/11 6/1 9/12 11/21 12/15 13/19 14/7 14/10 14/16 19/4 21/2 21/12 21/15 22/24 26/16 33/5 34/20 35/9 47/25 48/19 49/8 54/25 56/23 60/23 63/12 72/4 75/25 78/1 79/13 81/4 81/20 82/23 83/2 84/1 88/17 90/7 90/12 97/3 101/19 105/22 106/14 108/23
Ms. Weyland's [4]  10/10 11/20 16/7 79/2
much [6]  34/16 38/11 53/11 60/10 64/24 64/25
multipage [1]  88/5
multiple [1]  57/1
municipal [4]  38/20 38/23 46/23 87/3
must [2]  15/13 91/1
mwarner [1]  1/18
mwe.com [2]  1/17 1/18
my [27]  8/17 8/19 11/2 11/5 17/14 19/12 19/13 29/10 31/20 46/23 59/22 63/17 64/9 77/13 77/15 78/15 78/17 79/1 79/13 84/8 88/24 94/10 95/13 95/22 97/11 101/14 105/1
Myer [3]  56/22 84/17 86/6
MYERS [1]  2/7
myself [6]  41/8 57/16 64/6 98/4 99/15 107/3

**N**

Nadel [4]  1/13 9/8 13/10 17/22
NAGDCA [1]  74/18
name [4]  31/9 35/23 36/2 63/22
named [1]  108/12
national [1]  83/23
nationwide [30]  8/6 9/23 10/11 10/22 11/14 11/21 14/22 16/11 35/12 39/23 40/3 59/22 64/5 64/12 65/24 66/1 66/5 66/11 66/18 70/2 70/11 70/21 72/16 86/4 87/8 93/14 93/15 95/5 96/16 96/18

Nationwide's - operation
Case 1:16-cv-00660-TFH Document 241 Filed 03/30/18 Page 125 of 133
Page 125

**N**

Nationwide's [1] 10/18
nature [1] 89/19
Neal [1] 2/3
necessarily [1] 96/18
necessary [1] 44/14
need [9] 20/2 66/17 71/5 76/17 79/23 84/24 88/25 89/1 109/24
needed [1] 66/22
needing [1] 9/15
needs [1] 104/8
Neese [48] 5/20 5/24 6/6 7/1 7/23 16/17 30/23 54/11 56/21 63/21 65/7 65/12 71/23 74/13 74/14 75/13 75/25 76/7 76/10 76/22 77/1 77/3 77/6 77/17 77/20 77/22 78/12 81/5 89/23 90/6 90/12 90/15 92/6 98/1 99/13 100/4 100/6 100/21 101/20 102/18 102/25 106/15 107/4 107/22 108/7 108/7 108/9 108/15
Neese's [4] 6/3 9/3 9/10 75/9
neglected [1] 34/3
negotiating [2] 53/8 60/23
negotiation [1] 61/10
negotiations [6] 10/24 11/23 42/14 42/18 59/17 95/6
Nelson [9] 54/11 56/21 61/16 63/21 73/23 74/2 75/5 75/7 98/1
never [5] 19/6 19/16 20/1 32/21 102/5
new [31] 30/10 56/4 56/10 57/18 57/19 57/19 58/2 58/7 64/10 64/18 64/19 65/23 67/4 67/6 68/23 69/3 69/9 69/16 69/20 70/15 70/21 72/17 74/19 74/24 76/4 83/23 85/11 92/13 92/14 100/3 100/22
New Jersey [1] 64/18
New Mexico [1] 74/19
New York [1] 64/19
newspaper [1] 72/12
next [29] 7/14 9/13 20/11 20/23 31/9 34/13 47/22 54/16 56/2 56/7 66/14 67/12 69/24 70/10 70/17 73/23 74/2 85/4 86/14 92/1 92/2 92/18 94/21 95/10 95/24 96/6 97/22 107/21 108/15
nice [3] 54/12 81/13 109/18
nicest [1] 77/13
night [5] 5/23 6/19 7/4 7/19 73/9
no [49] 1/4 6/4 7/11 10/9 11/5 12/18 14/12 15/3 17/25 19/5 20/9 20/10 30/15 32/11 32/13 36/24 36/25 38/16 41/7 42/24 42/25 57/3 61/17 65/16 66/17 67/21 67/22 75/20 75/21 78/8 78/9 81/18 83/21 83/22 88/6 88/9 90/8 92/15 98/23 99/2 100/3 100/15 102/25 106/8 107/8 108/11 108/14 109/1 109/9
non [4] 29/18 52/3 59/15 96/12
non-compete [2] 52/3 59/15
non-profit [1] 29/18
non-responsive [1] 96/12
normal [8] 13/12 13/12 14/17 14/18 25/10 33/1 33/2 36/20
normally [3] 14/19 32/12 97/1
North [1] 1/16
Northwest [2] 24/9 24/16
not [113]
note [4] 18/25 20/8 20/8 34/11
notebook [5] 22/14 36/11 42/1 42/8 83/3
notebooks [1] 82/12
noted [2] 61/18 68/16
notes [6] 14/17 18/25 21/3 33/6 34/10 69/8
nothing [4] 19/16 46/16 91/1 96/13
notwithstanding [2] 52/12 52/14
November [3] 77/21 81/8 81/23
November 2 [1] 77/21
now [81] 4/3 6/16 9/21 9/24 10/2 12/15 17/12 21/4 21/5 23/10 24/2 25/3 25/13 32/5 34/6 35/19 36/7 37/3 41/25 42/7 43/3 43/8 43/24 46/13 47/9 47/9 47/25 48/17 49/16 50/11 51/14 51/25 52/11 54/16 56/2 58/9 59/17 60/19 60/23 61/5

62/14 63/24 65/2 68/19 69/10 67/1 67/23 71/12 71/25 72/13 75/11 77/19 77/25 80/23 81/4 83/2 84/1 84/14 84/19 84/21 85/3 86/14 87/11 87/17 88/17 88/18 89/17 91/5 91/21 92/21 92/21 94/14 95/2 95/23 101/16 104/11 104/12 105/22 106/14 107/21 108/7
number [5] 4/11 26/25 60/11 70/19 85/21
numbers [7] 22/16 61/23 62/3 62/4 62/22 62/22 62/25
numerous [2] 26/21 62/1
NW [3] 1/16 2/8 2/13

**O**

O'Donnell [2] 2/2 2/3
O'Donnell's [1] 79/12
O'MELVENY [1] 2/7
oath [1] 79/8
object [2] 31/22 32/1
objecting [2] 9/25 10/25
objection [38] 6/25 8/17 9/22 10/2 10/13 10/15 10/22 16/5 17/25 28/17 32/5 32/7 32/8 32/24 36/24 36/25 42/24 42/25 60/15 62/5 65/16 67/21 67/22 70/24 75/20 75/21 78/8 78/9 78/21 80/22 83/21 83/22 88/6 88/9 90/8 101/4 101/22 102/11
objections [4] 4/24 17/15 91/13 102/14
obligate [1] 46/17
obligations [7] 48/14 50/17 51/2 51/15 54/20 55/2 59/14
Obviously [2] 10/12 13/19
occurred [1] 25/7
October [16] 51/23 55/15 56/24 57/11 63/24 64/3 64/17 65/12 67/1 67/18 68/2 72/5 88/23 93/22 94/1 95/11
odonnell [1] 2/6
off [5] 28/5 31/14 64/21 76/5 105/19
offer [38] 8/6 10/18 12/4 12/10 12/13 12/14 13/9 15/2 16/12 29/4 29/11 30/2 30/18 33/6 33/10 36/23 42/22 58/6 59/18 63/2 65/15 67/20 75/17 78/6 83/19 85/11 88/1 90/2 91/12 93/20 95/1 96/18 97/5 97/13 98/11 98/14 98/15
offered [17] 9/23 10/22 11/22 12/16 12/18 12/19 14/22 16/1 29/9 29/14 45/2 46/4 47/4 89/3 93/17 93/17 95/5
offering [6] 44/14 50/9 58/6 68/23 85/16 96/16
offerings [1] 48/11
offers [2] 93/18 94/6
office [5] 25/25 63/23 64/9 96/2 110/2
officer [6] 21/24 22/11 25/13 27/16 81/20 98/5
officers [1] 33/3
offices [1] 30/22
official [2] 2/12 107/19
officially [1] 63/25
officials [2] 45/11 88/14
often [2] 26/18 42/20
oh [5] 18/22 19/21 57/21 58/1 77/25
okay [22] 18/1 21/6 27/5 28/18 28/22 33/15 33/16 44/4 44/10 44/23 50/14 52/13 66/23 67/8 70/24 76/4 97/18 101/23 103/19 104/20 106/8 107/6
old [3] 57/22 70/21 85/1
omm.com [1] 2/9
once [2] 26/21 28/14
one [42] 4/17 7/18 8/12 8/12 12/1 15/10 15/25 17/7 17/8 17/8 19/13 19/17 20/10 20/14 27/10 27/18 27/21 31/11 31/25 34/2 34/11 34/13 37/18 38/4 44/25 46/22 55/16 59/7 59/7 63/18 71/7 71/18 72/22 88/3 90/4 92/7 96/11 99/18 99/22 100/8 100/10 100/11
one-page [1] 8/12
ones [3] 26/19 28/23 30/19
ongoing [3] 55/5 55/17 89/19
only [16] 16/7 28/15 30/17 30/19 30/19 33/7 39/6 50/7 52/19 85/20 88/22 89/14 96/17 97/2
Open [4] 63/8 81/2 97/20 105/17
opening [3] 5/18 5/21 79/12
operating [4] 21/24 25/13 27/16 81/20
operation [1] 9/4

**O**

opinion [2] 81/14 101/14
opportunity [14] 5/15 11/12 14/2 34/6 37/19 37/22 40/11 53/18 56/1 57/6 72/14 73/1 93/13 94/11
opposing [1] 110/3
opposite [1] 80/1
options [2] 39/19 69/23
order [4] 4/5 25/1 85/11 86/18
ordered [2] 8/23 16/22
ordinary [1] 36/20
organization [2] 26/24 59/25
other [37] 6/13 7/11 11/1 12/22 15/12 18/22 18/24 20/13 26/23 28/22 28/23 31/25 32/11 32/13 34/2 34/11 35/20 45/11 46/23 50/6 50/22 51/3 54/24 55/24 56/15 59/4 63/22 64/23 66/24 72/6 77/17 87/21 91/25 100/6 100/13 103/1 105/6
others [7] 27/3 31/25 40/21 64/7 66/7 86/17 86/23
otherwise [1] 50/23
our [51] 6/25 7/3 8/12 9/12 10/12 15/19 17/17 20/3 25/8 25/8 25/9 30/9 36/4 39/4 40/12 40/13 45/7 48/8 48/16 49/5 50/8 50/9 50/10 51/9 55/8 57/22 64/8 64/9 65/24 68/22 71/5 72/9 72/12 72/17 73/17 75/4 82/2 84/6 84/8 89/6 89/12 91/13 92/4 93/14 98/4 98/4 99/8 99/16 107/11 109/1 109/14
out [30] 7/13 11/1 14/9 14/10 18/20 19/3 20/25 21/13 29/1 34/8 34/14 37/19 55/23 55/25 57/25 65/22 66/1 67/3 67/7 67/10 67/14 70/19 72/15 73/10 79/24 80/14 80/23 96/14 96/24 103/17
out-of-court [1] 14/10
outlined [1] 48/2
outreach [1] 48/4
outside [8] 14/4 14/15 15/16 21/3 33/24 57/25 58/1 109/19
outsider [2] 15/15 15/23
outsiders [1] 15/17
over [17] 5/4 17/16 19/24 29/9 32/24 38/8 38/10 38/11 38/13 40/15 40/19 66/21 86/16 100/14 100/18 100/19 104/2
overall [1] 104/25
overlook [1] 85/2
overrule [1] 16/5
oversee [1] 9/6
overseeing [1] 44/25
oversight [4] 45/1 76/21 84/25 85/7
own [2] 101/5 103/24
owned [1] 29/18

**P**

p.m [1] 110/7
page [38] 8/12 17/11 22/24 23/7 23/20 24/2 24/3 25/3 43/3 43/4 43/9 43/13 43/25 47/13 47/20 48/18 49/17 52/1 60/21 65/19 65/21 68/4 71/12 73/17 76/23 76/24 84/19 86/14 86/16 90/11 92/22 101/20 106/3 106/6 106/14 107/21 108/15 108/17
page 4 [1] 48/18
pages [1] 8/13
paid [7] 60/4 60/8 60/10 60/12 85/1 87/12 89/5
paper [1] 106/23
papers [1] 10/13
paragraph [24] 37/4 44/9 68/13 68/19 68/20 68/21 69/1 69/10 69/24 69/25 70/10 70/11 70/13 70/17 70/18 71/2 71/3 71/25 72/1 72/20 84/22 85/4 86/2 85/6
part [10] 15/25 23/10 39/21 53/24 61/16 74/9 86/21 97/15 98/6 105/3
participant [4] 15/12 41/23 41/24 89/6
participants [10] 29/12 29/15 38/9 38/10 60/14 66/22 67/4 85/21 87/8 89/3
participate [2] 39/5 52/25
participated [2] 38/6 38/15
participating [1] 48/6
participation [1] 71/4

particular [2] 86/25 72/17
parties [4] 4/18 9/14 35/19 46/16
partner [9] 39/22 50/4 50/5 50/6 50/10 51/12 74/24 83/24 85/5
partnership [7] 15/20 39/16 50/5 57/8 70/15 78/16 93/14
party [2] 101/9 101/15
passed [1] 34/6
patience [1] 33/22
patient [1] 94/13
Patrice [1] 2/7
pay [1] 90/19
payment [11] 9/24 10/23 41/21 41/23 59/18 59/24 59/24 60/6 85/16 85/20 89/7
payments [7] 41/18 60/18 87/14 88/19 88/22 88/25 89/1
Pennsylvania [1] 64/19
pension [1] 39/12
people [6] 39/5 41/9 46/23 46/24 64/6 100/19
per [5] 41/23 41/24 41/24 89/6 89/8
percent [1] 39/14
performance [4] 6/4 28/8 49/22 103/5
period [5] 22/5 23/15 45/6 51/22 100/14
periodic [1] 48/10
permit [4] 17/19 37/10 56/9 56/14
permitted [1] 7/12
person [9] 19/22 57/19 59/9 76/14 76/16 76/20 96/25 101/7 104/18
personal [2] 101/6 102/16
personally [1] 7/2
phone [1] 30/12
phrased [2] 11/2 11/4
picture [1] 108/17
place [5] 6/16 99/17 99/18 102/25 109/1
places [3] 55/24 58/3 64/16
PLAINTIFF [1] 35/3
PLAINTIFF's [18] 3/5 22/14 22/25 37/13 42/8 42/22 43/9 67/12 67/20 70/19 72/5 72/13 73/1 75/12 75/17 87/16 87/24 88/1
Plaintiff's Exhibit [12] 42/8 42/22 43/9 67/12 70/19 72/5 72/13 73/1 75/12 87/16 87/24 88/1
Plaintiff's Exhibit 115 [1] 22/25
plaintiffs [20] 1/4 1/13 4/14 5/12 5/19 5/23 6/18 7/2 7/19 9/2 11/9 12/23 16/10 20/18 32/22 32/25 36/23 42/2 78/6 90/2
plaintiffs' [13] 4/17 23/7 36/10 36/18 36/23 43/1 43/21 43/21 65/3 65/15 89/21 91/6 101/18
plan [32] 38/18 39/9 39/12 44/18 46/10 47/9 47/14 48/1 48/15 53/1 54/6 56/6 56/10 58/4 58/4 66/21 66/25 67/17 68/10 68/16 68/16 69/19 70/1 70/13 70/21 70/22 72/15 83/18 85/22 85/24 87/5 87/7
plane [1] 109/6
planned [2] 72/7 73/4
plans [9] 46/4 52/18 53/7 54/6 54/21 55/3 56/5 59/1 59/2
play [2] 4/22 91/1
played [1] 74/8
please [27] 4/4 21/8 34/25 36/10 37/5 41/25 42/7 43/3 43/8 43/15 44/22 45/8 45/15 46/14 49/11 56/7 62/3 63/12 66/16 69/24 82/8 82/12 83/2 105/22 106/12 109/15 109/20
pleased [2] 20/18
point [10] 4/25 8/19 10/4 11/11 12/2 48/9 55/13 95/13 102/6 102/7
pointed [1] 14/9
political [1] 52/20
Pont [1] 1/14
portions [1] 18/13
posed [2] 12/10 77/2
position [1] 20/3
possible [3] 8/7 56/10 72/3
possibly [1] 88/24
practice [6] 15/16 22/7 23/17 26/1 49/6 49/6
pre [3] 54/20 55/2 55/20

**P**

pre-existing [3]  54/20 55/2 55/20
precluded [1]  53/12
preliminary [1]  5/7
prepared [9]  6/11 13/21 13/25 15/10 15/16 18/14 83/8
 83/11 83/12
presence [7]  14/4 21/3 21/13 33/24 37/9 39/4 96/24
present [9]  6/6 7/7 14/11 24/4 26/6 27/1 33/19 82/20 92/25
presentation [1]  59/6
presented [3]  30/23 98/11 100/11
preserve [1]  59/23
president [2]  36/4 43/16
presiding [1]  4/4
press [3]  67/10 72/10 72/10
pretrial [2]  6/5 105/2
pretty [3]  40/20 81/6 81/13
previously [6]  6/14 8/23 35/4 55/11 74/7 88/18
pricing [2]  11/24 95/8
print [1]  45/10
prior [13]  41/3 48/8 68/17 74/14 85/1 85/5 85/8 85/8 85/11
 85/12 85/15 86/3 86/16
privileged [1]  6/24
probably [2]  20/20 34/12
problem [10]  12/23 13/3 16/13 19/15 55/20 58/11 58/12
 58/14 58/25 61/17
problems [1]  103/8
proceed [6]  6/16 24/25 34/16 34/24 45/8 45/15
proceedings [5]  1/10 2/15 9/15 110/7 111/4
process [3]  12/5 39/21 54/24
produce [3]  28/7 103/13 103/14
produced [7]  2/16 28/16 31/19 32/11 32/13 104/13 104/15
producing [1]  15/13
product [7]  6/24 11/24 37/20 48/11 50/7 95/14 95/15
Production [1]  88/11
products [8]  44/13 44/15 45/1 47/1 47/4 50/20 52/16 95/8
proffer [1]  11/9
profit [1]  29/18
program [92]  28/9 30/10 38/7 38/12 38/15 40/6 40/9 40/13
 41/12 41/19 44/15 45/1 45/2 45/9 45/17 45/22 47/4 48/3
 48/12 49/7 50/5 50/24 51/10 52/20 53/3 54/23 55/8 56/6
 56/9 56/14 57/13 57/17 57/21 57/22 58/2 58/6 58/7 59/7
 59/10 60/3 60/3 62/2 62/22 63/25 64/12 65/23 66/12 67/4
 68/23 69/5 69/9 69/12 69/16 69/20 70/2 70/6 70/7 71/5
 72/17 73/6 73/21 73/25 74/12 75/2 75/6 76/5 76/21 77/9
 79/22 81/24 83/7 83/15 85/1 85/7 85/11 86/11 86/18 87/8
 87/9 89/4 89/13 89/14 89/16 89/19 92/5 93/5 93/6 94/13
 99/22 103/6 103/9 104/7
programs [6]  48/4 48/6 56/15 57/1 59/23 72/8
project [3]  36/5 36/6 36/16
projection [1]  62/19
projections [1]  62/14
projects [1]  36/3
promenade [1]  108/22
prominent [1]  50/21
promise [1]  79/23
promoting [2]  45/9 48/3
promotion [2]  44/15 45/14
promotional [2]  50/22 64/10
proof [2]  13/8 13/9
properly [1]  9/5
property [1]  107/16
proponent [1]  11/10
proposal [8]  30/24 85/13 89/18 92/13 92/14 98/8 98/19
 100/3
propose [1]  4/22
proposition [1]  7/6
proprietary [1]  36/17
prove [2]  96/17 97/4

provide [9]  41/5 61/2 65/14 69/25 70/4 72/13 72/25 90/19
 93/4
provided [8]  15/7 53/7 54/21 60/7 61/14 61/19 61/23 103/23
provider [1]  69/3
providing [2]  52/16 53/25
provision [5]  44/14 48/22 48/25 49/25 52/22
provisions [1]  59/15
public [4]  50/20 72/7 85/17 95/15
publication [1]  46/2
publish [1]  86/12
published [5]  6/12 6/13 8/16 8/21 86/9
publishing [1]  86/10
pull [2]  49/10 109/25
pulled [1]  61/7
purported [1]  97/13
purpose [6]  61/2 68/21 92/2 96/17 99/20 102/8
purposes [2]  7/8 70/20
put [11]  17/14 23/24 38/12 52/22 63/14 65/20 79/24 84/2
 86/7 103/1 106/8
putting [1]  84/15
PX [4]  41/25 43/1 43/1 88/11
PX-1 [2]  41/25 43/1
PX-12 [1]  88/11
PX-2 [1]  43/1

**Q**

qualified [1]  26/10
qualify [3]  13/13 13/22 13/23
quarter [1]  41/24
question [15]  11/20 13/11 15/5 48/8 62/16 63/4 63/6 63/13
 63/16 72/22 72/23 74/9 80/25 97/22 97/24
questioning [1]  14/16 34/21
questions [9]  13/19 19/2 28/4 34/4 34/4 34/7 77/1 77/6
 83/16
quick [2]  18/22 18/24
quickly [1]  102/2
quite [1]  62/17
quorum [1]  24/23

**R**

Radford [7]  44/2 49/17 50/15 61/8 65/19 67/25 84/21
raise [2]  12/2 15/24
raised [3]  13/11 17/23 80/4
rather [3]  7/14 62/14 82/4
re [1]  4/9
reach [1]  37/19
react [1]  73/14
reaction [1]  90/23
read [24]  7/20 16/21 17/2 37/5 44/8 44/9 44/22 46/14 54/16
 56/2 56/7 66/15 68/20 69/11 69/25 71/1 71/25 78/13 84/22
 85/3 86/5 86/15 95/3 105/8
Reading [2]  62/20 62/21
ready [6]  21/5 21/9 21/10 30/9 82/22 97/21
real [3]  32/6 32/7 54/15
realistic [1]  98/24
realize [2]  7/25 102/2
really [5]  15/4 34/9 41/9 50/9 94/24
Realtime [1]  2/11
reason [3]  7/11 60/12 79/11
reasons [7]  5/22 7/22 14/9 69/15 70/14 85/6 91/13
reassurances [1]  56/18
reassured [2]  55/19 55/22
recall [26]  7/14 27/14 28/9 28/12 30/4 30/5 30/8 30/9 30/20
 31/1 41/14 54/10 57/16 60/10 60/11 61/19 63/22 64/21 72/9
 75/10 76/12 83/11 87/14 88/18 90/21 100/20
receipt [3]  106/17 107/23 107/25
receive [2]  36/20 85/20
received [1]  37/13
receiving [3]  85/7 85/15 89/16

reception - Ritz

**R**

reception [5]  100/8 100/12 100/22 100/23 100/25
recess [5]  82/3 82/7 82/11 82/16 109/14
recipients [1]  67/7
recognition [1]  50/19
recognize [8]  36/18 42/1 42/13 48/22 65/5 75/14 78/3 89/25
recognizes [1]  13/8
recollection [6]  31/20 61/10 73/11 91/24 95/19 96/20
recommend [1]  94/1
recommendations [1]  15/1
recommending [1]  16/8
record [19]  13/12 14/19 15/10 15/13 15/25 17/6 21/13 22/10 23/24 26/2 26/5 30/16 31/14 32/1 32/18 33/1 72/23 105/19 111/3
recorded [2]  2/15 15/12
recordkeeping [1]  69/4
records [11]  10/17 11/6 11/7 14/18 16/15 25/15 25/21 31/23 32/13 33/2 104/23
recross [2]  3/4 18/5
rectify [1]  58/25
red [1]  95/3
redacted [9]  6/15 6/15 7/24 8/1 8/2 16/22 18/14 32/25 96/12
redactions [2]  6/16 8/22
redirect [2]  3/4 18/5
reductions [1]  86/18
Reeves [9]  23/1 23/1 23/11 25/10 25/22 26/2 30/24 31/5 98/4
refer [1]  86/20
reference [4]  5/21 10/9 50/21 96/15
referring [2]  33/5 71/17
reflect [3]  11/21 14/19 95/21
reflecting [1]  8/5
reflects [1]  6/2
regain [1]  78/17
regard [14]  38/18 51/3 54/1 55/2 56/18 57/9 60/25 69/14 74/7 89/19 98/8 102/21 103/4 103/6
regarding [10]  5/10 5/20 5/23 6/22 9/3 18/11 28/8 34/12 79/2 87/11
register [1]  46/17
registered [2]  2/11 46/22
registration [1]  46/18
regular [7]  13/21 15/14 15/24 24/16 24/25 26/1 82/2
regularly [7]  25/18 31/23 31/24 32/10 32/10 32/19 32/25
reject [1]  98/19
rejected [8]  12/14 12/20 15/2 29/11 29/15 29/17 29/20 30/2
rejecting [1]  12/20
related [7]  10/11 18/12 61/11 86/11 91/25 103/5 103/24
relates [1]  6/4
relating [1]  42/14
relationship [15]  20/7 25/6 38/22 55/12 65/24 74/20 79/20 81/15 85/10 91/1 93/1 93/5 93/10 94/2 98/10
relationships [3]  52/17 53/6 57/12
relay [1]  93/12
release [3]  67/10 72/10 73/9
released [1]  72/10
relevance [1]  103/20
relevant [1]  105/4
reliable [2]  11/18 14/9
relied [1]  33/10
remain [2]  48/12 75/6
remained [2]  49/6 85/14
remains [2]  14/8 66/18
remember [11]  28/4 30/11 31/17 34/6 69/8 79/6 82/7 83/13 87/12 109/15 109/21
remind [1]  19/4
renew [2]  6/25 91/13
renewing [1]  8/8
repaid [3]  60/7 61/3 62/12

repayment [1]  61/12
replace [1]  35/12
replacement [1]  74/13
report [12]  6/11 6/20 7/24 8/1 8/9 8/16 15/15 16/15 18/11 96/20 97/4 103/2
reporter [5]  2/10 2/11 2/11 2/12 49/9
reporting [2]  14/10 29/5
reports [4]  5/20 16/22 102/19 104/6
representative [6]  7/3 17/18 18/3 42/19 87/17 87/20
representatives [1]  31/3
represented [2]  100/16 100/18
reputation [1]  50/8
request [5]  28/10 28/11 62/13 88/10 97/17
requested [2]  32/21 99/4
requesting [1]  13/6
require [3]  46/17 52/19 56/5
required [5]  52/25 61/16 65/25 66/5 107/12
requirement [4]  27/17 45/5 45/13 54/24
requires [2]  46/18 59/4
reschedule [1]  20/12
rescinded [1]  85/13
research [1]  7/4
reserve [1]  105/12
respect [3]  29/4 31/19 44/16
respond [2]  34/11 59/5
responded [2]  77/10 77/11
responding [1]  88/15
response [3]  76/22 77/21 77/22
responses [1]  31/16
responsibilities [4]  44/5 44/20 47/15 47/25
responsibility [4]  44/12 44/17 44/25 46/9
responsible [4]  59/10 77/9 86/10 88/14
responsive [2]  31/18 96/12
rest [1]  39/15
restart [2]  92/4 99/22
restaurant [5]  105/24 106/2 106/4 108/12 108/21
restore [1]  85/9
restructure [1]  98/9
restructuring [1]  30/24
result [1]  55/10
RESUMED [1]  35/4
retain [1]  28/25
retire [6]  39/14 73/5 73/8 73/15 74/22 75/8
retired [1]  73/21
retirement [10]  39/7 39/8 39/9 41/12 46/4 52/16 52/18 70/6 70/7 81/24
retiring [1]  73/10
return [2]  34/18 109/19
revenue [4]  40/13 59/23 85/12 89/16
review [4]  9/13 72/14 73/1 98/18
reviewed [1]  28/23
reviewing [1]  15/6
reviews [1]  48/10
revisit [1]  80/24
revisited [1]  8/10
revolution [3]  67/5 86/21 86/22
revolutionary [5]  67/6 67/16 67/17 68/10 95/14
RFP [1]  59/6
right [67]  4/12 4/16 5/4 7/16 8/18 8/25 9/1 14/13 17/12 17/13 18/2 18/8 18/10 18/20 19/11 19/23 20/23 21/9 21/11 22/21 26/12 28/13 29/8 31/4 31/12 32/2 32/17 32/23 33/11 33/16 33/20 34/18 34/23 49/13 62/7 64/8 64/16 65/17 67/16 67/22 73/6 73/6 75/21 80/18 80/25 82/11 82/14 83/22 88/8 88/15 90/5 90/9 91/15 91/19 94/7 94/9 94/12 95/17 97/21 101/5 102/9 103/16 105/18 109/12 109/13 110/4 110/6
rise [4]  4/2 4/3 33/17 82/15
Ritz [4]  101/21 106/4 106/21 107/7

**R**

RMR [2]  111/2 111/8
road [4]  57/16 64/8 64/13 64/15
role [3]  71/21 71/22 74/7
rollout [1]  58/9
room [2]  2/13 20/13
rooms [1]  99/19
Root [3]  6/22 8/13 17/3
Routh [1]  1/14
routinely [1]  13/18
royalty [2]  84/25 85/9
rule [5]  4/19 7/21 15/11 16/14 26/11
ruled [3]  6/14 8/6 91/15
rules [2]  11/7 18/15
ruling [4]  16/23 62/12 62/15 62/24
rulings [2]  5/1 33/25
run [2]  94/5 94/5

**S**

said [27]  8/15 11/6 11/8 11/21 12/15 13/24 14/7 14/22 15/6
16/2 17/10 19/5 32/9 34/4 55/5 62/3 62/18 62/19 67/6 76/17
79/6 86/24 95/5 98/17 102/19 105/9 106/20
sake [1]  7/12
salary [1]  39/15
sale [1]  56/4
sales [6]  6/7 57/20 63/24 64/2 64/25 98/25
salesperson [1]  64/24
same [11]  17/15 27/22 53/21 67/7 68/15 70/19 76/7 98/11
98/14 99/11 107/18
San [12]  99/9 99/18 100/7 106/4 106/21 107/24 108/13
108/18 108/24 109/3 109/4 109/8
San Francisco [9]  99/9 100/7 107/24 108/13 108/18 108/24
109/3 109/4 109/8
satisfied [1]  53/20
save [2]  18/2 68/10
savings [1]  46/4
saw [7]  7/24 100/8 100/10 100/10 100/11 100/20 100/22
say [11]  9/9 12/7 12/15 81/5 83/14 91/1 94/8 94/17 98/14
101/7 108/5
saying [4]  39/14 102/24 104/6 104/12
says [5]  10/19 37/24 43/18 71/13 96/11
scenario [2]  93/16 94/24
schedule [1]  82/2
scheduled [1]  48/6
scheduling [1]  20/8
Scott [2]  99/15 100/3
screen [14]  48/19 49/17 49/20 50/15 51/14 52/2 61/7 61/21
65/20 66/15 67/25 84/21 106/7 106/8
scroll [1]  75/24
sea [1]  78/17
seal [2]  6/19 51/9
seamless [1]  72/3
seated [1]  4/4
second [18]  4/21 17/6 17/7 17/8 17/8 20/8 24/2 24/3 31/11
37/4 68/4 69/10 71/12 72/19 78/13 80/14 83/6 90/4
Secondly [3]  5/18 34/10 96/15
section [13]  43/25 44/5 44/19 44/22 48/17 49/16 50/12
51/15 52/1 52/3 52/7 54/17 54/19
Section 7.2.6 [1]  52/1
secure [1]  108/21
secured [2]  108/24 109/8
see [33]  18/17 19/15 20/6 20/21 23/7 26/19 34/3 34/7 44/19
47/15 47/20 49/20 51/14 52/2 65/9 66/12 71/13 75/25 77/23
84/7 86/2 88/4 90/12 91/9 100/4 100/6 100/13 101/9 105/13
106/2 107/5 108/7 108/17
seeing [1]  74/12
seek [2]  54/22 55/10
seeking [1]  57/1

seen [4]  9/20 30/13 31/24 104/14
selected [1]  69/15
sell [4]  47/4 56/5 57/1 59/5
Seller [21]  36/13 43/17 43/14 43/15 54/10 56/21 63/21 73/4
73/14 74/8 74/11 74/22 75/8 84/17 86/6 98/2 99/13 106/24
107/3 108/6 108/9
Sellers [4]  34/23 36/2 37/18 75/3
selling [3]  46/25 57/21 59/1
seminars [1]  46/1
send [5]  25/10 65/12 66/1 66/24 67/7
senior [5]  1/11 43/16 54/14 73/16 75/4
sense [2]  12/4 97/3
sent [14]  25/8 65/22 65/22 67/3 67/10 67/14 68/15 70/18
72/15 73/2 85/24 87/5 87/7 92/6
sentence [14]  37/4 46/13 46/21 52/12 54/16 56/2 56/7
66/15 72/1 78/13 86/15 86/20 95/2 95/4
sentences [2]  37/5 85/3
separately [1]  66/3
September [4]  73/12 74/15 85/14 95/11
series [4]  6/22 8/13 46/1 75/13
serious [1]  103/8
seriousness [1]  94/16
serve [1]  7/6
served [4]  7/2 17/18 18/9 110/2
service [1]  87/2
services [9]  41/9 44/13 44/15 45/1 48/11 50/20 52/16 69/4
69/22
session [2]  1/7 4/3
Set [1]  88/10
several [1]  53/2
sexual [6]  5/24 6/3 7/18 9/3 9/10 18/15
shake [1]  67/6
shall [2]  46/17 54/18
share [2]  37/10 51/11
shared [3]  39/15 44/17 46/8
sharing [1]  95/15
Shawn [1]  2/3
she [51]  5/3 12/3 12/13 12/20 12/20 14/22 14/24 14/25 15/1
16/7 19/14 19/15 19/16 20/10 20/11 20/12 28/18
28/18 28/19 28/19 34/22 34/23 62/18 62/19 63/2 64/24
64/25 79/4 79/5 79/6 79/8 79/9 79/17 79/20 79/21 79/25
96/19 96/20 96/21 96/21 97/4 101/5 102/3 102/9 102/15
102/20 102/20 103/11 104/14 104/17
she'll [2]  5/2 13/20
she's [8]  20/1 62/10 63/1 79/10 79/19 80/3 80/13 105/11
short [4]  82/5 90/18 94/5 94/5
should [11]  8/6 14/1 15/1 16/22 19/14 20/4 50/10 85/2
103/7 103/25 105/8
show [5]  32/12 47/18 81/9 81/10 105/18
showing [1]  32/14
shown [2]  8/2 37/1
shows [1]  97/3
side [3]  75/4 84/18 96/23
sidebar [2]  10/10 10/20
sides [1]  4/25
sign [1]  60/13
signed [8]  28/5 42/17 43/5 43/11 57/11 68/5 88/13 90/12
similar [1]  72/22
Similarly [2]  6/10
simple [1]  72/3
since [3]  23/6 34/1 41/2
sincere [1]  80/2
sir [5]  10/3 29/3 30/15 32/16 105/1
sit [1]  82/4
sitting [2]  7/3 67/9
situation [2]  54/5 94/16
Six [1]  46/7
sized [1]  37/21
slow [1]  49/8

**S**

small [3]  26/22 37/21 40/20
smaller [1]  37/8
smart [2]  41/9 81/6
Smith [2]  99/15 100/4
snark [1]  81/18
so [72]  4/25 5/3 6/8 7/10 8/22 9/13 9/25 14/1 14/3 14/3 16/2
  16/12 16/14 16/20 17/14 31/25 33/2 34/14 36/5 37/11 37/19
  38/17 38/20 39/5 40/20 40/21 41/9 48/2 50/9 50/10 50/11
  51/9 53/1 53/11 53/18 53/19 55/25 56/1 57/6 57/15 57/24
  57/25 58/2 58/3 58/5 63/4 64/22 64/24 67/6 67/22 68/19
  69/10 72/22 72/23 76/4 77/25 79/6 81/11 82/3 82/10 84/8
  88/4 90/11 96/14 97/1 100/3 102/9 107/13 107/16 109/16
  110/4 110/6
So I think [1]  16/2
so it's [1]  97/1
social [1]  107/15
sold [2]  56/9 56/14
sole [2]  44/17 46/8
solution [1]  100/5
some [25]  4/24 4/25 5/20 12/2 15/19 20/13 27/9 28/3 33/25
  41/9 52/18 53/14 55/1 55/10 57/24 58/3 59/24 63/22 64/7
  69/18 77/1 96/22 100/5 103/1 104/12
somebody [1]  14/11
somehow [1]  6/3
someone [2]  15/11 33/5
something [5]  36/3 39/4 76/18 94/4 98/24
sometimes [4]  27/8 27/10 28/15 81/19
somewhere [2]  73/11 88/19
soon [2]  8/7 33/13
sorry [11]  13/4 18/22 18/24 22/18 28/20 47/16 47/23 49/12
  90/4 95/1 108/3
sort [3]  35/23 59/24 76/15
source [1]  15/11
sources [1]  15/17
South [1]  52/24
Southwest [2]  108/22 108/24
speak [3]  10/11 64/25 74/4
speaking [1]  35/19
specific [3]  10/19 30/8 100/20
specifically [8]  21/25 27/14 28/11 47/13 63/12 71/23 87/15
  104/4
speech [1]  103/23
sponsored [2]  107/13 107/17
sponsoring [1]  44/25
sponsors [11]  66/21 66/25 68/16 68/19 69/19 70/1 72/15
  83/18 85/25 87/5 87/7
spot [1]  29/20
spring [1]  27/9
square [1]  17/16
staff [7]  46/24 57/18 64/14 84/8 84/10 89/13 107/12
stand [4]  5/11 22/14 35/4 36/11
standard [2]  15/15 49/22
stands [1]  7/5
start [7]  20/17 20/20 55/25 76/5 86/22 93/10 107/19
started [7]  57/20 64/12 64/13 65/23 73/7 80/12 82/3
starting [1]  34/12
starts [1]  103/21
state [32]  12/19 13/6 16/7 33/7 52/19 52/21 52/24 52/25
  53/16 53/17 53/18 54/5 54/23 55/3 56/4 56/6 56/10 56/15
  57/1 57/12 58/4 58/4 58/6 58/10 59/1 59/4 59/5 64/18 93/1
  93/5 97/3 99/5
stated [1]  91/14
statement [7]  11/20 14/10 15/23 62/21 66/11 96/6 96/24
statements [4]  15/17 15/24 29/23 87/21
states [20]  1/1 1/3 1/11 4/9 15/6 15/8 21/19 21/23 22/2 45/4
  51/1 53/6 53/7 53/10 53/13 54/1 55/6 55/11 55/20 57/1
stay [5]  4/20 75/4 80/23 86/18 109/19

stenography [1]  2/15
Steven [1]  7/4
Stevens [2]  12/15 14/12
Stevenson [4]  10/10 29/6 30/7 30/12
Stewart [1]  2/2
still [10]  70/23 80/3 85/7 94/7 94/8 94/23 94/24 95/17 104/9
  109/1
stipulation [1]  104/12
stop [1]  45/3
stopped [3]  87/14 88/19 89/8
strapped [1]  39/12
Street [6]  1/16 2/4 2/8 24/9 24/16 96/2
strict [1]  13/6
strike [2]  8/8 62/16
structured [1]  41/21
study [2]  8/9 17/1
subdivisions [2]  52/20 59/2
subject [9]  23/22 23/24 36/15 36/16 65/8 68/9 76/3 79/3
  91/16
submittal [1]  108/8
submitted [5]  9/14 78/9 102/18 106/24 108/6
submitting [1]  104/5
subpoena [4]  7/6 17/18 18/8 103/15
subsequent [2]  23/18 72/12
subsidiary [1]  29/18
succeeding [1]  89/14
success [1]  89/16
successful [4]  55/12 55/23 74/1 95/15
succinctly [1]  65/1
such [4]  12/4 33/2 33/9 54/23
suggest [1]  9/20
suggested [1]  12/1
Suite [1]  2/4
summer [12]  35/18 35/20 36/8 36/21 37/13 40/5 40/16
  88/19 88/22 89/1 89/7 89/18
Sunday [3]  75/25 76/11 108/25
superior [1]  46/25
Supp [2]  15/21 15/21
supplemental [1]  39/6
supplied [1]  15/11
support [3]  12/22 41/18 44/14
supports [1]  12/24
supposed [3]  30/12 30/18 103/7
supposedly [1]  10/24
sure [26]  5/2 8/22 12/22 12/23 12/25 14/5 28/11 36/1 38/19
  39/16 40/17 40/21 46/15 47/21 48/13 49/5 60/6 62/3 62/7
  78/23 88/4 90/20 97/7 101/25 104/16 106/11
surprising [1]  100/2
surround [1]  41/8
surveys [1]  48/10
sustain [2]  70/24 80/22
sustained [2]  8/17 60/16
switch [1]  47/9
SWORN [1]  35/4

**T**

tab [3]  36/10 41/25 67/12
table [3]  7/4 93/20 94/25
take [17]  6/16 9/6 9/14 17/9 21/12 34/14 68/20 82/1 82/3
  82/4 82/6 82/9 99/17 105/16 109/14 109/24 110/5
taken [3]  13/18 14/17 16/25
takes [1]  50/5
taking [1]  109/1
talk [13]  12/3 14/25 19/24 20/24 20/24 29/21 43/24 76/14
  76/15 76/17 79/19 80/18 82/8
talked [7]  26/19 28/24 30/23 31/17 48/4 78/12 101/11
talking [9]  11/21 33/5 34/22 57/20 68/22 71/19 79/17 95/9
  109/22
talks [1]  48/2

T

team [2]  68/21 77/7
telephone [1]  20/10
tell [11]  21/7 50/16 55/9 59/20 63/19 73/20 79/24 80/1 83/5
93/25 98/7
telling [1]  77/13
temporarily [1]  76/20
ten [12]  11/22 29/9 41/16 82/7 82/9 82/14 90/19 90/25
94/12 95/6 96/16 98/20
ten-minute [1]  82/7
ten-year [3]  90/19 90/25 98/20
tend [1]  16/4
Teresa [1]  56/21
term [1]  41/14
terminal [2]  108/22 108/24
terminate [1]  71/15
terminated [4]  65/24 85/10 103/3 103/4
terms [7]  39/22 44/11 44/24 46/25 55/4 66/5 93/22
terrific [1]  60/1
testified [7]  9/22 35/5 38/24 59/10 84/1 87/11 105/24
testifies [1]  4/21
testify [5]  10/21 79/9 102/15 102/20 103/11
testifying [2]  18/4 34/20
testimony [12]  5/12 5/14 6/1 16/3 16/15 17/20 21/12 28/13
82/23 102/4 102/13 103/22
than [10]  7/14 20/18 27/10 28/23 31/25 46/23 62/14 65/1
82/4 90/21
thank [34]  4/12 5/5 7/15 8/24 8/25 9/18 10/7 14/14 18/2
18/6 18/18 26/14 31/21 32/2 33/15 33/20 33/21 35/1 44/3
78/16 82/12 82/21 88/7 88/9 91/18 97/17 97/19 97/22
105/14 105/15 109/12 109/20 110/4 110/6
thank you [29]  4/12 5/5 7/15 8/24 8/25 9/18 10/7 14/14 18/2
18/18 26/14 31/21 32/2 33/15 33/20 33/21 44/3 78/16 82/12
82/21 88/7 88/9 97/19 97/22 105/14 105/15 109/20 110/4
110/6
that [476]
That'll [1]  18/2
that's [50]  9/24 10/20 12/12 13/3 14/9 14/20 15/7 15/19
16/13 16/19 20/7 20/9 21/6 24/13 29/13 31/7 36/11 39/5
42/11 43/18 49/13 59/3 59/4 60/20 64/13 65/3 72/19 75/25
80/4 80/5 80/10 80/14 81/13 81/18 81/22 83/8 84/4 84/15
84/19 84/22 87/4 90/5 90/5 90/9 95/1 95/3 96/7 96/8 102/6
106/15
their [20]  6/1 6/2 15/18 16/1 33/3 36/2 38/5 39/11 39/11
48/14 54/14 55/6 57/1 63/22 66/23 68/24 84/18 85/10 99/19
103/24
them [22]  10/16 17/2 17/4 19/2 43/21 51/12 53/14 63/22
64/8 68/24 83/17 83/17 93/15 94/23 97/12 98/23 103/12
103/13 104/4 104/17 104/23 105/11
themselves [1]  10/17
then [30]  4/7 4/21 8/8 9/2 12/24 13/1 17/6 19/8 27/9 28/4
31/2 51/11 58/5 66/14 67/10 76/22 77/10 77/22 81/1 82/11
88/8 88/25 98/12 100/24 101/11 103/12 104/24 105/12
105/16 105/19
there [72]  4/24 5/21 12/4 18/24 24/23 24/24 27/2 27/15
27/17 31/7 32/11 32/13 32/14 32/18 33/12 35/23 36/7 37/5
39/1 40/21 44/9 45/3 46/23 46/24 47/15 48/9 53/1 53/13
54/4 55/1 55/5 55/16 55/16 55/17 56/1 57/24 62/1 63/21
64/5 64/5 66/21 67/16 71/5 71/13 72/10 72/12 75/25 76/18
76/22 78/14 79/12 81/11 81/18 89/17 89/20 90/12 91/24
92/1 92/13 92/14 93/12 97/5 99/3 100/2 100/18 102/5
102/17 102/20 104/5 104/12 107/4 108/17
there's [8]  15/3 18/22 26/25 46/13 51/10 51/14 69/7 105/9
therein [2]  14/24 91/17
thereof [1]  44/13
thereto [1]  44/16
these [33]  13/12 13/20 13/25 14/17 24/5 26/10 28/14 29/1
29/8 30/19 31/16 31/22 48/2 53/13 60/23 62/3 63/14 75/14

they [74]  6/2 9/6 11/6 11/7 11/10 11/18 13/13 13/21 14/1
14/11 16/10 16/11 16/12 19/1 19/4 19/24 25/23 28/5 31/18
32/14 33/8 33/9 35/13 35/21 35/24 36/2 38/4 39/17 40/1
40/10 41/18 47/7 47/8 52/10 53/14 53/14 53/15 53/16 53/16
55/17 56/13 59/14 59/19 59/23 60/1 64/1 84/13 84/13 85/6
85/7 85/12 86/11 86/12 89/15 92/20 94/17 94/25 95/22
96/14 97/12 98/11 98/14 98/17 98/17 102/1 100/2 100/3 103/12
103/14 103/25 104/5 104/13 104/15 104/23 105/9
they're [12]  7/9 9/25 10/25 16/1 32/7 32/9 42/25 79/22
79/24 80/2 80/21 104/25
thing [8]  9/9 11/1 17/23 54/12 94/7 94/9 94/12 95/18
things [9]  37/18 48/7 49/3 71/19 73/18 93/18 96/11 102/2
102/15
think [35]  8/1 9/9 9/25 10/20 12/23 13/3 14/20 14/23 15/4
16/2 16/12 18/8 20/6 20/10 20/14 22/18 31/1 32/8 49/8
51/10 55/16 62/14 63/1 63/22 68/20 72/11 72/21 74/9 74/19
76/12 77/14 84/6 84/17 98/17 104/15
thinking [6]  12/5 94/3 94/4 94/9 94/10 96/19
thinks [1]  13/24
third [2]  37/3 92/22
this [198]
THOMAS [2]  1/10 4/4
thoroughly [1]  18/14
those [31]  4/25 5/13 5/15 6/14 6/16 7/17 8/23 9/20 11/11
11/12 11/15 14/18 17/16 22/8 23/18 24/4 25/21 41/14 44/18
46/9 52/9 54/20 55/7 55/20 60/4 64/12 87/14 89/11 96/11
96/12 96/14
though [1]  53/15
thought [9]  19/14 39/6 39/21 40/2 57/21 63/2 68/24 83/16
102/14
thousands [1]  66/22
three [4]  45/15 45/16 90/21 102/18
through [23]  7/16 9/20 15/22 22/5 40/16 45/9 46/20 50/20
51/23 60/4 68/13 74/13 78/18 78/19 79/6 80/10 80/12 80/15
80/19 82/4 88/17 102/3 107/15
throughout [4]  23/14 45/6 51/21 58/9
Thus [1]  11/18
ticket [1]  109/6
till [4]  17/13 82/4 101/1 105/20
Tim [4]  76/12 76/13 76/14 76/17
time [47]  9/13 14/25 16/18 17/15 18/3 25/7 30/6 34/19
35/16 35/23 37/25 38/12 40/3 43/15 43/19 47/22 53/23 54/3
55/14 55/15 55/25 63/16 63/20 66/17 68/7 72/22 76/5 76/6
79/7 81/21 82/7 82/23 85/23 89/17 93/8 94/16 96/19 99/3
100/8 100/11 101/15 102/24 104/18 104/18 105/11 105/12
109/10
times [2]  33/24 100/6
titled [1]  111/4
today [6]  4/22 5/12 6/21 19/3 28/13 82/3
together [8]  17/14 53/22 63/14 76/9 78/16 84/2 84/15 86/7
told [7]  19/2 36/2 73/23 75/8 81/10 93/15 94/23
Tom [4]  22/8 22/10 68/6 68/7
tonight [1]  19/3
too [4]  14/8 34/16 49/11 109/14
took [3]  64/21 96/13 99/18
top [1]  81/5
total [2]  29/9 37/9
totally [1]  80/5
tough [1]  78/17
toward [2]  57/4 60/20
towards [2]  48/5 79/1
track [1]  64/24
trademarks [1]  51/3
traffic [1]  79/14
trained [1]  58/1
training [5]  42/4 42/16 43/6 44/6 48/6
transcript [4]  1/10 2/15 4/24 111/3

## T

transcription [1]  2/16
transfer [2]  71/7 71/9
transferring [1]  70/21
transition [1]  72/2
translate [1]  38/9
treatment [1]  87/3
trends [1]  49/4
trial [4]  1/10 19/22 33/23 110/6
tried [6]  62/17 62/23 66/2 66/2 95/17 103/15
TRIGG [1]  2/3
trouble [1]  15/2
true [6]  12/4 14/1 27/22 31/18 80/7 96/17
trust [3]  78/15 81/10 81/10
trusting [1]  81/9
truth [9]  12/16 12/19 12/25 14/24 15/18 16/1 16/6 33/9 96/22
try [4]  17/16 34/6 59/23 95/17
trying [11]  30/9 76/4 79/14 79/21 80/17 81/15 93/9 93/12 93/21 94/7 94/8
Tuesday [3]  20/11 20/23 34/13
turn [13]  22/13 36/10 41/25 42/7 43/8 43/25 48/17 50/12 65/19 68/4 83/2 89/21 107/21
turned [1]  104/23
two [23]  4/15 7/22 7/24 11/13 13/16 17/2 18/22 18/24 18/25 31/5 33/6 37/5 45/8 45/9 55/16 59/3 71/5 71/8 85/3 96/11 101/2 102/2 102/14
type [3]  59/24 76/7 83/6

## U

U.S [32]  2/12 15/21 21/24 22/7 22/11 23/2 23/5 23/11 23/15 24/6 24/13 24/15 25/13 25/17 26/1 26/18 31/8 32/19 37/9 40/23 42/5 42/17 42/19 53/3 53/20 60/5 60/6 68/1 83/24 90/24 91/8 95/20
Uh [3]  5/17 9/17 11/17
Uh-huh [3]  5/17 9/17 11/17
ultimately [1]  41/11
unable [1]  7/4
unavoidable [1]  34/13
under [30]  6/19 11/7 12/9 12/10 15/18 16/6 26/10 40/3 41/17 41/21 44/5 44/6 44/11 44/24 45/2 47/3 47/5 48/1 48/12 48/14 50/17 51/15 54/23 59/15 63/25 79/7 85/1 89/8 97/2 104/21
understand [10]  7/9 8/10 10/16 14/11 18/13 27/17 32/5 43/17 47/7 57/7
understanding [22]  29/10 33/4 37/14 37/25 46/20 47/2 56/13 56/25 63/10 63/13 63/17 63/20 66/4 74/6 88/21 88/24 89/8 90/15 94/10 95/22 97/11 105/1
understood [6]  12/20 32/9 57/4 59/14 63/3 73/17
undertook [1]  48/14
undetermined [1]  98/16
undisputed [1]  103/22
unfortunate [1]  93/16
UNITED [11]  1/1 1/3 1/11 4/9 15/6 15/8 21/19 21/23 22/2 45/4 51/1
United States [2]  15/6 15/8
universe [1]  56/1
unless [2]  20/14 107/16
until [9]  5/15 7/21 16/21 16/23 18/15 66/23 82/24 101/10 105/13
up [41]  6/20 8/11 9/6 9/15 13/10 15/19 16/25 34/9 36/11 37/10 37/15 39/1 44/2 44/16 49/5 49/17 50/15 57/24 59/25 60/13 61/7 64/8 64/9 65/20 67/6 67/25 75/19 76/23 77/14 77/15 80/13 83/17 84/21 93/14 93/19 94/4 94/11 100/5 106/8 109/25 110/5
upcoming [1]  95/10
updated [3]  48/7 71/8 71/10
upfront [1]  79/15

upon [6]  9/21 9/6 33/10 47/6 61/16 91/15
ups [1]  72/12
us [29]  38/17 40/12 44/22 46/14 50/16 52/22 53/12 53/14 54/15 54/16 57/18 57/19 59/20 60/1 63/19 64/15 65/20 66/16 71/1 71/25 73/24 77/11 83/5 86/6 90/19 93/8 93/25 95/3 98/7
USCM [19]  32/22 37/8 37/10 37/15 47/3 50/21 51/16 52/14 54/18 56/4 84/24 85/5 85/10 85/10 85/13 85/14 85/17 85/20 86/17
USCM's [2]  50/19 51/15
use [8]  18/12 18/15 51/17 54/22 56/8 56/13 88/13 97/13
used [5]  11/3 16/23 41/9 68/2 83/7
USME [21]  22/5 24/1 25/15 25/19 27/2 27/17 28/15 32/22 40/14 41/1 41/5 44/17 44/20 44/24 45/12 45/18 46/17 47/3 48/1 89/9 89/15
USME's [1]  47/15
usually [1]  36/2
utility [1]  38/21

## V

vendor [6]  85/1 85/6 85/8 85/11 85/15 86/3
vendor's [1]  85/13
verbal [2]  12/12 15/2
verified [1]  88/14
verify [1]  15/16
version [1]  18/14
versus [4]  4/9 15/6 15/8 15/21
very [26]  11/2 11/4 11/22 13/6 17/24 26/22 41/2 50/2 53/9 54/14 54/14 58/12 62/23 69/11 73/16 79/20 79/21 81/25 82/5 90/21 95/6 98/11 99/25 100/23 101/1 103/8
viable [1]  43/21
vice [1]  43/16
video [1]  4/22
view [3]  48/4 101/3 101/6
Villa [2]  36/6 36/16
Villaraigosa [1]  36/5
violate [1]  62/12
violated [1]  54/19
violation [1]  62/10
virtual [1]  64/9
virtue [1]  54/20
visits [1]  84/7
voir [3]  14/3 21/2 21/17
voluntarily [1]  85/12

## W

wait [3]  17/13 80/14 102/9
waived [1]  10/12
walked [2]  84/24 85/12
walking [1]  85/8
want [15]  8/15 19/24 21/1 21/4 39/5 44/8 51/11 51/12 64/22 68/19 69/11 72/23 96/6 104/9 109/11
wanted [9]  8/22 11/1 34/3 39/16 49/5 62/3 67/5 73/17 85/6
Ward [1]  98/5
Warner [2]  1/13 13/19
was [308]
Washington [8]  1/5 1/16 2/8 2/14 24/9 24/17 25/25 96/3
wasn't [7]  63/17 63/17 77/8 90/20 97/15 101/10 103/24
watching [1]  106/6
water [1]  38/21
way [11]  38/4 40/12 60/8 77/11 77/13 77/17 84/24 86/17 86/25 87/1 107/14
ways [1]  59/3
we [234]
we believe [2]  11/14 103/6
we will [5]  6/20 7/10 11/11 18/15 80/24
we would [20]  4/22 5/14 5/25 6/8 6/15 6/25 7/12 9/19 13/6 27/21 31/22 31/24 53/2 55/8 55/24 66/1 89/3 89/5 90/18 97/17

## W

we'd [6]  18/17 27/8 62/15 93/14 95/17 95/17
we'll [17]  17/10 17/15 18/7 20/2 20/13 20/20 34/11 34/12
34/14 47/21 63/4 80/22 80/23 82/9 82/10 105/16 110/4
we're [26]  11/21 20/14 20/15 20/16 21/5 21/7 21/12 34/14
50/9 51/8 51/10 55/25 58/6 79/11 80/1 80/25 82/6 82/22
94/4 97/21 101/17 105/13 109/13 109/14 109/15 110/1
we've [4]  28/23 31/17 34/1 51/9
Website [5]  45/16 48/7 72/9 84/6 84/9
week [2]  7/14 91/25
welcome [1]  10/8
well [24]  5/8 9/4 14/15 15/12 17/24 19/24 22/8 29/15 32/8
37/20 37/23 40/2 43/9 47/7 50/10 55/7 56/14 58/4 58/5
59/21 62/23 76/8 79/22 100/18
went [15]  12/21 38/25 57/16 57/25 58/1 58/3 61/14 61/20
64/7 64/11 64/15 64/16 64/18 67/5 88/17
were [124]
weren't [1]  96/14
WEST [138]
West's [8]  6/12 7/3 9/5 50/16 57/12 58/10 75/5 88/18
Weyland [48]  4/21 5/11 6/1 9/12 9/20 11/21 12/15 13/19
14/7 14/10 14/16 19/4 21/2 21/12 21/15 22/24 26/16 33/5
34/20 35/3 35/9 47/25 48/19 49/8 54/25 56/23 60/23 63/12
65/8 72/4 75/25 78/11 79/13 81/4 81/20 82/23 83/2 84/1
88/17 90/7 90/12 95/5 96/15 97/3 101/19 105/22 106/14
108/23
Weyland's [5]  8/5 10/10 11/20 16/7 79/2
what [116]
what's [4]  39/9 102/10 102/23 105/10
whatever [2]  49/4 50/22
whatsoever [1]  6/5
WHEELER [1]  2/3
when [56]  8/15 11/11 12/20 13/19 15/1 21/1 23/15 25/7
26/6 35/16 35/19 37/13 37/24 39/4 50/4 51/22 56/23 56/24
57/16 60/23 62/2 62/10 73/4 73/14 74/17 74/19 74/22 75/7
83/11 83/11 83/13 83/14 84/7 85/10 86/2 86/24 87/4 88/22
89/7 89/18 91/17 92/16 93/14 93/25 94/8 94/20 95/9 96/19
97/4 98/14 99/3 99/10 100/10 100/11 104/22 104/23
whenever [2]  15/9 19/4
where [33]  6/4 13/17 14/22 14/24 20/16 24/8 30/18 30/23
34/23 39/10 44/16 46/8 54/5 55/11 56/10 57/6 58/3 59/21
64/16 64/21 78/25 79/3 82/2 93/18 96/1 99/7 99/17 102/18
104/2 106/20 108/22 109/2 109/4
whether [6]  14/21 15/5 20/16 45/10 55/17 91/24
which [28]  7/19 10/17 10/18 11/10 15/8 16/12 18/13 25/14
26/22 27/14 43/25 47/9 49/16 52/1 58/7 63/19 67/12 68/17
75/5 81/5 82/24 85/24 86/14 92/22 100/20 101/17 101/19
107/21
while [7]  10/18 10/21 11/4 11/6 34/11 53/7 61/25
who [34]  4/17 7/7 14/11 15/25 17/18 20/10 22/10 23/1
26/12 26/22 43/5 43/11 56/18 61/14 61/19 63/10 63/13 68/5
68/7 70/1 76/14 76/20 77/8 77/8 83/8 84/4 86/9 96/4 96/25
97/24 98/3 99/12 99/14 107/1
who's [4]  33/5 40/22 76/13 76/19
whole [1]  68/20
wholly [1]  29/18
wholly-owned [1]  29/18
whom [3]  54/8 56/20 86/3
why [23]  5/22 17/13 39/25 46/21 49/2 50/3 51/6 52/22
66/20 69/15 70/14 71/1 75/1 76/6 76/10 77/6 77/11 81/18
83/18 89/1 98/19 101/13 105/10
will [40]  1/15 5/12 6/20 6/21 7/10 11/11 14/15 17/19 18/15
18/19 19/19 19/21 20/23 20/24 33/12 34/11 34/21 43/22
44/12 44/24 49/7 50/18 51/10 53/11 54/22 55/1 56/8 65/20
66/11 66/19 68/10 68/20 71/15 80/15 80/19 80/24 82/25
85/20 86/23 88/11
William [4]  2/10 111/2 111/7 111/8
win [1]  59/6

wish [1]  9/10
withdrawn [5]  60/18 63/11 70/12 74/21 84/10
within [1]  76/16
without [9]  9/15 9/22 10/2 10/22 15/14 29/19 34/16 66/19
85/16
witness [3]  3/2 9/12 9/13 19/7 19/7 19/20 22/19 34/5 35/3
101/6 105/19
witnesses [2]  3/4 18/18
won't [1]  5/3
wonderful [4]  101/8 101/9 101/14 101/15
word [4]  11/4 62/18 62/19 67/16
words [1]  79/13
work [16]  6/24 18/21 33/2 33/16 34/14 41/18 66/7 73/24
74/12 74/20 76/8 79/21 81/12 84/14 100/4 109/17
worked [5]  40/20 42/17 42/20 57/25 84/17
working [3]  20/25 53/15 81/15
works [1]  50/10
would [116]
wouldn't [2]  12/18 103/14
write [3]  34/7 76/10 78/4
writes [1]  79/25
writing [2]  90/16 90/17
written [7]  11/13 28/3 28/4 34/4 89/22 106/23 108/20
wrote [1]  78/14
wtotrial.com [1]  2/6

## Y

yeah [7]  18/19 20/9 63/6 76/25 102/16 104/9 107/5
year [22]  11/13 16/11 26/21 27/6 27/8 27/11 27/18 28/14
32/14 41/23 74/19 74/4 77/25 90/19 90/20 90/25 94/6 94/12
98/16 98/18 98/20 99/11
years [13]  11/13 11/22 13/16 27/14 29/9 33/6 41/3 41/16
90/20 90/21 94/12 95/6 96/16
yes [159]
yesterday [11]  5/18 6/10 7/2 7/24 9/22 10/21 16/22 17/19
19/1 34/3 34/20
yet [6]  6/2 8/20 11/9 20/16 97/15 105/8
York [1]  64/19
you [366]
you know [2]  57/23 62/4
you're [13]  7/18 10/8 16/17 18/8 21/9 29/5 30/18 30/19
97/14 81/5 102/24 106/14 109/18
you've [4]  26/19 59/10 78/15 90/25
your [132]
Your Honor [59]  4/8 4/14 5/5 5/25 6/9 9/10 10/5 10/9 10/15
11/1 11/11 12/8 13/4 14/6 16/19 16/24 17/25 18/12 19/19
20/2 21/1 26/9 26/14 28/17 29/24 31/11 31/21 32/3 32/18
33/19 34/24 36/24 47/21 60/15 62/5 62/9 62/17 65/16 67/21
70/23 75/20 78/21 78/25 80/13 83/21 88/3 88/6 90/4 90/8
91/14 91/18 97/6 97/10 101/4 101/22 102/17 103/20 106/10
109/10
yours [1]  79/13
yourselves [1]  82/9

## Z

Zaremba [4]  2/10 111/2 111/7 111/8