# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES CONFERENCE OF MAYORS,** *et al.,* <br><br> **Plaintiffs,** <br><br> v. <br><br> **GREAT-WEST LIFE & ANNUITY INSURANCE CO.,** <br><br> **Defendant.** | **Civil Action No. 16-00660 (TFH)** |

## MEMORANDUM OPINION

Plaintiffs here are the United States Conference of Mayors and its subsidiary United States Mayor Enterprises, Inc. (collectively, "the Mayors" or "Plaintiffs"). They sued Defendant Great-West Life & Annuity Insurance Company ("Great-West" or "Defendant") in April 2016 for breach of contract and breach of the implied covenant of good faith and fair dealing. Initially, Defendant responded with counterclaims against Plaintiffs, but dropped them on the eve of trial. At the close of Plaintiffs' case-in-chief, Defendant moved orally for a directed verdict and judgment as a matter of law. The Court took the motion under advisement insofar as it related to damages and otherwise denied the motion. On January 23, 2018, after a nine-day trial, the jury returned an $8 million verdict for Plaintiffs and concluded that Defendant had breached both its contract with Plaintiffs and the implied covenant of good faith and fair dealing. Verdict Form, ECF No. 218. Defendant then renewed its motion for judgment as a matter of law. Def.'s Mot. ("Mot."), ECF No. 224. Plaintiffs opposed the motion, Pls.' Opp'n ("Opp'n"), ECF No. 235, and Great-West replied, Def.'s Reply ("Reply"), ECF No. 238. The Court held a hearing on

May 23, 2018. Upon consideration of the parties' briefing and argument, for the reasons discussed herein, and in accordance with the oral ruling announced in open court on May 23, the Court denies Defendant's motion for judgment as a matter of law.

## BACKGROUND

The United States Conference of Mayors ("USCM") is "a non-partisan organization of cities with populations of 30,000 or more." Am. Compl. ¶ 5, ECF No. 22. USCM's wholly-owned subsidiary, United States Mayor Enterprises, Inc. ("USME"), markets products to cities and their employees, including retirement products and services. *Id.* ¶¶ 2, 6. In 2012, the Mayors entered into two contracts with Great-West relating to USCM's Retirement Program: (1) a License Agreement between USCM and Great-West, and (2) a Joint Marketing and Training Agreement ("JMTA") between USME and Great-West. *Id.* ¶¶ 1, 16. Both Agreements included an initial ten-year term. JMTA ¶ 4.1; License Agreement ¶ 6.1, ECF Nos. 9-7 & 9-8.

In December 2015, the Mayors notified Great-West that they intended to terminate the Agreements for cause based on Great-West's contractual breaches. Am. Compl. ¶ 28. The parties attempted to engage in mediation but were unable to agree on a meeting location. March 15, 2016 Letters to JAMS, ECF Nos. 9-12 & 9-13. On April 6, 2016, the Mayors filed their original complaint. ECF No. 1. On September 30, the Mayors filed an Amended Complaint, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. Am. Compl. ¶¶ 29–38, ECF No. 22. Great-West filed its Answer and Counterclaim on October 17, asserting counterclaims for unjust enrichment, breach of contract, and breach of the implied covenant of good faith and fair dealing. ECF No. 26. The Mayors filed their Answer to Great-West's counterclaims on October 28. ECF No. 28.

Both parties filed various motions in limine, which the Court resolved before trial. Among these rulings, the Court excluded an anonymous letter detailing allegations of sexual harassment and other forms of misconduct against one of Defendant's employees but permitted the letter to remain available for impeachment and cross-examination purposes. ECF No. 150. Two employees were fired as a result of the investigation that followed receipt of the anonymous letter, and the Court ruled that the internal communication announcing the firings was admissible, as was Defendant's filing with the Financial Industry Regulatory Authority ("FINRA") reporting these employees' ethical violations. *Id.* Also relevant here, the parties disputed the significance of certain attachments to their Agreements, which showed profit and reimbursement calculations based on estimated participant enrollment in the insurance program. *See* Mot. to Exclude Improper & Irrelevant Evidence at 4, ECF No. 103. Defendant argued that these were "hypothetical examples" rather than contractual obligations and that Plaintiffs should not be allowed to imply that a failure to achieve those figures constituted a breach of contract. *Id.* The Court ruled that Plaintiffs could not refer to the attachments as projections but instead must refer to them as "hypothetical examples." ECF No. 151. Defendant also argued—for the first time after months of discovery and pretrial disputes—that the contract language precluded Plaintiffs from seeking lost revenue or profits, among other types of damages. ECF No. 98. The Court disagreed and so ruled in *U.S. Conference of Mayors v. Great-West Life & Annuity Insurance Co.*, 288 F. Supp. 3d 4 (D.D.C. 2017), providing several reasons why Defendant's reading of the contract was unnatural. *Id.* at 9–10.[1]

Now, Defendant moves for judgment as a matter of law, alleging that Plaintiffs have, over the course of this litigation, "refused to commit to a single damages theory—or even to any

---

[1] Defendant renews those arguments here, but the Court remains unpersuaded for the reasons stated in its December 8, 2017 Memorandum Opinion.

particular set of alternative theories." Mot. at 2. For purposes of judgment as a matter of law, the relevant facts include only the evidence that was presented to the jury. *See Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 165 (D.C. Cir. 2015) ("Appellants have shown at most that there was a conflict in the evidence before the jury. It is the function of the jury and not this court to weigh evidence and make findings."). Accordingly, the Court will focus on the evidence adduced at trial and related legal arguments here.

## ANALYSIS

### I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 50 allows parties to seek judgment as a matter of law "any time before the case is submitted to the jury," and to renew that motion after trial. Fed. R. Civ. P. 50(a)(2), (b). "The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2).

"Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." *Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007) (citing *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000)). "In making that determination, a court may not assess the credibility of witnesses or weigh the evidence." *Halcomb v. Woods*, 610 F. Supp. 2d 77, 80 (D.D.C. 2009) (citing *Hayman v. Nat'l Acad. of Sciences*, 23 F.3d 535, 537 (D.C. Cir. 1994)); *see also* Wright & Miller, 9B Fed. Prac. & Proc. Civ. § 2524 at 250–57 (3d ed. 2018)). "Even if the Court finds the evidence that led to the jury verdict unpersuasive, or that it would have reached a different result if it were sitting as the fact-finder, that is not a basis for overturning the jury's verdict and granting judgment as a matter of law." *Pitt v. Dist. of Columbia*, 558 F. Supp. 2d 11, 16–17 (D.D.C. 2008). Thus, "the

Court must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in her favor." *Halcomb*, 610 F. Supp. 2d at 80.

Defendant makes two arguments in its motion. The questions before the Court are 1) whether the Mayors adequately established that Great-West's breach of contract caused the Mayors damages and 2) whether the jury had enough evidence to award damages in the amount that it did without engaging in guesswork or speculation.[2] *See* Mot. at 9. The Court will address each argument in turn.

## II.  CAUSATION

A breach of contract is "an unjustified failure to perform all or any part of what is promised in a contract entitling the injured party to damages." *Window Specialists, Inc. v. Forney Enters., Inc.*, 106 F. Supp. 3d 64, 89 (D.D.C. 2015) (citing *Fowler v. A & A Co.*, 262 A.2d 344, 347 (D.C. 1970)). "A 'material' breach is one where the injured party received something substantially less or different from that for which he bargained." *Id.* Causation is an element of a breach of contract claim. *See, e.g.*, *Tsintolas Realty Co. v. Mendez*, 984 A.3d 181, 187 (D.C. 2009) ("To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach."). Nonetheless, "[n]ominal damages at least can be recovered immediately upon the happening of the breach." *Wright v. Howard Univ.*, 60 A.3d 749, 753 (D.C. 2013); *see also Window Specialists*, 106 F. Supp. 3d at 92 ("If a party establishes breach of contract but fails to prove actual damage or its proof of damages is vague or speculative, the party is entitled to no more than nominal damages.").

---

[2]  The Court notes that Defendant does not argue that it is entitled to judgment as a matter of law as to breach and has therefore waived this argument.

5

Few D.C. cases discuss failure to adequately prove causation, but under "Maryland law, the element of proximate causation for breach of contract lost profit damages is satisfied when the breach was a substantial factor in causing the loss."[3] *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 32 A.3d 456, 472–73 (Md. Ct. Spec. App. 2011); *see also Parr v. Ebrahimian*, 70 F. Supp. 3d 123, 133 (D.D.C. 2014) ("[T]o survive a motion for summary judgment based on the asserted insufficiency of proof of damages, a plaintiff need not, at this stage, show the amount of damages; he is obligated only to show that they exist and are not entirely speculative."); *cf. Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior*, 624 F. Supp. 2d 1, 13 (D.D.C. 2009) (noting that federal law requires plaintiffs establish "the fact of losses that were the natural and proximate result of the breach of contract").

Great-West claims that by failing to address and disprove all of Great-West's evidence and theories, Reply at 1, Plaintiffs failed to establish a "causal connection between Great-West's breaches and any lost profits damages at all," Mot. at 25. This argument incorrectly assumes that Plaintiffs needed to disprove each of Great-West's theories, rather than to make their own affirmative case supported with evidence of breach, causation, and damages.[4] *Cf. Bldg. Servs. Co. v. Nat'l R.R. Passenger Corp.*, 305 F. Supp. 2d 85, 98 (D.D.C. 2004) (granting defendant's summary judgment motion where plaintiff failed to provide evidence of its claims). Plaintiffs made out an affirmative case that Great-West did not perform as promised. Among other

---

[3] Since "D.C. imported the common law of Maryland . . . D.C. courts have 'customarily looked to post-1801 decisions of the Court of Appeals of Maryland for assistance in interpreting the law.'" *Hensel Phelps Constr. Co. v. Cooper Carry Inc.*, 861 F.3d 267, 272 (D.C. Cir. 2017) (quoting *Heard v. United States*, 686 A.2d 1026, 1029 (D.C. 1996)) (alterations omitted).

[4] For example, Great-West argues Plaintiffs did not "identify even a *single* specific, additional sale to a municipal organization . . . that would have occurred had Great-West's performance measured up to the Mayors' standards." Mot. at 29. But this is Great-West's theory of the case, which the jury rejected, despite having ample opportunity to consider it. There is more than one way to breach a contract.

examples, the record included testimony from USCM membership such as Stephen Benjamin, Mayor of Columbia, S.C., and USME staff such as Kathryn Kretschmer-Weyland, both of whom described Great-West as an organization that quickly became recalcitrant in fulfilling its obligations under the contract. *See generally*, Tr. Jan. 9, 2018 PM, at 11–15; 18–22; 28–34; 36; 45–46; 51; 128–129; 131; Tr. Jan. 10, 2018 AM, at 37–38; 45–59; 73–78; 81; 90–92; 106–109. Internal emails showed that Great-West personnel believed the contract was no longer valuable and intended to "tank the deal," *see, e.g.*, Tr. Jan. 12, 2018 PM, at 57–59, and that Great-West had divided employees between selling the Mayors' program and the state-based program, *see, e.g.*, Tr. Jan. 10, 2018 AM, at 56–59. The Mayors also presented evidence that one of Great-West's Vice Presidents, and the employee responsible for running the Mayors' program, Brent Neese, was not only distracted and submitting false spending reports relating to his work with that program, *see, e.g.*, Tr. Jan. 11, 2018 AM, at 89–91; Tr. Jan. 12, 2018 PM, at 26–27, but he appeared to have a difficult working relationship with Kathryn Kretschmer-Weyland—his primary point of contact with the Mayors—that Great-West did little to remedy, *see, e.g.*, Tr. Jan. 10, 2018 AM, at 76–78; 81. The record contains evidence of other factors that Great-West argues contributed to the program's poor performance, *see* Mot. at 27, which the jury had ample opportunity to consider. Ultimately, Plaintiffs presented evidence sufficient to show that Great-West promised to perform, was able to perform, and then failed to perform as promised, and thus breached the contract to Plaintiffs' detriment.

> In addition, the Court specifically instructed the jury on causation as a necessary element:
>
> If you find that Great-West breached the contracts or the implied covenant of good faith and fair dealing, you must determine whether that breach caused the Mayors damages. Except in the case of nominal damages, which I will explain in a moment and which are permitted in breach-of-contract cases, even if you find Great-West breached, you may not award damages unless Great-West's breach caused the damages.

7

Jury Instructions at 11, ECF No. 220; Tr. Jan. 22, 2018 AM, at 39–40. Counsel for Great-West emphasized the importance of causation as an element several times in his closing argument. *See* Tr. Jan. 22, 2018 PM, at 15–16; 30; 48–50; 57. And, at Great-West's request, the Court gave additional instructions on excuse from performance and substantial performance. Jury Instructions at 11–12; Tr. Jan. 22, 2018 AM, at 40–41. Both concepts emphasize that if other factors prevented Great-West from performing, it should not be held to account for ensuing damages. The substantial performance instruction also made clear that if the Mayors did not perform or performed sub-optimally, the jury should weigh that in assessing liability. There is no reason to believe the jury did not understand and follow these instructions. Indeed, the jury took extensive notes throughout the trial and, when appropriate, wrote detail-oriented questions to the parties about evidence and testimony just presented. *See, e.g.*, Tr. Jan. 11, 2018 PM, at 31; Tr. Jan. 16, 2018 PM, at 166; Tr. Jan. 19, 2018 AM, at 9–10; 73.

The Mayors presented sufficient evidence to support the conclusion that while they worked hard to perform and uphold their end of the bargain, Great-West did not. There was evidence that Great-West had conflicting interests because of its state-based programming, that Great-West's Vice President in charge of the Mayors' program was engaged in unethical behavior and distracted from his work, that Great-West leadership tried to change the structure of the contract to avoid doing the work they had agreed to do because the contract began to seem less profitable to them than other contracts, and that Great-West sent inexperienced personnel on sales calls. Whether or not the Court found this evidence persuasive is not the proper question at this stage. Rather, the question is whether there was sufficient evidence to support the conclusion that Great-West breached their contract with the Mayors and caused damages. The Court finds that there was.

## III. DAMAGES

In arguing that the Mayors failed to provide the jury with a "non-speculative means of measuring . . . lost profits," Mot. at 9, Great-West is too eager to discount the evidence the jury had before it.

Recoverable damages in a breach of contract action include those arising "directly from the breach itself, or [which] could reasonably have been in contemplation of both parties when they made the contract." *Mercer Mgmt. Consulting, Inc. v. Wilde*, 920 F. Supp. 219, 238 (D.D.C. 1996). Actual lost profits are generally available but cannot be awarded based on a speculative estimate. *Country Club Assocs. Ltd. P'ship v. FDIC*, 918 F. Supp. 429, 436 (D.D.C. 1996); *see also Hill v. Rep. of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) ("[A] plaintiff may recover damages for past economic losses if such losses are 'reasonably proved.'"). Methods for estimating lost profits include "evidence of past performance by an established business, or profits made by others." *Mercer Mgmt.*, 920 F. Supp. at 238 (citing Restatement (Second) of Contracts § 352, cmt. b (1981) (*hereinafter* "Restatement"); *see also* 24 Williston on Contracts § 64:11 (4th ed. 2018) (noting that courts "use a variety of methods to prove lost profits").[5]

"While an award may not be based on speculation or guesswork, it may be a just and reasonable estimate based on relevant data. Probable and inferential considerations as well as direct and positive proof may provide the basis for an award." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 902 (D.C. 2008). Although "[d]oubts are generally resolved against the party in breach," Restatement § 352 cmt. a, the "[f]ailure to offer a

---

[5] *See also CapitalKeys, LLC v. Dem. Rep. Congo*, 278 F. Supp. 3d 265, 272 (D.D.C. 2017) ("Expectation damages typically are measured by (a) the loss in the value to [the injured party] of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, *less* (c) any cost or other loss that [the injured party] has avoided by not having to perform.") (citing Restatement § 347).

9

'reasonable basis for calculating' damages means that the plaintiff 'has not met its burden of proof' to recover damages for breach of contract, and may only recover nominal damages." *Klayman*, 255 F. Supp. 3d at 167; *see also Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."); Williston on Contracts § 64:10 ("Defendant cannot, however, on this account, after having held out these glowing assurances to the plaintiff, and after failing and refusing to allow the plaintiff an opportunity to make good on them, be allowed to avoid recompensing him.").

Both parties argue by analogy but diverge as to which analogy best fits this case.[6] Great-West claims this case is most like one in which an untested product is brought to market and

---

[6] The parties also disagree vehemently over what constitutes a "reasonable certainty" in measuring damages. In their effort to show that the weight of authority supports their respective understandings, the parties stray in their briefing from D.C. law. Plaintiffs would prefer the Court refer to New Jersey law as stated in *V.A.L. Floors, Inc. v. Westminster Communities, Inc.*, 810 A.2d 625, 630 (N.J. Super. Ct. App. Div. 2002) ("In fact, we do permit considerable speculation by the trier of fact as to damages . . . the rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery.") (quotation marks and alterations omitted). *See* Opp'n at 5. Meanwhile, Defendant would prefer the Court rely on appraisals of Illinois and Texas law as stated in *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 817 (5th Cir. 2017) ("Generally, Illinois courts consider evidence of lost profits in a new business too speculative to sustain the burden of proof. This 'new business rule' also applies to new product lines in established businesses when profits are difficult to measure. . . . This rule is not ironclad, however.") and *Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276 (Tex. 1994) (explaining that "anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated" and concluding that "TI's inability to produce a working model . . . despite the strong positive incentive of profit and the stronger negative incentive of avoiding very substantial liability, indicates that Teletron's proposed business was not feasible"), *see* Mot. at 16, 17; Reply at 14 & n.7. These cases illustrate that states vary in terms of the precision required to prove damages.

10

fails, through no fault of the contracting entities.[7] Mot. at 11. Plaintiffs contend this case is more similar to an established brand destroyed through Defendant's breach of contract.[8] Opp'n at 8. In fact, what happened is that two established entities came together to sell a product that was somewhat similar to other products on the market; both entities were experts in the field and believed the product would be successful; one brought branding power and the other brought a sales force. Based on the record here, both believed that they would be successful.

Great-West's primary argument is that Plaintiffs refused time and again "to articulate a single, distinct damages theory on which they were relying." Mot. at 6 (citing Tr. Jan. 17, 2018 AM, at 38–42). Plaintiffs respond that the jury had before it testimonial and documentary evidence showing the value of the Mayors' previous contract with Nationwide, which had ranged from between $1.5 million per year paid to the Mayors for their endorsement, up to at least $3 million per year. Tr. Jan. 17, 2018 AM, at 38–41. And Plaintiffs showed that these previous payments from Nationwide informed how Great-West's senior executives valued the contract. *See* Tr. Jan. 9, 2018 AM, at 56–57. On September 22, 2012, Great-West's President of

---

[7] *See, e.g.*, *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (granting summary judgment to defendant on lost profits claim and noting that "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate"); *Booker v. Ralston Purina Co., Inc.*, 699 F.2d 334, 336−37 (6th Cir. 1983) (affirming the conclusion that lost profits were "too speculative and uncertain to sustain a damage award" because "the product had yet to prove itself as a winner and therefore [as] profitable").

[8] *See, e.g.*, *Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1040 (2d Cir. 1992) (reversing judgment notwithstanding the verdict because there was sufficient evidence and the "jury was properly instructed as to the standard it was to apply in assessing [the] proof of damages, and there is no reason to believe that it ignored the court's instructions"); *Agfa-Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1523 (7th Cir. 1989) ("When a distributor obligates himself to use his best efforts to promote a product and then breaks his contract, the remedial question is indeed how much he would have sold had he used his best efforts, implying diligent and energetic promotion."); *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614–15 (2d Cir. 1979) (noting that Defendant was "bound to make a good faith effort to see that substantial sales of [Plaintiff's] products were made" and given its failure to do so, the judge may a reasonable estimate of royalties that would have been due).

Retirement Services, Charlie Nelson, wrote to Great-West's then-CEO, Mitchell Graye, regarding how much Nationwide had paid for a contract with the Mayors in the past. Ex. PX-348. Thus, the Mayors claimed that these senior executives were aware that "Nationwide had offered up to $6 million to retain [the program]," and that Great-West valued the program in September 2012 accordingly. Tr. Jan. 9, 2018 AM, at 57. Because the parties had entered into ten-year contracts, the Mayors argued they would prove the value of the "harm done to the Mayors" was at least "$30 million, and probably more." *Id.*

Plaintiffs also argued that although the attachments to the Agreements were not contractual obligations, they did provide evidence of the parties' expectations, a view that was supported by testimony from USME staff and Great-West employees. Tr. Jan. 9, 2018 PM, at 11 (Mayor Benjamin testifying that the Mayors expected to receive $3 million annually); Tr. Jan. 11, 2018 AM, at 31–32 (the Mayors' accountant testifying that the Mayors' expectations came from Great-West's projections); Tr. Jan. 19, 2018 AM, at 62–63 (Great-West's employee, Rob Dwyer, testifying that the attachments showed "how the math works to recoup the money" that Great-West had paid the Mayors in a lump sum at the beginning of the contract period). In addition, Steven Bresler, Great-West's corporate representative, testified that Great-West expected to recoup its advance as represented in the examples attached to the contracts, *see* Tr. Jan. 19, 2018 AM, at 62–63, and Plaintiffs argued that the examples attached to the contracts "demonstrate how repayment was expected to work," Opp'n at 14. The Mayors also point to evidence from Great-West's own documents, which support the view that the parties consistently contemplated recruiting program participants at the levels reflected in the attachments to the Agreements, i.e., 38,000 participants were expected in the first year, 114,000 participants in the second year, and so on. *Id.* at 15 (citing Exs. D-120, D-155). These documents referred "to

'Plan Projections' and 'Plan Assumptions,'" *id.*, and Kathryn Kretschmer-Weyland testified that Great-West was the source of the data in the examples and that she had encouraged Great-West to "use conservative numbers in the examples," *id.* at 12 (citing Tr. Jan. 10, 2018 AM, at 61–62). All of this information was available to the jury to calculate the damages the Mayors incurred as a result of Great-West's breach.

Great-West argues that the $8 million verdict "has no basis in the theories and calculations Plaintiffs argued to the jury." Mot. at 8. But Great-West is mistaken about the precision required in determining damages. Juries are not required to show their work. *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 65 (D.D.C. 2011) ("All damages must be demonstrated with reasonable certainty . . . although mathematical precision is not required."). In their closing argument, Plaintiffs argued that they had presented the jury with sufficient evidence to award over $30 million in damages. *See* Mot. at 8; Tr. Jan. 22, 2018 AM, at 81–82. But the jury also had before it evidence that the Mayors provided less support in implementing the program than Great-West expected, Mot. at 11, and that other factors in the market may have contributed to some of the marketing failures, *id.* at 21. What's more, the Court instructed the jury that certain evidence could only be used for a limited purpose. Tr. Jan. 22, 2018 AM, at 31–33. These instructions precluded the jury from using Nationwide's offers or payments to the Mayors as the basis for calculating what the Mayors would have received from Great-West but explained this evidence could be relevant to what the parties expected when they entered into the Agreements. *Id.* at 31–32. The Court also instructed the jury that the contract attachments were "hypothetical examples" and that "Great-West's failure to achieve the numbers contained in these hypothetical examples does not represent a contractual

13

breach." *Id.* at 31. These limiting instructions may well account for the damages figure below $30 million.

The jury also found that Great-West breached the implied covenant of good faith and fair dealing. *See Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1087 (D.C. 2008) ("[E]very contract contains within it an implied covenant of both parties to act in good faith and damages may be recovered for its breach as a part of a contract claim."). "There is no single definition of good faith and fair dealing, as the duty varies depending upon the context in which it arises." *Window Specialists*, 106 F. Supp. 3d at 89. "Good faith requires 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Id.* (quoting Restatement § 205 cmt. a). "A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Restatement § 205 cmt. d.

Precisely determining damages resulting from a failure to execute a contract in good faith can be challenging, but so long as plaintiffs can provide reasonable support for their damages claim, a defendant cannot avoid liability by arguing the damages calculation is imprecise. *See Mergentime Corp. v. Wash. Metro. Area Transp. Auth.*, 2006 WL 416177, at *76 (D.D.C. Feb. 22, 2006) (finding that failure to exert best efforts cannot be excused by "financial difficulty or economic hardship"); *see also Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 615 (2d Cir. 1979) (observing that "when it is certain that damages have been caused by a breach of contract, and the only uncertainty is to their amount, there can rarely be good reason for refusing on account of such uncertainty, any damages whatever for the breach," and that a "person

violating his contract should not be permitted entirely to escape liability because the amount of damage which he caused is uncertain").

The jury's determination that Great-West breached the contract and that damages flowed from the breach is a reasonable one. Not only did the jury have before it concrete figures to help them calculate damages, *see, e.g.*, Opp'n at 15–18; Tr. Jan. 12, 2018 PM, at 16; 20; 22; Leshinsky Tr. Jan. 11, 2018 AM, at 7, the Court also provided extensive instructions on how to do so, *see, e.g.*, Tr. Jan. 22, 2018 AM, at 39–40. The jury was instructed that "[i]f the Mayors did not fully perform all the duties under the contracts, then [the jury] must decide whether they substantially performed those duties . . . [and if they did], then Mayors are entitled to receive all damages to which they are entitled under the contracts, minus any compensation to Great-West for defects in performance." *Id.* at 40–41. With regard to damages related to breach of the implied covenant of good faith and fair dealing, the Court instructed the jury that Plaintiffs had the burden to prove their damages and that the basic principle is that "the injured party should be put in as good a position as if the other party had fully performed its obligations under the contract." *Id.* at 43. The Court went on to instruct the jury in detail about incidental and consequential damages and stated that "[d]amages must be determined with reasonable certainty from the evidence presented." *Id.*; *see also id.* at 45. The Court also instructed the jury that nominal damages are appropriate where there is breach but "no proven damages resulting or that the damages are only speculative." *Id.* at 44.[9] These instructions provided the jury with the necessary framework to make a decision based on the evidence before it.

---

[9] Moreover, as mentioned *supra*, the jury was attentive and visibly engaged throughout the trial—asking questions at the appropriate times and taking copious notes. The jury appears to have taken on its job as factfinder seriously and to have deliberated carefully. Nothing suggests that they were inflamed with bias or failed to understand or adhere to the Court's instructions.

## CONCLUSION

The evidence before the jury provided a reasonable basis for the damages awarded. The jury returned a verdict, and Great-West is unhappy with it, but it nevertheless has support in the record. Because a reasonable jury could have reached—and did reach—a verdict in Plaintiffs' favor, the Court denies Defendant's motion for judgment as a matter of law. A separate Order accompanies this Memorandum Opinion.

August 29, 2018                                        _____
                                                                                 Thomas F. Hogan
                                                              SENIOR UNITED STATES DISTRICT JUDGE